**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**

```
 1              UNITED STATES BANKRUPTCY COURT
             EASTERN DISTRICT OF NORTH CAROLINA
 2                    RALEIGH DIVISION

 3

 4    IN THE MATTER OF:          )
                                 )  Chapter 7
 5        BRANDON SCOTT BAXLEY,  )
                                 )  Case No. 18-03406-5-DMW
 6                    Debtor     )

 7

 8

 9

10

11                    DEPOSITION

12                       OF

13             MARTHA VIRGINIA BAXLEY

14          October 29, 2019 - 1:04 p.m.

15             Raleigh, North Carolina

16

17

18

19    Reported By:  Lisa A. Wheeler, RPR, CRR

20

21

22

23

24

25
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                                          **Page 2**

```
 1    A P P E A R A N C E S:

 2    On behalf of the Trustee:

 3          George Mason Oliver, Esq.
            Oliver & Cheek
 4          405 Middle Street
            New Bern, North Carolina 28563
 5          (252) 633-1930
            george@olivercheek.com
 6

 7    On behalf of the Bankruptcy Administrator:

 8          Brian C. Behr, Esq.
            Kirstin Gardner, Esq.
 9          U.S. Bankruptcy Administrator Office
            434 Fayetteville Street, Suite 640
10          Raleigh, North Carolina 27601
            (919) 334-3881
11          brian_behr@nceba.uscourts.gov
            kirstin_gardner@nceba.uscourts.gov
12

13    On behalf of Martha Baxley and Baxley
      Corporation, LLC:
14
            Benjamin E.F.B. Waller, Esq.
15          Hendren, Redwine & Malone
            4600 Marriott Drive, Suite 150
16          Raleigh, North Carolina 27612
            (919) 420-7867
17          bwaller@hendrenmalone.com

18    On behalf of the Debtor:

19          William P. Janvier, Esquire
            Janvier Law Firm
20          311 East Edenton Street
            Raleigh, North Carolina 27601
21          (919) 582-2323
            bill@janvierlaw.com
22

23    Also Present:  Tanya Aycock

24

25
```

1

2

3            This is the deposition of MARTHA

4    VIRGINIA BAXLEY taken pursuant to Notice of the

5    parties and in accordance with the Federal Rules

6    of Civil Procedure before Lisa A. Wheeler, RPR,

7    CRR, in the offices of the U.S. Bankruptcy

8    Administrator, 434 Fayetteville Street, Suite

9    640, Raleigh North Carolina, on the 29th day of

10   October, 2019, beginning at 1:04 p.m.

11            The reading and signing of this

12   transcript is reserved.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      I N D E X

 2                                                    PAGE

 3   EXAMINATION BY MR. OLIVER                            5

 4   EXAMINATION BY MR. BEHR                             65

 5   EXAMINATION BY MR. OLIVER                           82

 6   EXAMINATION BY MR. BEHR                             83

 7   EXAMINATION BY MR. OLIVER                           84

 8

 9                    E X H I B I T S

10
     M. BAXLEY
11   NUMBER             DESCRIPTION                   PAGE

12   EXHIBIT 36   Baxley Corporation Account            79
                  QuickReport, November 10, 2017
13                - March 14, 2018, and Bicycle
                  Burger Weekly Sales Reports
14

15                PREVIOUSLY MARKED EXHIBITS

16   EXHIBIT 15   Chart of Credit Card Charges,         42
                  Capital One - Spark Business
17                Account Ending 9690

18   EXHIBIT 16   Chart of Credit Card Charges,         44
                  Brandon Baxley, Capital One -
19                Spark Business Account Ending
                  9690
20
     EXHIBIT 20   IRS Employer Identification           12
21                Number Letter, 5/17/2016

22   EXHIBIT 21   Bank of America Bank Checking         13
                  Account Statement, May 31,
23                2016, to May 31, 2016

24   EXHIBIT 22   Bank of America Signature Card        14
                  and Account Opening Documents,
25                April 4, 2019
```

```
 1                 P R O C E E D I N G S
 2   Whereupon,
 3                 MARTHA VIRGINIA BAXLEY,
 4   having been first duly sworn, was examined
 5   and testified as follows:
 6                        EXAMINATION
 7   BY MR. OLIVER:
 8        Q.   So I'm George Oliver.  We met just a
 9   few minutes ago.
10        A.   Yes.
11        Q.   I'm representing the trustee in your
12   husband's bankruptcy case --
13        A.   Yes.
14        Q.   -- Holmes Harden.
15        A.   Yes.
16        Q.   We also -- around the table we have
17   Brian, Tanya, and Kirstin from the Bankruptcy
18   Administrator's Office and then we have -- I
19   think you probably met Bill Janvier.  Of
20   course --
21        A.   I haven't.
22        Q.   -- you've met --
23             MR. JANVIER:  I don't think so.
24             MR. OLIVER:  Okay.  I'm sorry.
25             MR. JANVIER:  Nice to meet you.
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                          Page 6

```
 1              THE WITNESS:  You, too.
 2   BY MR. OLIVER:
 3        Q.   Yeah.  Bill is your husband's lawyer
 4   and then --
 5        A.   Yes.
 6        Q.   -- of course, you know Ben.  And then
 7   Lisa Wheeler here is taking down what we say.
 8   And so I'll ask you if you've ever done this
 9   before.
10        A.   No.
11        Q.   Okay.  So it's a conversation, but we
12   have to be careful not to talk over each other --
13        A.   Right.
14        Q.   -- and we have to be careful to use
15   verbal responses instead of shakes and nods and
16   uh-huhs, okay?  And if you don't understand a
17   question, please let me know and I will try to
18   rephrase it for you or -- or maybe it's just a
19   bad question.  I can ask it a better way.
20        A.   Okay.
21        Q.   And sometimes I may have to remind you
22   of these rules.  I'm not trying to be rude, but I
23   am trying to make the best transcript we can do.
24        A.   Okay.
25        Q.   Okay.  Great.  So if you need a break
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                                     Page 7

```
 1   any time, please let me know.  I would ask that

 2   you answer whatever question's on the table so I

 3   don't lose my place.  Is that good?

 4        A.   Yes.

 5        Q.   Okay.  And Brian may have some

 6   questions for you also after I get done.  We've

 7   got the same kind of things, but I don't know

 8   what's in his brain exactly so --

 9        A.   Okay.

10        Q.   -- we'll do our best.  So I have

11   questions about your husband's bankruptcy but

12   also --

13        A.   Uh-huh.

14        Q.   -- Baxley Corp., LLC.

15        A.   Uh-huh.

16        Q.   Who are the owners of Bax- -- Baxley

17   Corp., LLC?

18        A.   Myself and my father-in-law, Rudy.

19        Q.   Rudy.

20        A.   Uh-huh.

21        Q.   We just talked to Rudy.

22        A.   Yes.

23        Q.   Okay.  What percentage do you own?

24        A.   75.

25        Q.   And what percentage does he own?
```

1      A.    The rest, 25.

2      Q.    25.  Okay.  And I understand that the

3  company was formed around May of 2016?

4      A.    Yes.

5      Q.    Okay.  And that your father-in-law --

6  the way he described it is he gave money to

7  Brandon to invest in Nello's, 30-, $35,000.  He

8  doesn't know when.  They caught Nello's cheating

9  and so they sued.

10      A.    Uh-huh.

11      Q.    And then the money came from a

12  settlement from a lawsuit and he said he directed

13  that money go into Baxley Corp., LLC, and if it

14  wasn't paid back to Rudy within a year, he would

15  have 25 percent ownership.

16      A.    That's the way I understand it.  I was

17  not involved personally in any of that.

18      Q.    Okay.  Who was involved in that?

19      A.    My husband, I guess.

20      Q.    Okay.

21      A.    Yeah.

22      Q.    And his dad?

23      A.    Yes.

24      Q.    Okay.  So before -- if he's right about

25  the time line as I understand it, then the

 1   settlement with Nello's happened December of '16,

 2   and a year after that would have been December of

 3   '17, and that would mean that he would have

 4   gotten 25 percent sometime after December of '17

 5   or in December of '17.  Does that sound right to

 6   you or is it different?

 7        A.   I have -- I -- I really am not aware of

 8   the specifics.

 9        Q.   Okay.  I see.

10        A.   Yeah.  I'm sorry.

11        Q.   So -- so you know at some point, he got

12   25 percent?

13        A.   Yes.

14        Q.   But before that who owned that --

15        A.   I'm not aware.  I'm just -- I'm not

16   sure of the time line.

17        Q.   Okay.

18        A.   Yeah.

19        Q.   Right.  Right.  Okay.  Who owned that

20   25 percent before he did?

21        A.   I did.

22        Q.   So you owned a hundred percent when it

23   was formed?

24        A.   Uh-huh.

25        Q.   Yes?

1      A.   Yes.

2      Q.   Okay.  Sorry.

3      A.   Sorry.

4      Q.   I've got to --

5      A.   No.

6      Q.   What amount of money did you pay for

7   your hundred percent ownership when the company

8   started?

9      A.   Well, I know that I gave Brandon

10   $10,000.

11      Q.   Okay.

12      A.   Yeah.

13      Q.   And what was that for?

14      A.   It was because we were trying to keep

15   the doors open.

16      Q.   Okay.  Is that when the company

17   started?

18      A.   Yeah.  It -- well, it was early 2016.

19   It was when my daughter was still in the

20   hospital.

21      Q.   Okay.  What was --

22      A.   Yeah.

23      Q.   -- your daughter in the hospital for?

24      A.   She was born nine weeks early, so we

25   were in the hospital for three months.

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                                      Page 11

```
1        Q.   So it was when she -- when was she
2   born?
3        A.   She was born February 2016.
4        Q.   February 2016.  Okay.
5        A.   Uh-huh.
6        Q.   And is that the time that Baxley Corp.
7   was being started?
8        A.   Yes.
9        Q.   Okay.  About the -- about that time
10  when she was in the hospital -- she was in the
11  hospital for nine weeks?
12       A.   Yes.
13       Q.   Okay.
14       A.   Well, no.  She was born nine weeks
15  early.
16       Q.   Oh, I'm sorry.
17       A.   She was in the hospital for six weeks
18  and I was in the hospital before she was born for
19  three weeks, so --
20       Q.   Gotcha.  So that's the --
21       A.   -- it was nine weeks.
22       Q.   -- nine weeks?  Okay.  I understand.
23       A.   Yeah.
24       Q.   So that nine weeks would take us to, I
25  don't know, mid March, early April?
```

1      A.   I can't tell you for sure --

2      Q.   Okay.

3      A.   -- when it was.  You could look at --

4    you'll have my savings account records and you

5    could look at withdrawals --

6      Q.   Okay.

7      A.   -- from that time.

8      Q.   All right.

9      A.   It wasn't a $10,000 withdrawal.  It was

10   several -- it was at least a couple -- two or

11   three withdrawals --

12     Q.   Okay.

13     A.   -- around that time.

14     Q.   And -- and you gave that to Brandon to

15   start the company?

16     A.   Uh-huh.

17     Q.   Okay.  Yes?

18     A.   Yes.

19     Q.   Okay.

20          (EXHIBIT 20, IRS Employer

21   Identification Number Letter, 5/17/2016, was

22   previously marked for identification.)

23   BY MR. OLIVER:

24     Q.   We have looked at some documents

25   earlier today and I'm going to show you -- those

```
 1   have already been numbered.  I may have some more
 2   for you with new numbers, but this was Exhibit 20
 3   from this morning and this is -- this is
 4   something that was -- yeah, that's right.  Ben
 5   will help us.  Number 20.  This is the IRS giving
 6   the employer identification number for Baxley
 7   Corp., LLC, which is done when the company is
 8   formed so that you can have a number for taxes,
 9   right?
10        A.   Okay.
11        Q.   It says, Baxley Corporation, Brandon
12   Baxley, sole member.  Was he the sole member when
13   it was formed?
14        A.   That is not my understanding, no.
15        Q.   Okay.
16             (EXHIBIT 21, Bank of America Bank
17   Checking Account Statement, May 31, 2016, to May
18   31, 2016, was previously marked for
19   identification.)
20   BY MR. OLIVER:
21        Q.   The next thing we looked at was Exhibit
22   21, which is the opening of a bank account for
23   Baxley Corp., LLC.
24        A.   Uh-huh.
25        Q.   And this looks like it was opened on
```

1    May 31st of 2016.

2          A.    Okay.

3          Q.    Do you see that there where it's zero

4    balance and then there's money put in to start

5    the account?

6          A.    Yes.

7                (EXHIBIT 22, Bank of America Signature

8    Card and Account Opening Documents, April 4,

9    2019, was previously marked for identification.)

10   BY MR. OLIVER:

11         Q.    The next exhibit is 22 and if you could

12   go to the fourth page of Exhibit 22, I'm going to

13   ask you about that.  So this is the opening of

14   the Bank of America account on May 31st of 2016.

15         A.    Okay.

16         Q.    Do you see that Brandon has done that?

17         A.    I see his name, yes.

18         Q.    Does that look like his handwriting?

19         A.    No.

20         Q.    What about the next page, does that

21   look like his signature?

22         A.    That does look like his signature.

23         Q.    Okay.  And if you go -- if you see

24   above his signature it says, in witness whereof

25   and intending to bind the company, I have

1  hereunto subscribed my name as a member/manager

2  of the company this 31st day of May, 2016.

3          Is that what he signed?

4      A.   Yes, that's what I see there, too.

5      Q.   And on the page before that he is

6  listed as the member/manager in two different

7  places, isn't he?

8      A.   Yes.  I see that.

9      Q.   Are you aware that he also signed his

10  e-mails as like managing director, manager, those

11  sorts of things?

12     A.   I'm -- I'm not familiar with his

13  e-mails, yeah.

14     Q.   Okay.

15     A.   Yeah.

16     Q.   And these are e-mails that he sent on

17  behalf of Baxley Corp., LLC?

18     A.   Okay.

19     Q.   You're not familiar with any of those

20  e-mails?

21     A.   I haven't -- we don't e-mail back and

22  forth through his work account.

23     Q.   Okay.

24     A.   Yeah.  So I've not seen his

25  signature --

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                                    Page 16

```
 1        Q.    Okay.

 2        A.    -- that I can recall.

 3        Q.    When -- when this Nello's settlement

 4   happened --

 5        A.    Uh-huh.

 6        Q.    -- the way I understand it from looking

 7   at the lawsuit, and it doesn't always tell the

 8   story, but there was a company called Commercial

 9   Holdings Corp. --

10        A.    Okay.

11        Q.    -- that was the plaintiff.

12        A.    Okay.

13        Q.    Were you ever an owner in Commercial

14   Holdings Corp.?

15        A.    No.

16        Q.    Was that all owned by Brandon?

17        A.    I'm not even familiar with that --

18        Q.    Okay.

19        A.    -- company so I couldn't tell you.

20        Q.    Did you have any involvement in the

21   company that invested in Nello's?

22        A.    I did not.

23        Q.    Okay.  Do you have any knowledge of

24   that lawsuit or the dispute?

25        A.    I don't.  To be perfectly honest with
```

```
 1   you, I intentionally kept my ears closed.  I told
 2   Ben this yesterday, but my -- one of my best
 3   friends' brother-in-laws that -- was the guy that
 4   started Nello's.  So I --
 5       Q.   Okay.
 6       A.   -- didn't want it to interfere with
 7   friendship so from the very beginning, I was not
 8   wanting that relationship to happen.
 9       Q.   Okay.
10       A.   Yeah.  So I did -- I just tuned it out,
11   didn't --
12       Q.   Did -- did you understand that money
13   had come from that lawsuit back to Brandon's
14   company, the Commercial Holdings Corp.?
15       A.   I was aware of that, yes.
16       Q.   Do you know how much money it was?
17       A.   I am not aware of the specific amount,
18   no.
19       Q.   Are you aware generally of how much it
20   was?
21       A.   I am hesitant to say because I don't --
22   I -- I've never -- I'm not -- no.
23       Q.   Was it more than $500,000?
24       A.   No.  Gosh, no.
25       Q.   Was it less than $100,000?
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                            Page 18

```
 1        A.    Yes.

 2        Q.    Okay.

 3        A.    Yeah.

 4        Q.    Do you know what happened to that

 5   money?

 6        A.    It was used for operations of the

 7   company.

 8        Q.    Which company?

 9        A.    Baxley.

10        Q.    Okay.

11        A.    Yeah.

12        Q.    Baxley -- what is it?  Baxley Corp.,

13   LLC?

14        A.    Uh-huh.

15        Q.    Okay.  So that was deposited from --

16   directly into the Baxley Corp., LLC, from the

17   settlement?

18        A.    I have no idea.

19        Q.    Okay.

20        A.    Yeah.

21        Q.    You don't know anything about that

22   transaction --

23        A.    Uh-uh.

24        Q.    -- or how the money flowed?

25        A.    Correct.
```

1      Q.   Okay.

2      A.   Yeah.

3      Q.   Do you know how much your father-in-law

4  gave to your husband to invest in Nello's back

5  when it first happened?

6      A.   I don't.

7      Q.   Okay.  Do you know if that number was

8  the same as the number that came from the Nello's

9  settlement or less?

10     A.   I have no idea.

11     Q.   Okay.  Back to Exhibit 22.  The first

12  page here, this is a -- a bank document from --

13  if you turn to the third page, you'll see it's

14  from April 4th of 2019.

15     A.   Which page are you looking at, the

16  fourth?

17     Q.   Third -- third -- the third page of

18  Exhibit 22.

19     A.   Okay.

20     Q.   You see it's from April 4th of 2019?

21     A.   Uh-huh.

22     Q.   Who signed there on behalf of the

23  business?

24     A.   That looks like Brandon's signature.

25     Q.   Okay.  And this is saying that -- this

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                    Page 20

1    is -- if you go to the first page, it's

2    author- -- it's listing the authorized persons to

3    sign on the company bank account.

4          A.   Uh-huh.

5          Q.   Go to that first page with me, please.

6    Do you see who's listed as authorized signatures?

7          A.   I do see that.

8          Q.   It's Rudolph Baxley, Brandon Baxley,

9    and Jonathan Keith, right?

10         A.   Correct.

11         Q.   Why are you not listed as an authorized

12   signer?

13         A.   I don't know.

14         Q.   Do you sign checks for Baxley Corp.,

15   LLC?

16         A.   I do.

17         Q.   Did you back in April of 2019?

18         A.   I -- yes.  That's this year, right?

19   Yes.  Yes.

20         Q.   Okay.  Did you authorize the company to

21   take you off as a signer as of April 4th, 2019?

22         A.   Not that I recall, no.

23         Q.   Go -- turn through this exhibit until

24   you get to -- down at the bottom right there's

25   little numbers.  It says, BANA_Baxley.  Go to the

1    one that says BANA_Baxley-939.

2            MR. WALLER:  I hope you can read that.

3            THE WITNESS:  I can.

4            MR. OLIVER:  Huh?

5            MR. WALLER:  I said I hope she can read

6    that.

7            MR. OLIVER:  Oh.

8        A.  I just turned 40 so my eyesight hasn't

9    gone yet.

10       Q.  I've just got my first bifocals.  I'm

11   with you.  This -- it looks like -- that's it.

12   Yeah.  So do you see the account number on that?

13   It ends in 9364.

14       A.  Yes.

15       Q.  And if you go back to the first page,

16   it ends in 9348.  So that's two different

17   accounts, right?

18       A.  I'm sorry.  I'm -- I'm mixed --

19       Q.  On the first --

20       A.  -- up again.

21       Q.  -- page the account number's 9348.

22       A.  Oh, yes, I see that there.

23       Q.  So there's two different accounts, two

24   different authorizations for the two accounts?

25       A.  Yes.

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**                    Page 22

```
 1        Q.   How many Bank of America accounts did
 2   Baxley Corp., LLC, have?
 3        A.   I was aware of two.
 4        Q.   Just these two?
 5        A.   Yeah.
 6        Q.   The two that are here?
 7        A.   Yes.
 8        Q.   Do you see that on this Page 939 you're
 9   also not listed as a signer for that account
10   either?
11        A.   I do see that.
12        Q.   It's just Jonathan Keith, Brandon
13   Baxley, and Rudolph Baxley, right?
14        A.   Correct.
15        Q.   And is that also signed on April 4th by
16   Brandon Baxley?
17        A.   It appears to be, yes.
18        Q.   Okay.  What are Brandon's day-to-day
19   duties with Baxley Corp.?
20        A.   Mac- -- mainly project management.
21        Q.   Okay.
22        A.   Yes.
23        Q.   What does that mean?
24        A.   He directs crews on the ground, lines
25   up equipment, whatever you do to manage a
```

```
 1   project.

 2        Q.   Okay.  Has that always been his role

 3   with Baxley Corp.?

 4        A.   As far as I know.

 5        Q.   Okay.  And since 2016 when it started?

 6        A.   Yes.  He's always been directing crews.

 7        Q.   Has his role ever changed since the

 8   business started as far as his -- his day-to-day

 9   duties?

10        A.   I am not involved in the daily

11   operations --

12        Q.   Okay.

13        A.   -- so I'm not familiar with all of it.

14        Q.   So do you -- is it fair to say you

15   don't know exactly what he does day to day?

16        A.   Everything that he does day to day, no,

17   I -- I'm not familiar.

18        Q.   Okay.

19        A.   Yeah.  I have a general idea.

20        Q.   Is it fair to say you don't know if his

21   duties have changed since 2016?

22        A.   Yeah, I don't know.

23        Q.   Okay.

24        A.   Yes.

25        Q.   What are your duties with the company?
```

```
 1        A.    Financial responsibility.

 2        Q.    Okay.  What does that mean?

 3        A.    Uh-huh.  That means that all of the

 4   bond lines, the insurance, the credit lines with

 5   vendors is all me.

 6        Q.    Now, you're the only one that would

 7   have signed a personal guaranty for those things,

 8   right?

 9        A.    Correct.

10        Q.    Okay.  You're --

11        A.    As far as I know.

12        Q.    -- the only one that would have signed

13   for a bond?

14        A.    Yes --

15        Q.    And --

16        A.    -- as far as I know.

17        Q.    -- credit lines?

18        A.    Yes.

19        Q.    Any sort of borrowing would have just

20   been in your name?

21        A.    Yes.

22        Q.    Okay.  Anything else that are your --

23   your duties for the company?

24        A.    I sign checks.  I don't know why I'm

25   not on there, but I do sign checks.
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                    Page 25

```
 1        Q.    Okay.  Does anyone else sign checks?

 2        A.    I have never seen anyone else sign a

 3   check.

 4        Q.    Okay.

 5        A.    So I'm not -- I'm not aware of who else

 6   signs.  Seems that these three people all have

 7   that right, too.

 8        Q.    Okay.  How did -- who gives -- who

 9   tells you what checks to sign?

10        A.    Brandon.

11        Q.    Okay.  And they are just presented to

12   you in a stack to sign?

13        A.    Uh-huh.

14        Q.    Yes?

15        A.    Yes.

16        Q.    Okay.  Has that always been the case

17   since the company started?

18        A.    Yes.

19        Q.    Who does the profit and loss and

20   balance sheets for the company?

21        A.    I am not familiar with who that would

22   be.

23        Q.    Have you ever seen one?

24        A.    No.

25        Q.    Okay.  Does the company have
```

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**                                    Page 26

```
 1   QuickBooks?

 2        A.   Yes.

 3        Q.   Have you ever accessed it?

 4        A.   No.  We have a -- a -- Less Back

 5   Office, a company that work -- we work with.

 6        Q.   What's it called?

 7        A.   Less Back Office.

 8        Q.   L-e-s?

 9        A.   Yes.  L-e-s-s.

10        Q.   Oh, Less.  I'm sorry.

11        A.   Yes.

12        Q.   I thought it was the name of a

13   person --

14        A.   No.

15        Q.   -- like Leslie Backoffice.  All right.

16   So Less --

17        A.   They -- they handle --

18        Q.   Sorry.

19        A.   -- like the bookkeeping.

20        Q.   So they handle that for the company?

21        A.   Yes.

22        Q.   Have they always done that since '16,

23   since it started?

24        A.   I'm not aware of when they came into

25   the relationship.
```

1      Q.   Okay.  And what sort of things do they

2  do for accounting for the business?

3      A.   I don't work with them directly so I

4  can't speak to that.

5      Q.   Who does?

6      A.   I -- I don't know if that's Brandon or

7  Jonathan or -- it probably would not be Rudy so

8  one of the two --

9      Q.   Okay.

10     A.   -- Brandon or Jonathan.

11     Q.   Okay.  So you don't receive like profit

12  and loss statements?

13     A.   Uh-uh.  I've never seen one.

14     Q.   Okay.  Or balance sheets?

15     A.   I've never seen one.

16     Q.   Do you review the tax return before

17  it's filed?

18     A.   I do and I sign for it.

19     Q.   I understand you sign for it.

20     A.   Yes.

21     Q.   Do you review it in detail before you

22  sign it?

23     A.   I looked at it before I signed it, yes.

24     Q.   Okay.  Are you the only person that

25  signs it?

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                    Page 28

```
 1        A.    I am not sure.

 2        Q.    Okay.

 3        A.    Yeah.  I don't remember.  I don't

 4   recall any other signatures.

 5        Q.    Do you --

 6        A.    I was the only one that it was

 7   presented to at the time that I signed it.

 8        Q.    Okay.  Do you speak with the accountant

 9   yourself about the tax return?

10        A.    I don't.

11        Q.    Who does?

12        A.    I don't know.

13        Q.    Who -- who --

14        A.    I've not witnessed those conversations.

15        Q.    Who presents the tax return to you to

16   sign?

17        A.    Brandon gave it to me.

18        Q.    Okay.

19        A.    Yes.

20        Q.    Has that been the case since the

21   company started?

22        A.    Yes.

23        Q.    Okay.  Did -- how many hours a week

24   would you say Brandon works for the company?

25        A.    60.
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                    Page 29

```
 1        Q.    That's what Jonathan said so sounds
 2   about right.  How many hours a week do you think
 3   Jonathan works for the company?
 4        A.    60.
 5        Q.    Okay.  And how about Rudy?
 6        A.    60.
 7        Q.    Okay.  And how about you?
 8        A.    Ten to 12.
 9        Q.    Okay.  And is it all from your home?
10        A.    Yes.
11        Q.    I understand that's where the office
12   is?
13        A.    It is.
14        Q.    All right.  How long has the business
15   been located in your home?
16        A.    From inception.
17        Q.    Okay.  I imagine the employees don't
18   come there, right; they're just out in the field?
19        A.    No.  They do sometimes.
20        Q.    They do?
21        A.    Yeah, to pick up paychecks and stuff.
22        Q.    I see.  Okay.
23        A.    Yes.
24        Q.    Do you remember a time that Jonathan
25   became a manager of the company?
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**

Page 30

```
1        A.   I -- do I remember when he beca- --
2   like are you asking if I remember --
3        Q.   Do you remember him being hired?
4        A.   I do, yes.
5        Q.   Okay.  Was that early in the company,
6   like 2016?
7        A.   Perhaps.
8        Q.   Okay.
9        A.   Yeah.
10       Q.   Do you remember his role ever changing
11  since he was hired?
12       A.   Yes.
13       Q.   Okay.  When was that?
14       A.   I don't -- I'm not -- I'm not aware of
15  the time line.
16       Q.   Okay.  In what way did his role change?
17       A.   Well, I believe he started off doing
18  mostly estimating and -- and bidding.
19       Q.   Okay.
20       A.   And he still does that, but he also
21  manages the company --
22       Q.   Okay.
23       A.   -- for us.
24       Q.   Do you know when he started doing that?
25       A.   I -- I don't.
```

1      Q.   Do you know why he started doing that?

2      A.   I don't.  I was not involved in that

3   conversation or decision.

4      Q.   Okay.  You didn't decide to promote him

5   to manager, for example?

6      A.   No.

7      Q.   Who did that?

8      A.   I assume Brandon.

9      Q.   Okay.  Do you know if the timing of

10   that had anything to do with Brandon filing

11   bankruptcy?

12      A.   I don't.

13      Q.   Okay.

14      A.   I don't know.

15      Q.   It looks like it was within a week or

16   ten days of the same thing so I just didn't --

17      A.   Okay.

18      Q.   -- know if there was a reason.

19      A.   I don't know.

20      Q.   Don't know?

21      A.   Yeah.

22      Q.   We had asked for some documents and

23   I've got a bunch of them.  Did you help organize

24   those or did someone else do that?

25      A.   Jonathan did the Baxley Corporation

```
 1    documents.

 2         Q.    Okay.

 3         A.    Yeah.

 4         Q.    Gotcha.  Where did he find all those

 5    documents?

 6         A.    I -- I assume in his computer.  I don't

 7    know.

 8         Q.    Okay.

 9         A.    I don't know what documents were

10    presented to you.

11         Q.    Does the company keep financial

12    documents in paper form?

13         A.    We have lots of files at home in our

14    basement.

15         Q.    Okay.

16         A.    Yes.  So I imagine he came over and

17    went through those as well.

18         Q.    I gotcha.

19         A.    Yeah.

20         Q.    So what -- how far back do you keep

21    records?

22         A.    I am not involved in the filing of

23    records so I don't know.

24         Q.    Okay.

25         A.    I'm not familiar.
```

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**                                    Page 33

```
1        Q.   Who handles that?

2        A.   Brandon works from our house mostly.

3        Q.   So he would --

4        A.   Yeah.

5        Q.   -- do the filing?  He would know where

6   everything is?

7        A.   I assume so, yeah.

8        Q.   Okay.  Gotcha.  You don't know; he

9   would know --

10       A.   Per --

11       Q.   -- is that fair?

12       A.   I would -- yes.

13       Q.   Okay.

14       A.   It's not me.

15       Q.   I understand.  What sort of

16  compensation does Brandon get from the business,

17  from -- from Baxley Corp.?

18       A.   He -- he doesn't.  He doesn't get a

19  paycheck.

20       Q.   Doesn't get a paycheck?

21       A.   Correct.

22       Q.   Why does he work 60 hours a week for

23  no --

24       A.   Because we're hoping --

25       Q.   -- paycheck?
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                    Page 34

```
 1        A.    -- to build something where he will get

 2   a paycheck.

 3        Q.    Okay.  So he's never received a

 4   paycheck?

 5        A.    Not that I'm aware of.

 6        Q.    Does he have a set amount that he would

 7   be paid if the business could afford to pay him?

 8        A.    I don't believe we've had any

 9   discussions around that.

10        Q.    Okay.

11        A.    Yeah.

12        Q.    So he's not owed payroll checks that he

13   hasn't been paid; he just --

14        A.    I have no idea.

15        Q.    Okay.

16        A.    Yeah.

17        Q.    Who would know that?

18        A.    Perhaps Jonathan.

19        Q.    Okay.

20        A.    Yeah.

21        Q.    The company isn't carrying like a debt

22   to Brandon for past payroll?

23        A.    I have no idea.

24        Q.    Okay.  Gotcha.

25        A.    Yeah.
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                    Page 35

1      Q.   Because that would be on the balance

2    sheet, right, and you haven't seen those?

3      A.   Correct.  I haven't seen those.

4      Q.   Does the company pay any of Brandon's

5    expenses?

6      A.   Some of our -- our household expenses

7    like power bill, cell phones --

8      Q.   Okay.

9      A.   -- yeah, because we have a home office.

10     Q.   All right.

11     A.   Uh-huh.

12     Q.   Other than the power bill and cell

13   phones, what other sorts of personal expenses

14   does the company pay for you?

15     A.   I am -- I told this to Ben yesterday.

16   Brandon and I keep our finances totally separate,

17   so I have bills I pay and he has bills he -- he

18   pays, but I'm not --

19     Q.   Okay.

20     A.   -- aware of the specifics of what he

21   pays and how much and --

22     Q.   So you have your own bank account that

23   he's not on?

24     A.   Yes.

25     Q.   That's a personal account?

```
 1        A.    Yes.

 2        Q.    Okay.  What sort of bills do you pay

 3    from that account?

 4        A.    Our mortgage --

 5        Q.    Okay.

 6        A.    -- water bill, sewer, recycling, trash,

 7    car insurance, childcare.  There's probably a lot

 8    more I'm forgetting.  Groceries.

 9        Q.    Grocery -- okay.

10        A.    Diapers.

11        Q.    What does Brandon pay?

12        A.    I -- like I said, I --

13        Q.    Are there other household bills that --

14        A.    I mean -- yeah.

15        Q.    -- you can just list?

16        A.    So like our power bill and our cell

17    phone bill.

18        Q.    Okay.  And he -- he pays that from his

19    own account?

20        A.    I don't -- I have not witnessed him

21    paying them, so I don't know if the company

22    writes a check or if he writes a check.  So I --

23        Q.    Okay.

24        A.    -- couldn't tell you.

25        Q.    You know they are paid because the
```

1  power works and the cell phones work, right?

2        A.   Yes.

3        Q.   But you don't know if he has a personal

4  account or just uses the company account?

5        A.   I don't know.  We are completely

6  separate.

7        Q.   Does the --

8        A.   He's not even on my accounts so...

9        Q.   Does he have a bank account in his own

10  name?

11        A.   I don't -- you'd have to ask him.

12        Q.   Okay.

13        A.   Yeah.  I don't know.

14        Q.   Okay.  You just don't know if he has a

15  bank account?

16        A.   I know that sounds weird, but we don't.

17        Q.   I -- I'm -- no.  I'm -- I'm not

18  judging.  I'm just --

19        A.   We don't --

20        Q.   -- curious.

21        A.   We don't have our finances combined

22  whatsoever, so I don't --

23        Q.   Okay.

24        A.   We don't file taxes together.  We

25  don't...

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                           Page 38

1        Q.   If he didn't have a bank account, I
2   don't know if he does or not, in his own name,
3   what source of money would he have for -- to buy
4   anything?
5        A.   I don't know.  You'd have to ask him
6   that.
7        Q.   Okay.
8        A.   Yeah.
9        Q.   So you don't ever give him money?
10       A.   No.
11       Q.   Right.  Do you know if he has a credit
12   card in his own name?
13       A.   I don't know.  I know we have credit
14   cards.  I don't know if they're company or
15   personal.
16       Q.   Okay.
17       A.   Yeah.
18       Q.   You -- I saw some records that looked
19   like he does have a company credit card and
20   you --
21       A.   Okay.
22       Q.   -- do, too.
23       A.   I do.  I know I do, yes.
24       Q.   What do you use your -- yours for?
25       A.   For gas for meetings and stuff and

```
 1    lunch meetings and --

 2         Q.   Okay.

 3         A.   -- things like that.  Yeah.

 4         Q.   Nothing else?  You don't use anything

 5    for personal items?

 6         A.   I don't, no.

 7         Q.   No.  Your -- your credit card, do you

 8    use your business credit card for any personal

 9    items?

10         A.   I don't.

11         Q.   Okay.

12         A.   No.

13         Q.   I thought you said I don't know.  I'm

14    sorry.  You said --

15         A.   No.  I said --

16         Q.   -- I don't, comma, no.

17         A.   -- I don't, no.  Yes.  Sorry.

18         Q.   It's like that Less --

19         A.   That's confusing.

20         Q.   -- that pesky Les Backoffice guy.  Do

21    you know if Brandon uses his company credit card

22    for personal items?

23         A.   I -- I do not know how he uses his.

24         Q.   Do you ever look at the company credit

25    card statements?
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                      Page 40

```
1        A.    I do not.

2        Q.    Do you look at the company bank

3   statements?

4        A.    I do not.

5        Q.    Who does?

6        A.    I assume Brandon and Jonathan.

7        Q.    Okay.

8        A.    Yeah.

9        Q.    You've never looked at the company bank

10   statements or credit card statements?

11       A.    I don't recall that I've ever seen

12   them.

13       Q.    Okay.

14       A.    Yeah.

15       Q.    Did you guys go on a vacation to Turks

16   and Caicos?

17       A.    We did.

18       Q.    About a year ago, maybe?

19       A.    We did.

20       Q.    Okay.  Do you know how that was paid

21   for?

22       A.    Brandon paid for it.

23       Q.    Do you know if he paid for it using the

24   company credit card?

25       A.    I don't know.
```

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**                              Page 41

```
 1        Q.   Does it matter to you as a -- as an
 2   owner of the company whether he uses the company
 3   credit card for personal items?
 4        A.   I trust my husband so --
 5        Q.   Okay.
 6        A.   -- I let him make those decisions.
 7        Q.   Okay.
 8        A.   Yeah.
 9        Q.   And you just don't know whether he does
10   or doesn't --
11        A.   I -- I don't know.
12        Q.   -- use it for personal items?
13        A.   Yes.  Yeah, I don't know.
14        Q.   Okay.  Have you ever discussed -- as
15   the owner of the company have you ever discussed
16   putting a limit on what he can charge on the card
17   in a month?
18        A.   No.
19        Q.   Do you have any idea what he has
20   charged on the card?
21        A.   No.
22        Q.   Okay.  Would you be surprised to know
23   that he's charging things like Soccer Shots on
24   the company credit card?  Is that for your kids'
25   soccer activities?
```

1       A.   That sounds familiar, yeah.

2       Q.   Okay.  Would it --

3       A.   Yeah.

4       Q.   -- surprise you to know that he's using

5    company money to do that?

6       A.   Maybe.  I don't know.

7       Q.   Okay.

8       A.   Yeah.  It's -- was not a significant

9    amount of money.

10      Q.   Okay.

11      A.   Yeah.  It's like $75 or something.

12      Q.   What about purchase of alcohol, is that

13   something you would expect him to do on the

14   company credit card?

15      A.   Maybe.  I don't know.  I know that he

16   gifts that to clients a lot.

17      Q.   Okay.

18      A.   Yeah.

19      Q.   And the Turks and Caicos vacation, if

20   that was on a credit card statement, is that

21   surprising to you as the owner?

22      A.   I -- I don't know.

23      Q.   Okay.

24      A.   Yeah.  I'm sorry.

25           (EXHIBIT 15, Chart of Credit Card

```
 1   Charges, Capital One - Spark Business Account

 2   Ending 9690, was previously marked for

 3   identification.)

 4   BY MR. OLIVER:

 5        Q.   There was -- we looked at what was

 6   being charged on the company credit card just for

 7   a three-month period, and if you go to Exhibit

 8   Number -- I'll tell you -- Exhibit Number 15.  We

 9   looked at all the people that have company credit

10   cards.

11        A.   Uh-huh.

12        Q.   There's seven people.

13        A.   Okay.

14        Q.   At that time, it was you, Dencil

15   Harrison, Sam Bradford, Rudolph Baxley, Dustin

16   Johnson, Jeff Jackson, and Jonathan Keith.

17        A.   Okay.

18        Q.   And we looked at each month, August,

19   September, and October, and looked at the totals

20   that was charged by each person on --

21        A.   Okay.

22        Q.   -- their card.  You see the totals

23   there are about $67,000 or something for those

24   three months for all seven people?

25        A.   Okay.
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                     Page 44

1              (EXHIBIT 16, Chart of Credit Card

2      Charges, Brandon Baxley, Capital One - Spark

3      Business Account Ending 9690, was previously

4      marked for identification.)

5      BY MR. OLIVER:

6          Q.   And then we looked at what Brandon was

7      charging and that's Exhibit 16.  This is for the

8      same time frame and he charged $111,000 on his

9      own --

10         A.   Uh-huh.

11         Q.   -- on the company cards.  Does that

12     number surprise you?

13         A.   With the amount of money that I believe

14     the company spends on equipment and gas and fuel

15     and food to feed crews, no.

16         Q.   Okay.

17         A.   Yeah.

18         Q.   So you think these are --

19         A.   He also books --

20         Q.   -- for equipment?

21         A.   -- all the hotel rooms for all the guys

22     and things like that.

23         Q.   Okay.

24         A.   Yeah.

25         Q.   All right.  Fair to say that you just

```
 1  never have seen this information because you

 2  don't look at the credit card statements?

 3       A.   Yes, I've never seen --

 4       Q.   Okay.

 5       A.   -- that information.

 6       Q.   1211 Wake Forest Road, what is that

 7  address?

 8       A.   That's our house.

 9       Q.   So the credit card statements come to

10  Martha V. Baxley, Baxley Corporation, at 1211

11  Wake Forest Road.  Fair to say that you don't

12  open these when they came in?

13       A.   I've never even -- yeah, I don't open

14  them.

15       Q.   Okay.

16       A.   Yeah.

17       Q.   All right.  Does Brandon have a Venmo

18  account?

19       A.   I have no idea.

20       Q.   Okay.  Because I saw something tying

21  that to the company account.  I was just

22  wondering if you were aware that he's paying that

23  from the company funds.  Did you have any idea?

24       A.   I am not aware of a Venmo account.

25       Q.   Tell us about the investment in Plates
```

 1   Kitchen.

 2        A.   I don't know how much I can tell you.

 3   I was not involved in that.

 4        Q.   Okay.

 5        A.   Yeah.

 6        Q.   Are you aware that Brandon had an

 7   investment in Plates?

 8        A.   I'm aware that he was involved.  I'm

 9   not aware that he ever actually gave them any

10   money.

11        Q.   Do you know whether that was an

12   involvement personally or through Baxley Corp.?

13        A.   I think it was personal.  I don't know.

14   Honestly, I don't -- I -- I shouldn't say because

15   I don't know the specifics.  I wasn't involved.

16        Q.   Okay.  Was he a manager at Plates?

17        A.   I don't know what his title would have

18   been.

19        Q.   Do you know whether he received any

20   compensation from Plates?

21        A.   He did not.

22        Q.   And you don't know if he put any money

23   into Plates?

24        A.   I know that he put some money into

25   upgrading the decor.

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                         Page 47

1      Q.   Okay.

2      A.   Yeah.  And some repairs.

3      Q.   I saw a --

4      A.   I think he might have helped with

5    payroll a few times.

6      Q.   Where would he have received that

7    money --

8      A.   I don't know.

9      Q.   -- if he doesn't have a bank account in

10   his personal name?

11     A.   I'm not saying he doesn't.  I'm

12   saying --

13     Q.   No.  I -- I --

14     A.   -- I'm not aware of.

15     Q.   I know.  I'm just saying --

16     A.   Yeah.

17     Q.   -- assume for a second he doesn't.

18   Would the only source of money have come from

19   Baxley Corp., LLC?

20     A.   I -- I can't say.

21     Q.   Okay.

22     A.   I don't know his finances.

23     Q.   Do you know anything about Bicycle

24   Burger?

25     A.   I do not.

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                        Page 48

```
 1        Q.    Do you know if he had an investment in

 2   that?

 3        A.    I -- I'm not aware of that either.

 4        Q.    Okay.  Or a company called Raleigh

 5   Foods, LLC, do you know anything about that?

 6        A.    No.

 7        Q.    Okay.  Do you own a condo in Ramsgate?

 8        A.    My family does.

 9        Q.    It's your family condo?

10        A.    Yes.

11        Q.    Okay.  That -- you don't have any

12   ownership in that or --

13        A.    No.

14        Q.    -- or Brandon doesn't?

15        A.    It's my mom and her brothers and

16   sisters.

17        Q.    Okay.  Do you know anything about

18   Carolina Landscapes North Carolina, LLC?

19        A.    Uh-uh.

20        Q.    I'm sorry.  No?

21        A.    I'm sorry.  No.  Yes.

22        Q.    I saw an e-mail from Brandon stating

23   that in November '15, he was converting that into

24   Baxley Corporation.  Was there any sort of merger

25   between the two?
```

 1          A.    I'm not aware of that.

 2          Q.    Okay.  Are you -- do you have any sort

 3    of -- other than being the owner, are you in any

 4    sort of management position with Baxley Corp.,

 5    LLC?

 6          A.    That's my title, manager, yes.

 7          Q.    Manager?

 8          A.    Uh-huh.

 9          Q.    Okay.  Are you also an officer?

10          A.    I don't believe I've ever signed that

11    title before.

12          Q.    Okay.

13          A.    Yeah.

14          Q.    Any sort of officer, president, vice

15    president, secretary, treasurer --

16          A.    I don't --

17          Q.    -- assistant secretary?

18          A.    I'm not aware.

19          Q.    Okay.

20          A.    Yeah.  Whenever I've signed my name,

21    I've signed manager.

22          Q.    Okay.  And who are the other managers

23    of the company?

24          A.    Jonathan.

25          Q.    Just the two of you?

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                              Page 50

```
 1        A.    And -- I mean, I -- maybe Rudy.  I
 2   don't know Rudy's title --
 3        Q.    Okay.
 4        A.    -- to be honest with you.
 5        Q.    And at some point, Brandon was a
 6   manager, wasn't he?
 7        A.    Yes.
 8        Q.    Okay.  Is it your understanding that
 9   Brand- -- Brandon stepped down as manager at the
10   same time Jonathan became a manager?
11        A.    I -- yes.
12        Q.    Okay.  Is it fair to say that you don't
13   know which jobs Baxley Corporation, LLC, is
14   involved in right now?
15        A.    Specific jobs, no.  I'm not involved in
16   the daily operations.
17        Q.    Okay.  And that's been the case since
18   it opened in 2016?
19        A.    Correct.
20        Q.    Okay.  You had said that your -- your
21   duties are financial responsibility and you
22   listed like bond lines, insurance, credit lines
23   with vendors.  Fair to say that you're not
24   involved with the day-to-day money in, money out
25   for the company?
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                           Page 51

```
 1        A.    Yes.

 2        Q.    Okay.  Because you don't look at the

 3   bank statements?

 4        A.    Correct.

 5        Q.    Or the credit card statements?

 6        A.    Correct.

 7        Q.    Okay.  Do you know anything about the

 8   accounts receivable that's owed to the company at

 9   any given time?

10        A.    No.  I'm not involved in that.

11              (Reporter asks to repeat.)

12              THE WITNESS:  I said, no, I'm not

13   involved in that.

14   BY MR. OLIVER:

15        Q.    Do you know how much the company's

16   expenses are in a given month?

17        A.    I do not.

18        Q.    Okay.  Do you know whether the

19   company's expected to make money this year or

20   lose money?

21        A.    I do not.

22        Q.    How much are you paid by Baxley Corp.?

23        A.    I'm not paid by Baxley Corp.

24        Q.    Okay.  Do you have a job outside of

25   Baxley Corp. that you work for?
```

```
 1        A.    I get paid through Baxley Leasing.

 2        Q.    Okay.

 3        A.    Yeah.

 4        Q.    How much are you paid by Baxley

 5   Leasing?

 6        A.    $5,000 a month.

 7        Q.    All right.  And what is that for?

 8        A.    For living expenses.

 9        Q.    No.  I mean, why does the company --

10        A.    Oh.

11        Q.    -- pay you?  What do you do for the

12   company --

13        A.    Oh, I --

14        Q.    -- for Baxley Leasing?

15        A.    I own Baxley Leasing.

16        Q.    Okay.  Do you -- how many hours a month

17   do you -- or week, sorry, do you spend working

18   for Baxley Leasing?

19        A.    Ten to 12.

20        Q.    Is it the same ten to 12 you spend for

21   Baxley Corp.?

22        A.    Sure.  Yeah, I would say it's combined

23   between the two.

24        Q.    Okay.

25        A.    Yeah.  Baxley Leasing, there isn't -- I
```

```
 1   mean, there isn't -- it doesn't do work so

 2   there's not --

 3          Q.   Okay.

 4          A.   -- work to do.

 5          Q.   What -- so do you have any duties with

 6   respect to Baxley Leasing, LLC?

 7          A.   Yes.

 8          Q.   What are those duties?

 9          A.   Financial.

10          Q.   Is it the same financial duties that

11   you have for the other company?

12          A.   No.

13          Q.   What are your financial duties for

14   Baxley Leasing, LLC?

15          A.   I lease all of the equipment.

16          Q.   To whom?

17          A.   Baxley Corporation.

18          Q.   Does Baxley Leasing have any clients or

19   customers other than Baxley Corporation?

20          A.   No.

21          Q.   Okay.  What does -- now, we talked

22   about your financial duties.  What is -- what is

23   your involvement with leasing the equipment?

24   What do you have to do?

25          A.   I sign as a guarantor on all of the
```

```
 1   financials.

 2        Q.   How do you determine on behalf of

 3   Baxley Leasing which equipment that you want to

 4   buy?

 5        A.   Jonathan and Brandon --

 6        Q.   So you're -- you're --

 7        A.   -- make those decisions.

 8        Q.   -- not making those decisions?

 9        A.   Correct.  Yeah.

10        Q.   Who set your salary at 5,000 a month

11   from Baxley Leasing?

12        A.   I did.

13        Q.   How did you determine 5,000 a month?

14        A.   I looked at what we needed to pay for

15   our mortgage and what other expenses I needed --

16        Q.   Okay.

17        A.   -- to cover.

18        Q.   How -- is that how you decided how much

19   to charge Baxley Corp. by Baxley Leasing?

20        A.   No.

21        Q.   Okay.  Well, how did you decide how

22   much to charge Baxley Corp. by Baxley Leasing?

23        A.   Jonathan and Brandon and I look at the

24   market value of whatever the equipment is --

25        Q.   Uh-huh.
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                    Page 55

```
 1        A.    -- and decide if it makes sense to try
 2   to purchase it and lease it back to the company
 3   or continue to lease it or rent it from another
 4   company.
 5        Q.    That's United Rentals, right?
 6        A.    Yes.
 7        Q.    Okay.  So Baxley Corp. rents some
 8   things from United Rentals?
 9        A.    Yes.
10        Q.    And it rents some things from Baxley
11   Leasing?
12        A.    Correct.  Yes.
13        Q.    Okay.  And Jonathan and Brandon help
14   you decide which things to buy in the name of
15   Baxley Leasing?
16        A.    Yes.
17        Q.    Okay.  Have you ever determined on your
18   own that you thought a piece of equipment was a
19   good investment for Baxley Leasing or is it
20   always with recommendations --
21        A.    Yeah.
22        Q.    -- from Baxley --
23        A.    Yeah.
24        Q.    -- and -- excuse me, Brandon and
25   Jonathan?
```

1        A.    Yes.

2        Q.    Okay.  Have you ever disagreed with

3   Brandon and Jonathan about the purchase of a

4   piece of equipment for Baxley Leasing?

5        A.    No.

6        Q.    And the way you set your salary from

7   Baxley Leasing was to determine what your family

8   needed on a monthly basis for expenses?

9        A.    I -- sure.  Yes.

10       Q.    Does Baxley Leasing -- is it

11  profitable?

12       A.    It makes enough profit for me to get

13  paid a distribution.

14       Q.    And that distribution is the 5,000 a

15  month?

16       A.    Uh-huh.

17       Q.    Yes?

18       A.    Yes.

19       Q.    So Baxley Leasing, what other expenses

20  does it have?  Does it have any employees?

21       A.    Just myself.

22       Q.    Okay.

23       A.    Yeah.  It has insurance and then, you

24  know, the interest rates on the equipment we're

25  leasing.

1       Q.    Who does it buy or lease equipment

2    from?

3       A.    I can't recall the companies.  I don't

4    have that in front of me.

5       Q.    Is Baxley Leasing leasing equipment

6    from other companies?

7       A.    We're financing it.

8       Q.    So sometimes --

9       A.    We don't own anything yet.

10      Q.    Sometimes you do that under a purchase

11   and sometimes you do it under equipment lease.

12   Do you know which it is for Baxley?

13      A.    It's -- I believe it's a purchase,

14   yeah.

15      Q.    Okay.  So Baxley Leasing is buying

16   equipment and then leasing that equipment to

17   Baxley Corporation for a set amount each month?

18      A.    Each -- each piece of equipment would

19   have a different set value, yeah.

20      Q.    Okay.  How much does Baxley Corp. pay

21   to Baxley Leasing each month for leasing the

22   equipment?

23      A.    I don't have the financial information

24   in my head and I don't have it --

25      Q.    Okay.

```
1        A.    -- in front of me so I could -- I
2    couldn't tell you.
3        Q.    Is there a ballpark?  Do you know
4    generally how much it is?
5        A.    I don't know.  15- to 20,000, maybe --
6        Q.    Okay.
7        A.    -- maybe --
8        Q.    I gotcha.
9        A.    -- if you're asking for me to --
10       Q.    No.
11       A.    -- try to guess.
12       Q.    I just want to get a scope.
13       A.    Okay.
14       Q.    I didn't know if it was over 50- or --
15   it's not as much as 30-?
16       A.    I don't -- I can't say for sure.
17       Q.    Okay.  If it was 20- -- again,
18   hypothetical, if it was 20-, can I assume that
19   the other expenses of Baxley Leasing would be
20   around 15- that would allow you to get 5-?  So
21   does it -- is Baxley Leasing building money every
22   month or is it paying out everything either in
23   expenses and your salary?
24       A.    I mean, I don't think we're zeroing out
25   the account if that's what you're asking.
```

1      Q.   Okay.

2      A.   Yeah.

3      Q.   Do you --

4      A.   But it's -- the -- I -- the profits

5    aren't anything for me to get excited about.

6      Q.   I understand.  Do you know how much is

7    in the Baxley Leasing account now?

8      A.   I don't, no --

9      Q.   Okay.

10     A.   -- not off the top of my head.

11     Q.   Do you know generally how much it would

12   be?

13     A.   I don't.

14     Q.   Okay.  Are there written leases between

15   Baxley Leasing, LLC, and Baxley Corp.?

16     A.   I assume so.  I can't recall right now.

17   I can't recall right now that I've seen one

18   recently.

19     Q.   Have you ever seen one?

20     A.   I can't recall.

21     Q.   Okay.

22     A.   Yeah.

23     Q.   Do you remember ever signing one?

24     A.   I sign a lot of stuff.  I can't recall

25   specifically.

1      Q.   Okay.

2      A.   Yeah.

3      Q.   If there was a lease, would it have

4   been something that you drafted or something that

5   was presented to you to sign?

6      A.   Probably presented to me to sign, yeah.

7   I have not drafted a lease myself.

8      Q.   Okay.  And who would have presented

9   that to you to sign?

10      A.   Brandon or Jonathan.

11      Q.   Do you know how many -- how many

12   employees Baxley Corp., LLC, has?

13      A.   I sign the paychecks every week.  I

14   don't know.  I can't give you a specific number.

15   30ish, maybe, if I had to guess.

16      Q.   Okay.  When you sign the paychecks, do

17   you compare them to time sheets?

18      A.   I do not.

19      Q.   Do you -- do you verify any of the

20   information or just sign the sta- -- the checks?

21      A.   I just sign the checks.

22      Q.   Okay.  And when you sign other checks

23   for expenses for the company, say health

24   insurance, do you have an invoice with the check

25   or you just sign the check?

```
 1         A.    I usually have invoices with the check.

 2         Q.    You do?

 3         A.    Yeah.

 4         Q.    Okay.  Why -- why did you start Baxley

 5    Corp., LLC?

 6         A.    Me personally are you asking or --

 7         Q.    Yes.

 8         A.    Okay.

 9         Q.    As -- as the owner, why -- why did you

10    start the company?

11         A.    Well, it's -- it was our hope that it

12    would be my exit strategy from working outside

13    of -- for another company, that it was -- that we

14    could get it to be a woman-owned business and

15    that the additional profit that we'd be able to

16    make off of that -- having that label and that

17    status with government contracts would allow us

18    to make enough money to justify me quitting my

19    job.

20         Q.    Did you quit your job?

21         A.    I did.

22         Q.    Okay.  And when did you quit your job?

23         A.    September '18.

24         Q.    So you contin- --

25         A.    About a year ago.
```

```
 1        Q.   So you continued to work full-time

 2   until then --

 3        A.   I did --

 4        Q.   -- at your other job?

 5        A.   -- because I couldn't afford to quit.

 6        Q.   I understand.

 7        A.   Yes.

 8        Q.   And what was that job?

 9        A.   I worked at WakeMed Foundation.

10        Q.   Okay.

11        A.   Uh-huh.

12        Q.   What did you do for them?

13        A.   Nonprofit fundraising.

14        Q.   Okay.  Gotcha.  Did you have any

15   background in construction work --

16        A.   No.

17        Q.   -- when you started Baxley Corp.?

18        A.   No.

19        Q.   Do you have any background in

20   construction work now?

21        A.   No.

22        Q.   Did you have any background in any of

23   the other things that Baxley Corp. has done over

24   the years?

25        A.   No.
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                    Page 63

```
1        Q.   I understand that Jonathan became a

2   manager -- we looked it earlier today -- maybe

3   June of 2018?  Does that sound right to you or do

4   you not know?

5        A.   I have no idea.

6        Q.   Okay.

7        A.   Yeah.

8        Q.   You know it happened at some point?

9        A.   I do know it happened at some point,

10  yeah.

11       Q.   Before that time is it fair to say that

12  Brandon was directing the -- the company?

13       A.   Yes.

14       Q.   Okay.  And that's Baxley Corp., LLC?

15       A.   Uh-huh.  Yes.

16       Q.   Was he making all the day-to-day

17  decisions?

18       A.   As far as I know, yes.

19       Q.   And you were working full-time for

20  WakeMed --

21       A.   Right.

22       Q.   -- Foundation?

23       A.   Yes.

24       Q.   Okay.  Do you know whether that --

25  whether Brandon's involvement has changed since
```

1   Jonathan became a manager?

2        A.   I have no idea.

3        Q.   Okay.  Have you seen -- again, as the

4   owner of the company, have you seen any

5   difference in the way the company was operated

6   before that date and after that date?

7        A.   I'm not involved in operations so I

8   can't --

9        Q.   Okay.

10       A.   -- speak to it.

11       Q.   You just don't know?

12       A.   Yeah.

13       Q.   Okay.  And you and Brandon don't talk

14   about the business at home?

15       A.   We do sometimes, yeah.

16       Q.   Okay.

17       A.   He has -- we have a home office so I

18   hear conversations --

19       Q.   Right.

20       A.   -- on the phone and -- yeah.

21            MR. OLIVER:  Okay.  Can we take a quick

22   break?  I may be done.

23            THE WITNESS:  Okay.

24            (Whereupon, there was a recess in the

25   proceedings from 1:44 p.m. to 1:47 p.m.)

```
 1                    MR. OLIVER:  Thank you.  I think Brian
 2   has a few questions for you.
 3                    THE WITNESS:  Okay.
 4                    MR. BEHR:  Yeah.  Get you out of here
 5   quickly.
 6                         EXAMINATION
 7   BY MR. BEHR:
 8        Q.   Ms. Baxley, my name is Brian Behr.  I'm
 9   a staff attorney with the United States
10   Bankruptcy Administrator's Office.  When did you
11   and Brandon marry, what year?
12        A.   2008.
13        Q.   2008.  Okay.  And were you familiar
14   with all his business dealings from 2008 to the
15   present, generally aware --
16        A.   Aware --
17        Q.   -- what he was doing?
18        A.   Yes.
19        Q.   Okay.
20        A.   Yeah.
21        Q.   So Baxley Corporation was created in
22   mid 2016, right?
23        A.   I know it was 2016.
24        Q.   Okay.  Whenever --
25        A.   Yeah.
```

1        Q.    Whenever it started in 2016, what was

2   Brandon doing immediately prior to that?

3        A.    You mean what project or --

4        Q.    Yeah.  What sort of work was he

5   involved in?

6        A.    He was doing a lot of tree removal and

7   site clearing, I think.

8        Q.    So things similar to what Baxley

9   Corporation, LLC, does?

10       A.    No, I would not --

11       Q.    How did --

12       A.    -- say similar.

13       Q.    -- it change?

14       A.    Well, Baxley does a lot of bridge and

15   infrastructure repair and disaster relief.  He

16   was -- I just remember when my daughter was in

17   the hospital, his big project was Lendlease and

18   they were building a building and he -- they were

19   doing site clearing for it and landscaping stuff,

20   planting things.

21       Q.    So that was the business prior to 2016?

22       A.    Yes.

23       Q.    Okay.  What equipment -- well, let

24   me -- let me strike that question.  Let me ask it

25   a different way.

 1              You mentioned that he needed $10,000 to

 2      keep the lights on around the time of mid 2016;

 3      is that right?

 4          A.    Uh-huh.

 5          Q.    All right.  And what -- what sort of

 6      lights on?  I don't understand.

 7          A.    Payroll.

 8          Q.    Payroll?

 9          A.    Yeah.

10          Q.    So he had people working for him?

11          A.    Yeah.

12          Q.    Okay.  And so he had projects when he

13      initially started?

14          A.    Yeah.

15          Q.    Okay.  And at that point, did you buy

16      your equity in the company?

17          A.    I don't know that I bought my equity

18      into the company, but I -- I gave him -- I gave

19      the company money.

20          Q.    Okay.  So how did the comp- -- so

21      $10,000 is probably not enough money to start a

22      company.  Where did he get the money to start the

23      company?

24          A.    I don't know.

25          Q.    Okay.

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**

Page 68

```
 1        A.    Yeah.
 2        Q.    So he -- he must have brought in some
 3   of his own money?
 4        A.    I don't know.
 5        Q.    Okay.  You don't know how your -- your
 6   company got started?
 7        A.    I mean, I don't know that -- with the
 8   industry that you have -- you get awarded a job,
 9   you work it, you get paid.  That's how you get --
10        Q.    Okay.
11        A.    -- the money.
12        Q.    Presumably, they don't give you any
13   money up front, right, so you got to have -- you
14   have some sunk costs --
15        A.    No.  You get paid for -- you get paid
16   for showing up, yeah, and, actually, that's the
17   majority of contracts.
18        Q.    So they'll -- they'll give you money
19   before you go to the contract?
20        A.    Yeah.
21        Q.    Okay.  And how do you know that?
22        A.    From, I don't know, working for the
23   company.
24        Q.    Okay.  So you're involved in the
25   contracting?
```

```
 1        A.    No.  I hear -- I -- well, I hear the
 2   conversations with Jonathan and Brandon.
 3        Q.    You just overheard?
 4        A.    It's call mobilization.
 5        Q.    Mobilization?
 6        A.    They get paid for -- to mobilize crews.
 7        Q.    Okay.  All right.  So what happened to
 8   the landscaping business in mid 2016?
 9        A.    That Lendlease project completely
10   destroyed it.
11        Q.    Okay.
12        A.    He never got paid.
13        Q.    Did it have equipment at the time?
14        A.    I'm not aware of -- of what equipment
15   it may have had.
16        Q.    Okay.  Did any of the equipment get
17   transferred into Baxley Leasing?
18        A.    Not that I'm aware of.
19        Q.    Is it possible?
20        A.    I don't -- Baxley -- oh, into Baxley
21   Leasing?
22        Q.    Yes.
23        A.    No.  Yeah.  That I can say for sure no.
24        Q.    You don't review any of the bank
25   statements or anything like that?
```

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**                              Page 70

```
 1        A.   I have not reviewed them.

 2        Q.   Okay.  You don't know who has what card

 3   for the company?  So like if I give you the last

 4   four digits, you wouldn't be able to tell me, oh,

 5   that's Brandon's card or that's --

 6        A.   No, I would not be able to tell you.

 7        Q.   Okay.  Do you know why -- well,

 8   strike -- let me ask this a different way.

 9             Do you know who Steven M. Day, Jr., is?

10        A.   Steve Day.  Yes, I do.

11        Q.   Who's Steve Day?

12        A.   He's the owner of Plates.

13        Q.   Okay.  Why did Baxley Corporation

14   transfer $90,000 to him on April the 10th, 2018?

15        A.   I don't know.

16        Q.   Does Baxley Corporation have a Square,

17   Inc., account?

18        A.   I don't know.

19        Q.   Who would know the answers to these

20   questions?

21        A.   Brandon or Jonathan.

22        Q.   Okay.  And if it predated Jonathan's

23   being appointed the member/manager, would --

24   would Brandon be the only person who knew the

25   answer?
```

1         A.    Probably, yeah.

2         Q.    In reviewing the bank statements, there

3    appears to be a lot of eating out and mainly in

4    downtown Raleigh establishments.  Do y'all eat

5    out a lot?

6         A.    No, not since we've had kids.

7         Q.    Since you've had kids.  Okay.  Do you

8    know if Brandon eats out a lot?

9         A.    He -- he's on the road a lot so I

10   can't -- I can't speak to where he eats.  If he's

11   not working from home, he's in his truck checking

12   on jobs and meeting with clients.

13        Q.    All right.  Have you -- for tax

14   purposes have you reviewed the -- any sort of

15   payments that Brandon may have received that are

16   a personal benefit to him for purposes of issuing

17   a 1099 or a W-2?

18        A.    I have not.

19        Q.    Okay.  Who would be in charge of that?

20        A.    We have an accountant.

21        Q.    Okay.  And the accountant would be

22   the -- and who's the accountant, I guess?

23        A.    Dan Minor.

24        Q.    And I'm not certain if -- I know

25   Mr. Oliver asked a question relating to this.

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                                    Page 72

```
 1   You don't have any knowledge about an investment
 2   in Plates Kitchen, do you?
 3       A.   I was not aware that we put -- beyond,
 4   like I said, the decor upgrades that we did, I
 5   was not aware of any money that was put into it.
 6       Q.   And what was your understanding of what
 7   you would receive in return for the decor
 8   upgrades?
 9       A.   We were supposed to have ownership down
10   the road --
11       Q.   Okay.  Was it --
12       A.   -- part ownership.
13       Q.   Was there a written agreement?
14       A.   I don't think so.
15       Q.   Who --
16       A.   Not that I'm aware of.
17       Q.   Okay.
18       A.   We -- we -- that was -- yeah.  No, not
19   that --
20       Q.   So your company transferred money to
21   Steve Day --
22       A.   Well, you're telling me that.  I wasn't
23   aware of that.
24       Q.   Okay.  Well, let me --
25       A.   Yeah.
```

1        Q.   -- let me show you real quick so you

2   can see it.  I don't want you to take my word for

3   it.  Here's your bank statement for account

4   ending 9364 April 1st, 2018, through April 30th,

5   2018, Bank of America account.  That highlight

6   right there (indicates).

7        A.   Uh-huh.

8        Q.   So as far as you're aware, there's no

9   sort of written agreement in relation to that?

10       A.   No.

11       Q.   You didn't authorize it as the owner?

12       A.   I did not.  I don't recall that.

13       Q.   When was the last time you understood

14   that your husband or your business had any

15   involvement with Plates Kitchen?

16       A.   It's been a while.  Him and Steve had a

17   falling out.  I don't remember specifically when

18   that was.

19       Q.   Was it in 2019?

20       A.   I -- I wouldn't think so.

21       Q.   Was it before or after the bankruptcy?

22       A.   I honestly have no idea.  I know we did

23   the decor upgrades and it was shortly thereafter.

24   We did the decor upgrades.  I was pregnant with

25   my second.  That was probably January '18 --

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                                    Page 74

```
 1    December and January '18.

 2         Q.   Okay.  And, I'm sorry, Dec- -- December

 3    '17?

 4         A.   December --

 5         Q.   -- January '18?

 6         A.   Yes.

 7         Q.   Okay.  I wanted to make sure --

 8         A.   Thank you.

 9         Q.   -- I got you there.  And you said you

10    don't know anything about Bicycle Burger?

11         A.   I mean, I -- I'm aware of a Bicycle

12    Burger.

13         Q.   Okay.  What is Bicycle Burger?

14         A.   It was a food truck.

15         Q.   Okay.  And did your husband have any

16    involvement in that?

17         A.   He -- well, he's friends with Sam

18    who's -- who was doing it.

19         Q.   Okay.  But --

20         A.   Yeah.

21         Q.   But --

22         A.   I'm not aware of a business

23    relationship they had.

24         Q.   Do you know if Baxley Corp. had

25    invested in Bicycle Burger?
```

```
1         A.    Not that I'm aware of.

2         Q.    Do you know if your husband submitted a

3    insurance claim to State Farm asserting that

4    Baxley Corp. may have had an interest in Bicycle

5    Burger?

6         A.    I'm not aware of that.

7         Q.    Are you familiar with an entity or a

8    food truck called Cue Burger?

9         A.    Yes.

10        Q.    What is Cue Burger?

11        A.    It's a -- it's a food truck.

12        Q.    Okay.  And who holds an interest in

13   that?

14        A.    Baxley Leasing.

15        Q.    So Baxley Leasing is involved in

16   leasing equipment to Baxley Corporation but is

17   also involved in Cue Burger?

18        A.    Yes.

19        Q.    Okay.  Is there any other operations

20   that Baxley Leasing is involved in?

21        A.    No.

22        Q.    Who -- who operates the food truck Cue

23   Burger?

24        A.    John Gates.

25        Q.    Sam Bradford involved?
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                                    Page 76

1       A.    He is now, yes.

2       Q.    Was he involved in Bicycle Burger?

3       A.    Sam was involved in Bicycle Burger,

4   yes.

5       Q.    Was John Gates involved in Bicycle

6   Burger?

7       A.    No.

8       Q.    Does Cue Burger turn a profit?

9       A.    Not that I'm aware of.

10      Q.    Okay.  Who manages the day-to-day

11  operations of Cue Burger?

12      A.    John Gates.

13      Q.    Okay.

14      A.    And I -- I was involved initially with

15  it.

16      Q.    What -- what got you involved in the

17  food truck business?

18      A.    Trying to help my family make money.

19      Q.    Okay.  So what -- what -- did you

20  approach John or did he approach you?  How did --

21  how did that get started?

22      A.    I don't remember how it got started.

23      Q.    Or did Brandon start it up and you just

24  have your name on it?

25      A.    No.  Well -- I see what you're doing

1  there.  I can't -- I can't -- I can't recall how

2  it got started.

3          Q.    I understand that Baxley Corp. recently

4  changed where it banks; is that correct?

5          A.    Yes.

6          Q.    Where does it bank now?

7          A.    Pinnacle.

8          Q.    Pinnacle?  Why did it change banks?

9          A.    Bank of America closed our accounts.

10         Q.    Why did it close our accounts?

11         A.    They said it was flagged for a security

12  alert or something.  I don't even know.  I can't

13  remember the specific language.  They had shut

14  down my personal accounts as well because I --

15  anything that Baxley had been attached to.

16         Q.    Did that give you any concern when you

17  learned that?

18         A.    Yes.

19         Q.    Okay.  What did you do?

20         A.    I opened up another account so I had --

21         Q.    Did -- didn't cause you to go back and

22  review the bank statements at Bank of America to

23  try to see what they might be concerned about?

24         A.    No.  We -- we had -- we had met with

25  the bank manager and decided that it was attached

 1    to perhaps subpoenas from you all to get

 2    information that sent a red flag up.  She said

 3    she'd seen it before.  She said it also could be

 4    the fact that we employ a lot of Hispanics that

 5    cash their checks and don't have bank accounts.

 6         Q.   I'm sorry.

 7         A.   They -- they -- they don't get -- they

 8    don't tell you why --

 9         Q.   Okay.  So you --

10         A.   -- so all you can do is come up with

11    theories.

12         Q.   I -- I'm sorry.  You said you employ a

13    lot of Hispanics.  Are you -- are they illegal

14    workers or --

15         A.   No.  Yeah.

16         Q.   Okay.  No.  So they -- because you're

17    writing them checks in their name and they must

18    have bank accounts in order to cash those, right?

19         A.   No, they don't.  Most Hispanics in that

20    industry do not have bank accounts that I'm aware

21    of.  They cash their check -- they may have bank

22    accounts, but they cash their checks.  They want

23    cash in their pocket every week.

24         Q.   Okay.  Have you ever -- I'm going to

25    label this as -- well, strike that.

1          Let me ask you another question.  P.O.

2   Box 28655, Raleigh, North Carolina, 2611 [sic],

3   who is the owner of that P.O. box?

4          A.   I -- I'm not familiar with the P.O.

5   box.

6          Q.   Okay.  Is it possible that it's your

7   husband's?

8          A.   Sure.

9          MR. BEHR:  What are we on, 37?  I used

10  that one, actually.

11          MS. AYCOCK:  It's 36.

12          MR. BEHR:  35.  36, yeah.

13          (M. BAXLEY EXHIBIT 36, Baxley

14  Corporation Account QuickReport, November 10,

15  2017 - March 14, 2018, and Bicycle Burger Weekly

16  Sales Reports, was marked for identification.)

17  BY MR. BEHR:

18          Q.   I hand you what I've labeled as Exhibit

19  Number 36.  Have you ever seen that before?

20          A.   No.

21          Q.   And that is a Baxley Corporation

22  account QuickReport.  You've never seen that

23  before?

24          A.   I've never seen that.

25          Q.   If you'd turn the page.  And you've

```
 1   never seen the Bicycle Burger weekly sales

 2   reports?

 3        A.   No.

 4        Q.   Okay.  Do you receive weekly sales

 5   reports from Cue Burger?

 6        A.   I do not.

 7        Q.   Who would receive them?

 8        A.   I don't know.

 9        Q.   Do you know if your husband receives

10   them?

11        A.   I don't know.

12        Q.   Have you ever conducted a corporate

13   meeting for Baxley Corporation, LLC?

14        A.   Yes.

15        Q.   When was the last time you conducted

16   one of those?

17        A.   I don't recall the date.

18        Q.   And who would have been present at

19   that?

20        A.   Brandon, Jonathan, Rudy, myself.

21        Q.   Why was Baxley Leasing created?

22        A.   To allow me to quit my job.

23        Q.   Why couldn't you get paid through

24   Baxley Corporation?

25        A.   It wasn't making enough money to pay
```

1   me.

2        Q.   Well, isn't it just paying additional

3   money to Baxley Leasing?

4        A.   It's -- but that's a line item that we

5   would have been paying a rental company.  It's

6   built into the jobs that we bid.

7        Q.   So you include your compensation within

8   that and that's a line item in the contract?

9        A.   No.  Renting equipment to -- to perform

10  a job is written into a bid, into a contract.

11  It's a line item.  You have to rent equipment to

12  perform a job.  My ability to buy it and lease it

13  back at less than market was saving Baxley money,

14  allowing...

15       Q.   Does Baxley Corporation still do

16  landscaping work?

17       A.   Not that I'm aware of.

18       Q.   I'm sorry?

19       A.   Not that I'm aware of.

20       Q.   Hasn't done any landscaping work for

21  R.J. Antonelli?

22       A.   Not that I'm aware of.

23       Q.   Who are the -- other than Hendren,

24  Redwine & Malone, does Baxley Corporation, LLC,

25  have any other attorneys?

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                                    Page 82

```
 1        A.   R.J. Antonelli.

 2        Q.   R.J.  And are you familiar with a

 3   Delaware corporation Baxley Corporation, LLC?

 4        A.   No.

 5             MR. BEHR:  I don't have any further

 6   questions, George.

 7             MR. OLIVER:  Just briefly.

 8                       EXAMINATION

 9   BY MR. OLIVER:

10        Q.   Did Bank of America close the accounts

11   because you were signing checks without

12   authority?  Did they mention that to you?

13        A.   They won't tell you.  They would not

14   tell us.  They -- they don't tell you so I

15   can't --

16        Q.   But you continued to sign checks after

17   April 4th of 2019, didn't you, for Baxley Corp.?

18        A.   I -- I don't recall when I started

19   signing checks.

20        Q.   So you might not have been signing

21   checks in April of 2019?  You don't know?

22        A.   I don't -- I -- I signed checks in

23   2019.  I don't recall what month I started

24   signing checks.

25        Q.   Have you -- did you start signing
```

1   checks when you opened the new Pinnacle bank

2   accounts?

3        A.   Perhaps.

4        Q.   So you don't know if you were signing

5   checks after -- at the -- on the Bank of America

6   accounts after April 4th of 2019?

7        A.   I don't know.

8        Q.   Do you -- can you tell me why you were

9   not authorized to sign checks on the Bank of

10  America accounts if you were the 75 percent

11  owner?

12       A.   I -- I can't tell you.

13       Q.   Can you tell me why Brandon Baxley

14  would be authorized to sign checks as of April

15  '19 if he was not an owner?

16       A.   I can't tell you.

17       Q.   Can you tell me why he'd be authorized

18  to sign checks in April '19 if he's not a

19  manager?

20       A.   I can't tell you.

21            MR. OLIVER:  Okay.

22            MR. BEHR:  George, I have one.

23                      EXAMINATION

24  BY MR. BEHR:

25       Q.   So you made a statement that Baxley

1   Corporation wasn't profitable.  What formed the

2   basis of that statement?

3       A.   I don't know.  I guess overhearing

4   conversation.

5       Q.   Okay.  So you haven't reviewed any of

6   the books?

7       A.   Correct.

8       Q.   Haven't seen any balance sheets, P and

9   Ls, anything like that?

10      A.   Correct.

11      Q.   Just based on things you've overheard?

12      A.   Conversations with Brandon and

13  Jonathan, yes.

14      Q.   You don't know how much money is in the

15  bank account currently?

16      A.   I don't.

17      Q.   Who would know the answer to that?

18      A.   Jonathan and Brandon.

19                       EXAMINATION

20  BY MR. OLIVER:

21      Q.   Is Brandon a signer on the Pinnacle

22  bank accounts?

23      A.   I -- I don't know.

24      Q.   Do you know who is a signer on the

25  Pinnacle bank accounts?

```
 1        A.    Beyond myself, I don't know.

 2        Q.    Okay.

 3        A.    Yeah.

 4        Q.    Who would know that?

 5        A.    Jonathan probably.

 6        Q.    Okay.  Do you know if Jonathan's a

 7   signer?

 8        A.    I imagine so.  I -- I don't know.

 9   Yeah.  I haven't seen the paperwork.

10        Q.    And how many bank accounts do you have

11   at Pinnacle for the company?

12        A.    One.

13        Q.    Just one account.  You had two at --

14        A.    But I --

15        Q.    -- Bank of America.

16        A.    Right.  I -- I -- I am only aware of

17   one that I sign checks from.

18              MR. OLIVER:  Okay.  All right.  Thank

19   you.

20              THE WITNESS:  Uh-huh.

21              MR. BEHR:  I'm good.

22              (Whereupon, the deposition of MARTHA

23   VIRGINIA BAXLEY concluded at 2:06 p.m., October

24   29, 2019.)

25              (Read and sign requested.)
```

```
 1                    DEPOSITION ERRATA SHEET

 2         I, MARTHA VIRGINIA BAXLEY, do hereby certify

 3    that I have read the foregoing transcript of my

 4    testimony, and further certify that it is a true

 5    and accurate record of my testimony (with the

 6    exception of the corrections listed below):

 7    Page      Line                    Correction

 8    _____     _____      _____

 9    _____     _____      _____

10    _____     _____      _____

11    _____     _____      _____

12    _____     _____      _____

13    _____     _____      _____

14    _____     _____      _____

15

16         WITNESS my hand and seal on this, the _____

17    day of _____, 20____.

18                          _____

19                          WITNESS SIGNATURE

20         This deposition was signed in my presence by

21    _____ on the _____ day of _____,

22    20____.

23                          _____

24                          NOTARY PUBLIC
                            NOTARY NO. _____
25                          My commission expires:_____
```

IN THE MATTER OF: BRANDON SCOTT BAXLEY
**Martha Virginia Baxley on 10/29/2019**                    Page 87

```
 1              CERTIFICATE OF COURT REPORTER

 2    North Carolina

 3    Wake County

 4         I, Lisa A. Wheeler, RPR, CRR, Notary Public

 5    in and for the State of North Carolina, certify

 6    that on October 29, 2019, in Raleigh, North

 7    Carolina, MARTHA VIRGINIA BAXLEY, having produced

 8    satisfactory evidence of identification and

 9    having been first duly sworn by me to tell the

10    truth, thereupon testified as set forth in the

11    preceding 86 pages, exclusive of errata sheet and

12    signature page, if required, the examination

13    being reported by me verbatim and reduced to

14    typewritten form by me personally.

15         I further certify that I am not of counsel

16    or in the employ of the parties to this action;

17    that I am not related by blood nor connected by

18    marriage to the parties of this action; that I am

19    not interested in the outcome thereof; that the

20    foregoing is a true and accurate transcript of

21    said proceeding to the best of my ability and

22    understanding.

23         This the 12th day of November, 2019.

24    _____

25              Lisa A. Wheeler, RPR, CRR
                Notary Public, #19981350007
```

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**                Index: $10,000..60

---

**Exhibits**

**BaxleyM - 36**
  4:12
  79:13,18,
  19

---

**$**

---

**$10,000**
  10:10 12:9
  67:1,21

**$100,000**
  17:25

**$111,000**
  44:8

**$35,000**  8:7

**$5,000**  52:6

**$500,000**
  17:23

**$67,000**
  43:23

**$75**  42:11

**$90,000**
  70:14

---

**1**

---

**10**  79:14

**1099**  71:17

**10th**  70:14

**12**  29:8
  52:19,20

**1211**  45:6,
  10

**14**  79:15

**15**  42:25
  43:8 48:23

**15-**  58:5,20

**16**  9:1
  26:22
  44:1,7

**17**  9:3,4,5
  74:3

**18**  61:23
  73:25
  74:1,5

**19**  83:15,18

**1:44**  64:25

**1:47**  64:25

**1st**  73:4

---

**2**

---

**20**  12:20
  13:2,5

**20,000**  58:5

**20-**  58:17,
  18

**2008**  65:12,
  13,14

**2016**  8:3
  10:18
  11:3,4
  13:17,18
  14:1,14

**15:2 23:5,**
  21 30:6
  50:18
  65:22,23
  66:1,21
  67:2 69:8

**2017**  79:15

**2018**  63:3
  70:14
  73:4,5
  79:15

**2019**  14:9
  19:14,20
  20:17,21
  73:19
  82:17,21,
  23 83:6
  85:24

**21**  13:16,22

**22**  14:7,11,
  12 19:11,
  18

**25**  8:1,2,15
  9:4,12,20

**2611**  79:2

**28655**  79:2

**29**  85:24

**2:06**  85:23

---

**3**

---

**30-**  8:7
  58:15

**30ish**  60:15

**30th**  73:4

**31**  13:17,18

**31st**  14:1,
  14 15:2

**35**  79:12

**36**  79:11,
  12,13,19

**37**  79:9

---

**4**

---

**4**  14:8

**40**  21:8

**4th**  19:14,
  20 20:21
  22:15
  82:17 83:6

---

**5**

---

**5,000**  54:10,
  13 56:14

**5-**  58:20

**5/17/2016**
  12:21

**50-**  58:14

---

**6**

---

**60**  28:25
  29:4,6
  33:22

---

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                    Index: 75..aware

**7**

**75**  7:24
  83:10

**9**

**9348**  21:16,
  21

**9364**  21:13
  73:4

**939**  22:8

**9690**  43:2
  44:3

**A**

**ability**
  81:12

**accessed**
  26:3

**account**  12:4
  13:17,22
  14:5,8,14
  15:22 20:3
  21:12,21
  22:9
  35:22,25
  36:3,19
  37:4,9,15
  38:1 43:1
  44:3
  45:18,21,
  24 47:9
  58:25 59:7
  70:17

73:3,5
77:20
79:14,22
84:15
85:13

**accountant**
  28:8
  71:20,21,
  22

**accounting**
  27:2

**accounts**
  21:17,23,
  24 22:1
  37:8 51:8
  77:9,10,14
  78:5,18,
  20,22
  82:10
  83:2,6,10
  84:22,25
  85:10

**activities**
  41:25

**additional**
  61:15 81:2

**address**  45:7

**Administrator'
  s**  5:18
  65:10

**afford**  34:7
  62:5

**agreement**
  72:13 73:9

**alcohol**
  42:12

**alert**  77:12

**allowing**
  81:14

**America**
  13:16
  14:7,14
  22:1 73:5
  77:9,22
  82:10
  83:5,10
  85:15

**amount**  10:6
  17:17 34:6
  42:9 44:13
  57:17

**answers**
  70:19

**Antonelli**
  81:21 82:1

**appears**
  22:17 71:3

**appointed**
  70:23

**approach**
  76:20

**April**  11:25
  14:8
  19:14,20
  20:17,21
  22:15
  70:14 73:4
  82:17,21

83:6,14,18

**asks**  51:11

**asserting**
  75:3

**assistant**
  49:17

**assume**  31:8
  32:6 33:7
  40:6 47:17
  58:18
  59:16

**attached**
  77:15,25

**attorney**
  65:9

**attorneys**
  81:25

**August**  43:18

**author-**  20:2

**authority**
  82:12

**authorizations**
  21:24

**authorize**
  20:20
  73:11

**authorized**
  20:2,6,11
  83:9,14,17

**awarded**  68:8

**aware**  9:7,15
  15:9
  17:15,17,

19 22:3
25:5 26:24
30:14 34:5
35:20
45:22,24
46:6,8,9
47:14 48:3
49:1,18
65:15,16
69:14,18
72:3,5,16,
23 73:8
74:11,22
75:1,6
76:9 78:20
81:17,19,
22 85:16

AYCOCK   79:11

---

**B**

back   8:14
15:21
17:13
19:4,11
20:17
21:15
26:4,7
32:20 55:2
77:21
81:13

background
62:15,19,
22

Backoffice
26:15
39:20

bad   6:19

balance   14:4
25:20
27:14 35:1
84:8

ballpark
58:3

BANA_BAXLEY
20:25

BANA_BAXLEY-
939   21:1

bank   13:16,
22 14:7,14
19:12 20:3
22:1 35:22
37:9,15
38:1 40:2,
9 47:9
51:3 69:24
71:2 73:3,
5 77:6,9,
22,25
78:5,18,
20,21
82:10
83:1,5,9
84:15,22,
25 85:10,
15

bankruptcy
5:12,17
7:11 31:11
65:10
73:21

banks   77:4,8

based   84:11

basement
32:14

basis   56:8
84:2

Bax-   7:16

Baxley   5:3
7:14,16
8:13 11:6
13:6,11,
12,23
15:17
18:9,12,16
20:8,14
22:2,13,
16,19 23:3
31:25
33:17
43:15 44:2
45:10
46:12
47:19
48:24 49:4
50:13
51:22,23,
25 52:1,4,
14,15,18,
21,25
53:6,14,
17,18,19
54:3,11,
19,22
55:7,10,
15,19,22
56:4,7,10,
19 57:5,
12,15,17,

20,21
58:19,21
59:7,15
60:12 61:4
62:17,23
63:14
65:8,21
66:8,14
69:17,20
70:13,16
74:24
75:4,14,
15,16,20
77:3,15
79:13,21
80:13,21,
24 81:3,
13,15,24
82:3,17
83:13,25
85:23

beca-   30:1

beginning
17:7

behalf   15:17
19:22 54:2

Behr   65:4,
7,8 79:9,
12,17 82:5
83:22,24
85:21

Ben   6:6
13:4 17:2
35:15

benefit
71:16

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
Martha Virginia Baxley on 10/29/2019          Index: Bicycle..card

**Bicycle**
  47:23
  74:10,11,
  13,25 75:4
  76:2,3,5
  79:15 80:1

**bid**  81:6,10

**bidding**
  30:18

**bifocals**
  21:10

**big**  66:17

**bill**  5:19
  6:3 35:7,
  12 36:6,
  16,17

**bills**  35:17
  36:2,13

**bind**  14:25

**bond**  24:4,
  13 50:22

**bookkeeping**
  26:19

**books**  44:19
  84:6

**born**  10:24
  11:2,3,14,
  18

**borrowing**
  24:19

**bottom**  20:24

**bought**  67:17

**box**  79:2,3,
  5

**Bradford**
  43:15
  75:25

**brain**  7:8

**Brand-**  50:9

**Brandon**  8:7
  10:9 12:14
  13:11
  14:16
  16:16 20:8
  22:12,16
  25:10
  27:6,10
  28:17,24
  31:8,10
  33:2,16
  34:22
  35:16
  36:11
  39:21
  40:6,22
  44:2,6
  45:17 46:6
  48:14,22
  50:5,9
  54:5,23
  55:13,24
  56:3 60:10
  63:12
  64:13
  65:11 66:2
  69:2
  70:21,24
  71:8,15
  76:23

**Brandon's**
  17:13
  19:24
  22:18 35:4
  63:25 70:5

**break**  6:25
  64:22

**Brian**  5:17
  7:5 65:1,8

**bridge**  66:14

**briefly**  82:7

**brother-in-
laws**  17:3

**brothers**
  48:15

**brought**  68:2

**build**  34:1

**building**
  58:21
  66:18

**built**  81:6

**bunch**  31:23

**Burger**  47:24
  74:10,12,
  13,25
  75:5,8,10,
  17,23
  76:2,3,6,
  8,11 79:15

80:20
83:13
84:12,18,
21

**business**
  19:23 23:8
  27:2 29:14
  33:16 34:7
  39:8 43:1
  44:3 61:14
  64:14
  65:14
  66:21 69:8
  73:14
  74:22
  76:17

**buy**  38:3
  54:4 55:14
  57:1 67:15
  81:12

**buying**  57:15

_____

           **C**

**Caicos**  40:16
  42:19

**call**  69:4

**called**  16:8
  26:6 48:4
  75:8

**Capital**  43:1
  44:2

**car**  36:7

**card**  14:8
  38:12,19
  39:7,8,21,
  25 40:10,
  24 41:3,

80:1,5

16,20,24
42:14,20,
25 43:6,22
44:1 45:2,
9 51:5
70:2,5

**cards**  38:14
43:10
44:11

**careful**
6:12,14

**Carolina**
48:18 79:2

**carrying**
34:21

**case**  5:12
25:16
28:20
50:17

**cash**  78:5,
18,21,22,
23

**caught**  8:8

**cell**  35:7,
12 36:16
37:1

**change**  30:16
66:13 77:8

**changed**
23:7,21
63:25 77:4

**changing**
30:10

**charge**  41:16
54:19,22
71:19

**charged**
41:20
43:6,20
44:8

**Charges**  43:1
44:2

**charging**
41:23 44:7

**Chart**  42:25
44:1

**cheating**  8:8

**check**  25:3
36:22
60:24,25
61:1 78:21

**checking**
13:17
71:11

**checks**  20:14
24:24,25
25:1,9
34:12
60:20,21,
22 78:5,
17,22
82:11,16,
19,21,22,
24 83:1,5,
9,14,18
85:17

**childcare**
36:7

**claim**  75:3

**clearing**
66:7,19

**clients**
42:16
53:18
71:12

**close**  77:10
82:10

**closed**  17:1
77:9

**combined**
37:21
52:22

**comma**  39:16

**Commercial**
16:8,13
17:14

**comp-**  67:20

**companies**
57:3,6

**company**  8:3
10:7,16
12:15 13:7
14:25 15:2
16:8,19,21
17:14
18:7,8
20:3,20
23:25
24:23
25:17,20,
25 26:5,20
28:21,24

29:3,25
30:5,21
32:11
34:21
35:4,14
36:21 37:4
38:14,19
39:21,24
40:2,9,24
41:2,15,24
42:5,14
43:6,9
44:11,14
45:21,23
48:4 49:23
50:25 51:8
52:9,12
53:11
55:2,4
60:23
61:10,13
63:12
64:4,5
67:16,18,
19,22,23
68:6,23
70:3 72:20
81:5 85:11

**company's**
51:15,19

**compare**
60:17

**compensation**
33:16
46:20 81:7

**completely**
37:5 69:9

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019      Index: computer..dealings

computer
32:6

concern
77:16

concerned
77:23

concluded
85:23

condo   48:7,9

conducted
80:12,15

confusing
39:19

construction
62:15,20

contin-
61:24

continue
55:3

continued
62:1 82:16

contract
68:19
81:8,10

contracting
68:25

contracts
61:17
68:17

conversation
6:11 31:3
84:4

conversations
28:14
64:18 69:2
84:12

converting
48:23

Corp   7:14,
17 8:13
11:6 13:7,
23 15:17
16:9,14
17:14
18:12,16
20:14
22:2,19
23:3 33:17
46:12
47:19 49:4
51:22,23,
25 52:21
54:19,22
55:7 57:20
59:15
60:12 61:5
62:17,23
63:14
74:24 75:4
77:3 82:17

corporate
80:12

corporation
13:11
31:25
45:10
48:24
50:13
53:17,19

57:17
65:21 66:9
70:13,16
75:16
79:14,21
80:13,24
81:15,24
82:3 84:1

correct
18:25
20:10
22:14 24:9
33:21 35:3
50:19
51:4,6
54:9 55:12
77:4 84:7,
10

costs   68:14

couple   12:10

cover   54:17

created
65:21
80:21

credit   24:4,
17 38:11,
13,19
39:7,8,21,
24 40:10,
24 41:3,24
42:14,20,
25 43:6,9
44:1 45:2,
9 50:22
51:5

crews   22:24
23:6 44:15
69:6

Cue   75:8,
10,17,22
76:8,11
80:5

curious
37:20

customers
53:19

─────────

D

dad   8:22

daily   23:10
50:16

Dan   71:23

date   64:6
80:17

daughter
10:19,23
66:16

day   15:2
23:15,16
70:9,10,11
72:21

day-to-day
22:18 23:8
50:24
63:16
76:10

days   31:16

dealings

65:14

**debt** 34:21

**Dec-** 74:2

**December**
9:1,2,4,5
74:1,2,4

**decide** 31:4
54:21
55:1,14

**decided**
54:18
77:25

**decision**
31:3

**decisions**
41:6 54:7,
8 63:17

**decor** 46:25
72:4,7
73:23,24

**Delaware**
82:3

**Dencil** 43:14

**deposited**
18:15

**deposition**
85:22

**destroyed**
69:10

**detail** 27:21

**determine**
54:2,13
56:7

**determined**
55:17

**Diapers**
36:10

**difference**
64:5

**digits** 70:4

**directed**
8:12

**directing**
23:6 63:12

**directly**
18:16 27:3

**director**
15:10

**directs**
22:24

**disagreed**
56:2

**disaster**
66:15

**discussed**
41:14,15

**discussions**
34:9

**dispute**
16:24

**distribution**
56:13,14

**document**
19:12

**documents**

12:24 14:8
31:22
32:1,5,9,
12

**doors** 10:15

**downtown**
71:4

**drafted**
60:4,7

**duly** 5:4

**Dustin** 43:15

**duties** 22:19
23:9,21,25
24:23
50:21
53:5,8,10,
13,22

---

**E**

---

**e-mail** 15:21
48:22

**e-mails**
15:10,13,
16,20

**earlier**
12:25 63:2

**early** 10:18,
24 11:15,
25 30:5

**ears** 17:1

**eat** 71:4

**eating** 71:3

**eats** 71:8,
10

**employ** 78:4,
12

**employees**
29:17
56:20
60:12

**employer**
12:20 13:6

**ending** 43:2
44:3 73:4

**ends** 21:13,
16

**entity** 75:7

**equipment**
22:25
44:14,20
53:15,23
54:3,24
55:18
56:4,24
57:1,5,11,
16,18,22
66:23
69:13,14,
16 75:16
81:9,11

**equity**
67:16,17

**establishments**
71:4

**estimating**
30:18

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                    Index: EXAMINATION..generally

**EXAMINATION**
  5:6 65:6
  82:8 83:23
  84:19

**examined**  5:4

**excited**  59:5

**excuse**  55:24

**exhibit**
  12:20
  13:2,16,21
  14:7,11,12
  19:11,18
  20:23
  42:25
  43:7,8
  44:1,7
  79:13,18

**exit**  61:12

**expect**  42:13

**expected**
  51:19

**expenses**
  35:5,6,13
  51:16 52:8
  54:15
  56:8,19
  58:19,23
  60:23

**eyesight**
  21:8

─────────
**F**
─────────

**fact**  78:4

**fair**  23:14,
  20 33:11
  44:25
  45:11
  50:12,23
  63:11

**falling**
  73:17

**familiar**
  15:12,19
  16:17
  23:13,17
  25:21
  32:25 42:1
  65:13 75:7
  79:4 82:2

**family**  48:8,
  9 56:7
  76:18

**Farm**  75:3

**father-in-law**
  7:18 8:5
  19:3

**February**
  11:3,4

**feed**  44:15

**field**  29:18

**file**  37:24

**filed**  27:17

**files**  32:13

**filing**  31:10
  32:22 33:5

**finances**

  35:16
  37:21
  47:22

**financial**
  24:1 32:11
  50:21
  53:9,10,
  13,22
  57:23

**financials**
  54:1

**financing**
  57:7

**find**  32:4

**flag**  78:2

**flagged**
  77:11

**flowed**  18:24

**food**  44:15
  74:14
  75:8,11,22
  76:17

**Foods**  48:5

**Forest**  45:6,
  11

**forgetting**
  36:8

**form**  32:12

**formed**  8:3
  9:23 13:8,
  13 84:1

**Foundation**
  62:9 63:22

**fourth**  14:12
  19:16

**frame**  44:8

**friends**
  74:17

**friends'**
  17:3

**friendship**
  17:7

**front**  57:4
  58:1 68:13

**fuel**  44:14

**full-time**
  62:1 63:19

**fundraising**
  62:13

**funds**  45:23

─────────
**G**
─────────

**gas**  38:25
  44:14

**Gates**  75:24
  76:5,12

**gave**  8:6
  10:9 12:14
  19:4 28:17
  46:9 67:18

**general**
  23:19

**generally**
  17:19 58:4
  59:11

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019          Index: George..imagine

65:15

**George**   5:8
82:6  83:22

**gifts**   42:16

**give**   38:9
60:14
68:12,18
70:3  77:16

**giving**   13:5

**good**   7:3
55:19
85:21

**Gosh**   17:24

**gotcha**   11:20
32:4,18
33:8  34:24
58:8  62:14

**government**
61:17

**Great**   6:25

**Groceries**
36:8

**Grocery**   36:9

**ground**   22:24

**guarantor**
53:25

**guaranty**
24:7

**guess**   8:19
58:11
60:15
71:22  84:3

**guy**   17:3
39:20

**guys**   40:15
44:21

———————

**H**

———————

**hand**   79:18

**handle**
26:17,20

**handles**   33:1

**handwriting**
14:18

**happen**   17:8

**happened**   9:1
16:4  18:4
19:5  63:8,
9  69:7

**Harden**   5:14

**Harrison**
43:15

**head**   57:24
59:10

**health**   60:23

**hear**   64:18
69:1

**helped**   47:4

**Hendren**
81:23

**hereunto**
15:1

**hesitant**
17:21

**highlight**
73:5

**hired**   30:3,
11

**Hispanics**
78:4,13,19

**Holdings**
16:9,14
17:14

**holds**   75:12

**Holmes**   5:14

**home**   29:9,
15  32:13
35:9
64:14,17
71:11

**honest**   16:25
50:4

**honestly**
46:14
73:22

**hope**   21:2,5
61:11

**hoping**   33:24

**hospital**
10:20,23,
25  11:10,
11,17,18
66:17

**hotel**   44:21

**hours**   28:23
29:2  33:22
52:16

**house**   33:2
45:8

**household**
35:6  36:13

**hundred**   9:22
10:7

**husband**   8:19
19:4  41:4
73:14
74:15  75:2
80:9

**husband's**
5:12  6:3
7:11  79:7

**hypothetical**
58:18

———————

**I**

———————

**idea**   18:18
19:10
23:19
34:14,23
41:19
45:19,23
63:5  64:2
73:22

**identification**
12:21,22
13:6,19
14:9  43:3
44:4  79:16

**illegal**
78:13

**imagine**

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019    Index: immediately..knowledge

29:17
32:16  85:8

**immediately**
66:2

**inception**
29:16

**include**  81:7

**industry**
68:8  78:20

**information**
45:1,5
57:23
60:20  78:2

**infrastructure**
66:15

**initially**
67:13
76:14

**insurance**
24:4  36:7
50:22
56:23
60:24  75:3

**intending**
14:25

**intentionally**
17:1

**interest**
56:24
75:4,12

**interfere**
17:6

**invest**  8:7

19:4

**invested**
16:21
74:25

**investment**
45:25  46:7
48:1  55:19
72:1

**invoice**
60:24

**invoices**
61:1

**involved**
8:17,18
23:10  31:2
32:22
46:3,8,15
50:14,15,
24  51:10,
13  64:7
66:5  68:24
75:15,17,
20,25
76:2,3,5,
14,16

**involvement**
16:20
46:12
53:23
63:25
73:15
74:16

**IRS**  12:20
13:5

**issuing**

71:16

**item**  81:4,
8,11

**items**  39:5,
9,22  41:3,
12

_____

_____
**J**
_____

**Jackson**
43:16

**January**
73:25
74:1,5

**Janvier**
5:19,23,25

**Jeff**  43:16

**job**  51:24
61:19,20,
22  62:4,8
68:8  80:22
81:10,12

**jobs**  50:13,
15  71:12
81:6

**John**  75:24
76:5,12,20

**Johnson**
43:16

**Jonathan**
20:9  22:12
27:7,10
29:1,3,24
31:25
34:18  40:6

43:16
49:24
50:10
54:5,23
55:13,25
56:3  60:10
63:1  64:1
69:2  70:21
80:20
84:13,18
85:5

**Jonathan's**
70:22  85:6

**Jr**  70:9

**judging**
37:18

**June**  63:3

**justify**
61:18

_____

_____
**K**
_____

**Keith**  20:9
22:12
43:16

**kids**  71:6,7

**kids'**  41:24

**kind**  7:7

**Kirstin**  5:17

**Kitchen**  46:1
72:2  73:15

**knew**  70:24

**knowledge**
16:23  72:1

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**          Index: L-E-S..manages

---

## L

**L-E-S**  26:8

**L-E-S-S**  26:9

**label**  61:16
  78:25

**labeled**
  79:18

**Landscapes**
  48:18

**landscaping**
  66:19  69:8
  81:16,20

**language**
  77:13

**lawsuit**  8:12
  16:7,24
  17:13

**lawyer**  6:3

**learned**
  77:17

**lease**  53:15
  55:2,3
  57:1,11
  60:3,7
  81:12

**leases**  59:14

**leasing**
  52:1,5,14,
  15,18,25
  53:6,14,
  18,23
  54:3,11,

19,22
55:11,15,
19  56:4,7,
10,19,25
57:5,15,
16,21
58:19,21
59:7,15
69:17,21
75:14,15,
16,20
80:21  81:3

**Lendlease**
  66:17  69:9

**Les**  39:20

**Leslie**  26:15

**Letter**  12:21

**lights**  67:2,
  6

**limit**  41:16

**lines**  22:24
  24:4,17
  50:22

**Lisa**  6:7

**list**  36:15

**listed**  15:6
  20:6,11
  22:9  50:22

**listing**  20:2

**living**  52:8

**LLC**  7:14,17
  8:13  13:7,
  23  15:17

18:13,16
20:15  22:2
47:19
48:5,18
49:5  50:13
53:6,14
59:15
60:12  61:5
63:14  66:9
80:13
81:24  82:3

**located**
  29:15

**long**  29:14

**looked**  12:24
  13:21
  27:23
  38:18  40:9
  43:5,9,18,
  19  44:6
  54:14  63:2

**lose**  7:3
  51:20

**loss**  25:19
  27:12

**lot**  36:7
  42:16
  59:24
  66:6,14
  71:3,5,8,9
  78:4,13

**lots**  32:13

**Ls**  84:9

**lunch**  39:1

## M

**M**  79:13

**Mac-**  22:20

**made**  83:25

**majority**
  68:17

**make**  6:23
  41:6  51:19
  54:7
  61:16,18
  74:7  76:18

**makes**  55:1
  56:12

**making**  54:8
  63:16
  80:25

**Malone**  81:24

**manage**  22:25

**management**
  22:20  49:4

**manager**
  15:10
  29:25  31:5
  46:16
  49:6,7,21
  50:6,9,10
  63:2  64:1
  77:25
  83:19

**managers**
  49:22

**manages**

---

30:21
76:10

managing
15:10

March  11:25
79:15

marked  12:22
13:18 14:9
43:2 44:4
79:16

market  54:24
81:13

marry  65:11

Martha  5:3
45:10
85:22

matter  41:1

means  24:3

meet  5:25

meeting
71:12
80:13

meetings
38:25 39:1

member  13:12

member/manager
15:1,6
70:23

mention
82:12

mentioned
67:1

merger  48:24

met  5:8,19,
22 77:24

mid  11:25
65:22 67:2
69:8

Minor  71:23

minutes  5:9

mixed  21:18

mobilization
69:4,5

mobilize
69:6

mom  48:15

money  8:6,
11,13 10:6
14:4
17:12,16
18:5,24
38:3,9
42:5,9
44:13
46:10,22,
24 47:7,18
50:24
51:19,20
58:21
61:18
67:19,21,
22 68:3,
11,13,18
72:5,20
76:18
80:25
81:3,13

84:14

month  41:17
43:18
51:16
52:6,16
54:10,13
56:15
57:17,21
58:22
82:23

monthly  56:8

months  10:25
43:24

morning  13:3

mortgage
36:4 54:15

N

needed
54:14,15
56:8 67:1

Nello's  8:7,
8 9:1
16:3,21
17:4 19:4,
8

Nice  5:25

nods  6:15

Nonprofit
62:13

North  48:18
79:2

November

48:23
79:14

number  12:21
13:5,6,8
19:7,8
21:12 43:8
44:12
60:14
79:19

number's
21:21

numbered
13:1

numbers  13:2
20:25

O

October
43:19
85:23

office  5:18
26:5,7
29:11 35:9
64:17
65:10

officer
49:9,14

Oliver  5:7,
8,24 6:2
12:23
13:20
14:10
21:4,7
43:4 44:5
51:14

**IN THE MATTER OF: BRANDON SCOTT BAXLEY**
**Martha Virginia Baxley on 10/29/2019**          Index: open..Pinnacle

64:21 65:1
71:25
82:7,9
83:21
84:20
85:18

**open**  10:15
45:12,13

**opened**  13:25
50:18
77:20 83:1

**opening**
13:22
14:8,13

**operated**
64:5

**operates**
75:22

**operations**
18:6 23:11
50:16 64:7
75:19
76:11

**order**  78:18

**organize**
31:23

**overheard**
69:3 84:11

**overhearing**
84:3

**owed**  34:12
51:8

**owned**  9:14,
19,22

16:16

**owner**  16:13
41:2,15
42:21 49:3
61:9 64:4
70:12
73:11 79:3
83:11,15

**owners**  7:16

**ownership**
8:15 10:7
48:12
72:9,12

———————

**P**

———————

**p.m.**  64:25
85:23

**P.O.**  79:1,
3,4

**paid**  8:14
34:7,13
36:25
40:20,22,
23 51:22,
23 52:1,4
56:13
68:9,15
69:6,12
80:23

**paper**  32:12

**paperwork**
85:9

**part**  72:12

**past**  34:22

**pay**  10:6
34:7 35:4,
14,17
36:2,11
52:11
54:14
57:20
80:25

**paycheck**
33:19,20,
25 34:2,4

**paychecks**
29:21
60:13,16

**paying**  36:21
45:22
58:22
81:2,5

**payments**
71:15

**payroll**
34:12,22
47:5 67:7,
8

**pays**  35:18,
21 36:18

**people**  25:6
43:9,12,24
67:10

**percent**  8:15
9:4,12,20,
22 10:7
83:10

**percentage**
7:23,25

**perfectly**
16:25

**perform**
81:9,12

**period**  43:7

**person**  26:13
27:24
43:20
70:24

**personal**
24:7
35:13,25
37:3 38:15
39:5,8,22
41:3,12
46:13
47:10
71:16
77:14

**personally**
8:17 46:12
61:6

**persons**  20:2

**pesky**  39:20

**phone**  36:17
64:20

**phones**  35:7,
13 37:1

**pick**  29:21

**piece**  55:18
56:4 57:18

**Pinnacle**
77:7,8
83:1

84:21,25
85:11

place   7:3

places   15:7

plaintiff
  16:11

planting
  66:20

Plates   45:25
  46:7,16,
  20,23
  70:12 72:2
  73:15

pocket   78:23

point   9:11
  50:5 63:8,
  9 67:15

position
  49:4

power   35:7,
  12 36:16
  37:1

predated
  70:22

pregnant
  73:24

present
  65:15
  80:18

presented
  25:11 28:7
  32:10
  60:5,6,8

presents
  28:15

president
  49:14,15

previously
  12:22
  13:18 14:9
  43:2 44:3

prior   66:2,
  21

proceedings
  64:25

profit   25:19
  27:11
  56:12
  61:15 76:8

profitable
  56:11 84:1

profits   59:4

project
  22:20 23:1
  66:3,17
  69:9

projects
  67:12

promote   31:4

purchase
  42:12 55:2
  56:3
  57:10,13

purposes
  71:14,16

put   14:4

46:22,24
  72:3,5

putting
  41:16

_____

_____

Q

question
  6:17,19
  66:24
  71:25 79:1

question's
  7:2

questions
  7:6,11
  65:2 70:20
  82:6

quick   64:21
  73:1

Quickbooks
  26:1

quickly   65:5

Quickreport
  79:14,22

quit   61:20,
  22 62:5
  80:22

quitting
  61:18

_____

R

R.J.   81:21
  82:1,2

Raleigh   48:4
  71:4 79:2

Ramsgate
  48:7

rates   56:24

read   21:2,5
  85:25

real   73:1

reason   31:18

recall   16:2
  20:22 28:4
  40:11 57:3
  59:16,17,
  20,24
  73:12 77:1
  80:17
  82:18,23

receivable
  51:8

receive
  27:11 72:7
  80:4,7

received
  34:3 46:19
  47:6 71:15

receives
  80:9

recently
  59:18 77:3

recess   64:24

recommendation
s   55:20

records   12:4

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019                Index: recycling..sign

32:21,23
38:18

recycling
36:6

red  78:2

Redwine
81:24

relating
71:25

relation
73:9

relationship
17:8 26:25
74:23

relief  66:15

remember
28:3 29:24
30:1,2,3,
10 59:23
66:16
73:17
76:22
77:13

remind  6:21

removal  66:6

rent  55:3
81:11

rental  81:5

Rentals
55:5,8

Renting  81:9

rents  55:7,
10

repair  66:15

repairs  47:2

repeat  51:11

rephrase
6:18

reporter
51:11

reports
79:16
80:2,5

representing
5:11

requested
85:25

respect  53:6

responses
6:15

responsibility
24:1 50:21

rest  8:1

return  27:16
28:9,15
72:7

review
27:16,21
69:24
77:22

reviewed
70:1 71:14
84:5

reviewing
71:2

road  45:6,
11 71:9
72:10

role  23:2,7
30:10,16

rooms  44:21

rude  6:22

Rudolph  20:8
22:13
43:15

Rudy  7:18,
19,21 8:14
27:7 29:5
50:1 80:20

Rudy's  50:2

rules  6:22

───────────

S

───────────

salary  54:10
56:6 58:23

sales  79:16
80:1,4

Sam  43:15
74:17
75:25 76:3

saving  81:13

savings  12:4

scope  58:12

secretary
49:15,17

security
77:11

sense  55:1

separate
35:16 37:6

September
43:19
61:23

set  34:6
54:10 56:6
57:17,19

settlement
8:12 9:1
16:3 18:17
19:9

sewer  36:6

shakes  6:15

she'd  78:3

sheet  35:2

sheets  25:20
27:14
60:17 84:8

shortly
73:23

Shots  41:23

show  12:25
73:1

showing
68:16

shut  77:13

sic  79:2

sign  20:3,
14 24:24,
25 25:1,2,

9,12
27:18,19,
22 28:16
53:25
59:24
60:5,6,9,
13,16,20,
21,22,25
82:16
83:9,14,18
85:17,25

**signature**
14:7,21,
22,24
15:25
19:24

**signatures**
20:6 28:4

**signed** 15:3,
9 19:22
22:15
24:7,12
27:23 28:7
49:10,20,
21 82:22

**signer**
20:12,21
22:9
84:21,24
85:7

**significant**
42:8

**signing**
59:23
82:11,19,
20,24,25

83:4

**signs** 25:6
27:25

**similar**
66:8,12

**sisters**
48:16

**site** 66:7,
19

**soccer**
41:23,25

**sole** 13:12

**sort** 24:19
27:1 33:15
36:2 48:24
49:2,4,14
66:4 67:5
71:14 73:9

**sorts** 15:11
35:13

**sound** 9:5
63:3

**sounds** 29:1
37:16 42:1

**source** 38:3
47:18

**Spark** 43:1
44:2

**speak** 27:4
28:8 64:10
71:10

**specific**
17:17

50:15
60:14
77:13

**specifically**
59:25
73:17

**specifics**
9:8 35:20
46:15

**spend** 52:17,
20

**spends** 44:14

**Square** 70:16

**sta-** 60:20

**stack** 25:12

**staff** 65:9

**start** 12:15
14:4 61:4,
10 67:21,
22 76:23
82:25

**started**
10:8,17
11:7 17:4
23:5,8
25:17
26:23
28:21
30:17,24
31:1 62:17
66:1 67:13
68:6
76:21,22
77:2

82:18,23

**State** 75:3

**statement**
13:17
42:20 73:3
83:25 84:2

**statements**
27:12
39:25
40:3,10
45:2,9
51:3,5
69:25 71:2
77:22

**States** 65:9

**stating**
48:22

**status** 61:17

**stepped** 50:9

**Steve** 70:10,
11 72:21
73:16

**Steven** 70:9

**story** 16:8

**strategy**
61:12

**strike** 66:24
70:8 78:25

**stuff** 29:21
38:25
59:24
66:19

**submitted**

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019     Index: subpoenas..Uh-uh

75:2

**subpoenas**
 78:1

**subscribed**
 15:1

**sued** 8:9

**sunk** 68:14

**supposed**
 72:9

**surprise**
 42:4 44:12

**surprised**
 41:22

**surprising**
 42:21

**sworn** 5:4

———————
**T**
———————

**table** 5:16
 7:2

**taking** 6:7

**talk** 6:12
 64:13

**talked** 7:21
 53:21

**Tanya** 5:17

**tax** 27:16
 28:9,15
 71:13

**taxes** 13:8
 37:24

**telling**
 72:22

**tells** 25:9

**ten** 29:8
 31:16
 52:19,20

**testified**
 5:5

**theories**
 78:11

**thing** 13:21
 31:16

**things** 7:7
 15:11 24:7
 27:1 39:3
 41:23
 44:22
 55:8,10,14
 62:23
 66:8,20
 84:11

**thought**
 26:12
 39:13
 55:18

**three-month**
 43:7

**time** 7:1
 8:25 9:16
 11:6,9
 12:7,13
 28:7 29:24
 30:15
 43:14 44:8
 50:10 51:9

60:17
 63:11 67:2
 69:13
 73:13
 80:15

**times** 47:5

**timing** 31:9

**title** 46:17
 49:6,11
 50:2

**today** 12:25
 63:2

**told** 17:1
 35:15

**top** 59:10

**totally**
 35:16

**totals**
 43:19,22

**transaction**
 18:22

**transcript**
 6:23

**transfer**
 70:14

**transferred**
 69:17
 72:20

**trash** 36:6

**treasurer**
 49:15

**tree** 66:6

**truck** 71:11
 74:14
 75:8,11,22
 76:17

**trust** 41:4

**trustee** 5:11

**tuned** 17:10

**Turks** 40:15
 42:19

**turn** 19:13
 20:23 76:8
 79:25

**turned** 21:8

**tying** 45:20

———————
**U**
———————

**Uh-huh** 7:13,
 15,20 8:10
 9:24 11:5
 12:16
 13:24 16:5
 18:14
 19:21 20:4
 24:3 25:13
 35:11
 43:11
 44:10 49:8
 54:25
 56:16
 62:11
 63:15 67:4
 73:7 85:20

**uh-huhs** 6:16

**Uh-uh** 18:23

IN THE MATTER OF: BRANDON SCOTT BAXLEY
Martha Virginia Baxley on 10/29/2019    Index: understand..zeroing

understand
6:16 8:2,
16,25
11:22 16:6
17:12
27:19
29:11
33:15 59:6
62:6 63:1
67:6 77:3

understanding
13:14 50:8
72:6

understood
73:13

United 55:5,
8 65:9

upgrades
72:4,8
73:23,24

upgrading
46:25

**V**

vacation
40:15
42:19

vendors 24:5
50:23

Venmo 45:17,
24

verbal 6:15

verify 60:19

vice 49:14

VIRGINIA 5:3
85:23

**W**

W-2 71:17

Wake 45:6,
11

Wakemed 62:9
63:20

WALLER 21:2,
5

wanted 74:7

wanting 17:8

water 36:6

week 28:23
29:2 31:15
33:22
52:17
60:13
78:23

weekly 79:15
80:1,4

weeks 10:24
11:11,14,
17,19,21,
22,24

weird 37:16

whatsoever
37:22

Wheeler 6:7

whereof
14:24

withdrawal
12:9

withdrawals
12:5,11

witnessed
28:14
36:20

woman-owned
61:14

wondering
45:22

word 73:2

work 15:22
26:5 27:3
33:22 37:1
51:25
53:1,4
62:1,15,20
66:4 68:9
81:16,20

worked 62:9

workers
78:14

working
52:17
61:12
63:19
67:10
68:22
71:11

works 28:24
29:3 33:2

37:1

writes 36:22

writing
78:17

written
59:14
72:13 73:9
81:10

**Y**

y'all 71:4

year 8:14
9:2 20:18
40:18
51:19
61:25
65:11

years 62:24

yesterday
17:2 35:15

**Z**

zeroing
58:24

27:13
48:19