**EXHIBIT B**

OFFICE OF THE BANKRUPTCY ADMINISTRATOR
EASTERN DISTRICT OF NORTH CAROLINA


```
IN RE:                    .    Case No. 18-03406-5(DMW)
                          .
                          .
BRANDON SCOTT BAXLEY,     .    Office of the U.S. Bankruptcy
                          .    Administrator's E.D.N.C.
                          .    434 Fayetteville St., Suite 640
                          .    Raleigh, NC 27601
                          .
              Debtor.     .    November 8, 2018
. . . . . . . . . . . . ..    1:05 p.m.
```

TRANSCRIPT OF 2004 EXAMINATION
BEFORE BRIAN BEHR, ESQUIRE, SR. STAFF ATTORNEY
OFFICE OF THE U.S. BANKRUPTCY ADMINISTRATOR


APPEARANCES:

For the Debtor:           Barkley Law Offices, P.C.
                          By:  W. TRAVIS BARKLEY, ESQ.
                          7413 Six Forks Road, Suite 306
                          Raleigh, NC 27615


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

# I N D E X

**PAGE**

**WITNESS**

Examination by Mr. Behr                                    4

1       MR. BEHR:  It is November 8th, 2018 at approximately

2  1:05 p.m.  We're here at the United States Bankruptcy

3  Administrator's Offices in Raleigh to conduct the 2004

4  Examination of Brandon Scott Baxley.

5       Mr. Baxley has provided me with a valid North

6  Carolina State driver's license evidencing his identity.  Mr.

7  Baxley is represented by Mr. Travis Barkley of the Barkley Law

8  Firm, is that correct?

9       MR. BARKLEY:  Barkley Law Offices.

10       MR. BEHR:  Barkley Law Offices.  I am Brian Behr,

11  senior staff attorney, United States Bankruptcy Administrator.

12  I'll be conducting the examination.  Also present is Tanya

13  Aycock, bankruptcy analyst.

14       Mr. Baxley, if you could please stand and place your

15  left hand on the Bible, and raise your right?

16       BRANDON SCOTT BAXLEY, DEBTOR, SWORN

17       MR. BEHR:  Okay.  Great.  Have a seat.

18       So, before we get started let me just -- we're going

19  to be -- there's going to be a few exhibits, a lot of it will

20  be what's in front of you, those claims that you filed in your

21  case, but I'm going to have a copy for your attorney.  The

22  exhibits that we do use, you'll leave those here, but your copy

23  will be with your attorney.  If you need additional copies, I

24  can provide them to you.  I don't know that you'll want them,

25  but we're here to accommodate.

Baxley - Behr                                                                          4

1                              EXAMINATION

2    BY MR. BEHR:

3    Q     The first thing I'm going to hand you and this is the

4    order allowing the motion to continue the 2004 Examination, and

5    you understand you're here pursuant to court order to -- for a

6    2004 Examination in your case, is that correct?

7    A     Yes.

8    Q     All right.  And I've labeled that Exhibit Number 1.  And

9    also in front of you are a number of bankruptcy petitions and

10   schedules that were filed in your case, and did you authorize

11   the filing of this case --

12   A     Yes.

13   Q     -- the bankruptcy case?  Okay.  Great.  All right.  Now,

14   I'm going to go into some instructions.  Have you ever had your

15   deposition taken before --

16   A     Yes.

17   Q     -- answered questions?  Okay.  So, if you know some of

18   these things I'm about to tell you, forgive me, but I just want

19   to make sure, you know, we're operating on the same spectrum

20   here.  If you don't understand my question, or you can't hear

21   me, please let me know.  I'll either raise my voice or slow

22   down, or sometimes I may even ask a question that doesn't make

23   any sense, and it's probably because I'm talking faster than

24   I'm thinking.

25            So, let me know, I'll slow it down.  I'll re-ask it.

Baxley - Behr                                                    5

1  The last thing we want is for you to answer a question that --

2  and we want to make sure you understand the question before you

3  answer is essentially what I'm trying to say.

4          If I've asked a question, please answer it

5  completely.  And what that means is if I asked you what you had

6  for breakfast and you had eggs, toast and milk, a correct

7  answer is eggs, toast and milk, not just eggs and toast.  So,

8  make sure you answer the questions completely, if you can.

9          You're not under the influence of any substances that

10 would prevent you from giving an honest answer today or

11 understanding my questions?

12 A     No.

13 Q     Okay.  Great.  And you -- a good thing you did there, you

14 did a non-verbal response, but then you verbalized your

15 response.  We'll need to have verbal responses, and if you see

16 me reminding you of that, please do not take offense.  It's

17 something that everybody does, even people who have a -- give a

18 lot -- it's sort of a natural inclination to do that, but we

19 need to create a record.  So, okay.

20         Mr. Barkley is here to represent you.  He is your

21 attorney.  If you want to ask him a question about one -- or

22 you want to consult with him about one of the questions that

23 I've asked you, I may first -- me and Mr. Barkley may discuss

24 whether or not you should try to attempt to answer the question

25 as best you can without first consulting with him.  It's

Baxley - Behr                                           6

1  unlikely that's going to arise, but if it does, give us an

2  opportunity to discuss whether or not you should try to first

3  try to answer the question, but otherwise he's here to

4  represent you, so.

5          All right.  I think we've got overall the starting

6  things here, and you've acknowledged that you filed this

7  Chapter 7 petition.  Why did you need to file for bankruptcy?

8  A    Ten years ago, plus, I was in the real estate development

9  business and when the market tanked, we lost property and banks

10  came after -- once we -- the properties were foreclosed on,

11  they -- I got sued personally for being the guarantor on the

12  loan.  I spent everything I had to defend myself, but I ran out

13  of money and judgments got placed against me.

14          At that time I went to a bankruptcy attorney and got

15  some advice.  I regret I did that at this point because I

16  should have filed ten years ago because it -- everybody in my

17  situation was, but I was told at that time that banks were

18  getting judgments so they could have large writeoffs and it

19  would go off.  That was ignorant for me to even believe that.

20          So, but it -- having these judgments never affected

21  me until recently, and then they started -- because I guess the

22  judgments have a ten-year time frame, and I don't know why all

23  of a sudden, but all of a sudden banks -- I mean attorneys

24  started to contact me, and then I've realized that I actually

25  have judgments against me for things I didn't even know.

Baxley - Behr                                                7

1  Q     Really?

2  A     Yes.  I mean, like, for example, Regents Bank, Regents

3  Bank sold the loan to East Bay Company.  East Bay Company

4  notified the building, not me.  I lost the property.  They sued

5  me, got, I don't know, an $800,000 judgment, or whatever it

6  was, and then apparently Regents Bank did as well.  That's why

7  -- that wasn't on the first petition because I didn't know I

8  had a judgment for Regents Bank at all.  How do you sell a loan

9  and then come after me for that?

10        So, you know, I went and talked to Travis, and it was

11 a way bigger mess than I had realized.  And, yeah, I put my

12 head in the sand for ten years.  I shouldn't have done that.  I

13 should have handled ten years ago, but that's why I'm here

14 today because I guaranteed loans, things went south, and I had

15 no idea it was the size it was.

16 Q     Who told you not to file?

17        THE WITNESS:  Can --

18 Q     You've acknowledged you received the advice.  I think he

19 can answer who told him, yeah.

20        MR. BARKLEY:  It wasn't me.

21        THE WITNESS:  No.

22        MR. BEHR:  Yeah, no, yeah, yeah.

23 A     Dick Hudson.

24 Q     Okay.  All right.

25 A     I mean he's -- you know, at the time, you know, I thought

Baxley - Behr                                                      8

1  bankruptcy was scary, you know, I mean it's not -- everybody

2  was doing it.  I should have done it.  I mean if you ask me

3  what my major regret in life is, it's that because it's --

4  Q    When did you start receiving the letters that -- or calls

5  that they were going to try to start enforcing these older

6  judgments?

7  A    The sheriff came to my house I guess it was June, May or

8  June.

9  Q    Of --

10 A    This year.

11 Q    -- 2018?

12 A    '18.

13 Q    Okay.  Had you received anything prior to that?

14 A    Not that I can remember.  It just all came in like a wave.

15 And the -- and I looked at the numbers and I just -- I sat on

16 the front porch with the sheriff and he's like, you need to

17 file.

18 Q    Yeah.

19 A    I mean, he's like -- he said, I'm going to say a prayer

20 for you tonight, he said, because this -- you can't fix this.

21 These numbers are just -- I mean if you look at the interest on

22 the City National one, that's -- the interest is something you

23 couldn't even imagine.

24 Q    Yeah.

25 A    And I never did business with that bank.

Baxley - Behr                                              9

1  Q    Yes.

2  A    That was a bank -- Imperial Capital Bank went under, and I

3  guess they absorbed the assets or however that happened.  So --

4  Q    Okay.  I understand, and not to cut you short, they -- so

5  one of the questions I'm going to ask is have you filed for

6  bankruptcy in the last eight years, I mean you've already

7  essentially answered that, but the answer is no, correct?

8  A    Yeah, that's right.

9  Q    All right.  And you have very little -- I know you amended

10 your schedules to include property in Fayetteville.

11 A    Yes, sir.

12 Q    And that's the only real property that you own?

13 A    Yes, sir.

14 Q    All right.  And it's my understanding that you weren't

15 aware of your ownership interest in the property?

16 A    No, I knew -- I thought the piece of property was family

17 property.

18 Q    Yeah.

19 A    It's been in our family for, I don't know, 40/50 years.

20 But I had no idea that how many years ago my parents had gifted

21 it to myself and my brother.

22 Q    And you -- are you -- is there any other property, real

23 property that --

24 A    No.

25 Q    -- you believe is in your name that you've come -- okay.

Baxley - Behr                                              10

1  And you filed an amendment and that's one of the documents

2  that's in front of you here.  So the first thing on top is your

3  bankruptcy petition.  Do you see where it says DOC-1 on the

4  top?  That's what was filed there.  This is the amendment.  The

5  next piece of paper --

6  A    Yes, sir.

7  Q    -- which is DOC-20 is the amendment that included that.

8  And --

9  A    So, this is the amendment.

10 Q    That's the amendment --

11 A    Okay.

12 Q    -- that lists the property at 7647 Stoney Point Road,

13 Fayetteville, North Carolina and --

14 A    Yes, sir.

15 Q    -- you amended that on August 29th, 2018, is that correct?

16 That's what it says, right?

17 A    Yes.

18 Q    Yeah, yeah, right.

19 A    Yes.

20 Q    And included within that you disclose that you don't have

21 any cars, vans, trucks, tractors, sport utility vehicles or

22 motorcycles?

23 A    I do not.

24 Q    Okay.  What do you use to drive around or do you not drive

25 around?

Baxley - Behr                                    11

1  A    No, I drive around.  I have a work truck that I

2  essentially use.

3  Q    Okay.  And what kind of work truck is that?

4  A    GMC Ford Truck.

5  Q    What year is it?

6  A    I don't know, two thousand --

7           MR. BARKLEY:  Just estimate.

8  A    '15, '16, something like that.

9  Q    Okay.  And who owns that truck?

10 A    It's a leased truck through Baxley Corporation.

11 Q    All right.  Who do you lease it from?

12 A    I don't know.

13 Q    Or who they lease it from?  You don't know?

14 A    I don't know.

15 Q    Okay.  And I know -- and that's the only automobile that

16 you have access to?

17 A    Well, I can drive my wife's car.

18 Q    What does your wife have?

19 A    It's a 2011 or '12 Audi.

20 Q    All right.  Did you have access to any other automobiles

21 on the date of filing on July the 8th, 2018?

22 A    Yes, I used to drive a different work vehicle.

23 Q    What was that?

24 A    It was a 2009 or '10 BMW.

25 Q    All right.  What happened to that?

Baxley - Behr                                    12

1    A    It just went to somebody else at work.

2    Q    Okay.

3    A    I was driving that because it was diesel and they get

4    great mileage, and I don't make long drive anymore.

5    Q    Who is using it now?

6    A    I believe my father is using it.

7    Q    Do you know how the company came into possession of the

8    automobile?

9    A    They bought it.

10   Q    Okay.  I mean, do you know who authorized the purchase or

11   anything like that?

12   A    No.

13   Q    Okay.  Do you know who physically purchased it while it

14   was -- or was it leased, was it financed?

15   A    I don't know.

16   Q    Okay.  Is that not something you would have dealt with?

17   A    No.

18   Q    Okay.

19   A    I mean, I can get that information for you if you --

20   Q    That's okay.  But it's no longer -- you're no longer

21   driving it essentially?

22   A    No.

23   Q    All right.  Okay.  Do you have a boat or access to any

24   boats or jet skis or anything like that?

25   A    Mm-mm.

Baxley - Behr                                                    13

1  Q    All right.

2  A    It would be nice.

3  Q    Yeah, some of these questions are going to be a little

4  silly, so -- but they are on this.

5  A    But a boat would be nice.

6  Q    Yeah.  Do you -- let's see here, do you have any

7  collectibles of any value, antiques, figurines, painting,

8  prints, books, pictures, art objects, stuff like that, coins?

9  A    No, sir.

10 Q    No.

11 A    No.

12 Q    Okay.  Any significant sporting goods, equipment for

13 sports or hobbies I guess is the question, they provide sports,

14 photographic exercise, other hobby equipment, bicycles, pool

15 tables, golf clubs?

16 A    No, sir.

17 Q    All right.  Any firearms?

18 A    No, sir.

19 Q    Okay.  Have you ever owned any firearms?

20 A    When I was a kid --

21 Q    Okay.

22 A    -- hunting with my dad at like --

23 Q    Okay.

24 A    -- 18, 19 years old, but no.

25 Q    Do you have any jewelry?

1   A    Mm-mm.

2   Q    No.  No Lexus -- I mean not Lexus, no Rolex or anything

3   like that?

4   A    No.

5   Q    All right.

6   A    I've got a wedding ring.

7   Q    Okay.

8   A    I don't know where it is.

9   Q    Do you know own any non-farm animals and, you know, rescue

10  dogs or anything like that -- not that, but like any sort of,

11  you know, like they provide dogs, cats, birds, horses or

12  anything like that?

13  A    I don't have any animals.

14  Q    Okay.  You said you had $100 cash on hand at the time of

15  filing, is that about right?

16  A    Yes, sir.

17  Q    Okay.  Did you have any bank accounts anywhere?

18  A    No, sir.

19  Q    Okay.  When was the last time you banked?

20  A    Ten years ago or more.

21  Q    Okay.  So, you haven't had a bank account in ten years?

22  A    I have not.

23  Q    Okay.

24       MR. BARKLEY:  Can I interject here?  Do you want to

25  speak to that, that you received advice regarding --

Baxley - Behr                                          15

1        THE WITNESS:  I mean, I'll -- I'm here to tell him

2   whatever --

3        MR. BARKLEY:  Okay.

4        THE WITNESS:  -- they want to know.  I mean --

5   Q    Feel free to fill in whatever you want.  I mean, you know,

6   so --

7   A    So, I mean, it sounds strange to haven't had a bank

8   account, right?

9   Q    No, it does.  I was going to ask more questions about it,

10  yeah.

11  A    So --

12  Q    Admittedly, that's probably the reason why we're here.

13  I'm hopeful -- I mean, you know, it's an interesting petition

14  --

15  A    It is.

16  Q    -- that was filed, yeah.

17  A    But if I filed ten years --

18  Q    Yeah.

19  A    -- were you doing this years ago, it was more normal when,

20  you know, anybody in real estate development that guaranteed

21  loans they were, you know --

22  Q    Yeah, I'm familiar with it.

23  A    Dick Hudson said -- I mean, first of all, they took all

24  the money, you know, because if you -- you have bank accounts

25  where you have loans because --

Baxley - Behr                                    16

1  Q    Right.

2  A    -- that's part of the loan package, they want you to open

3  an account there.  So, the first thing they do is they take

4  your money and collateralize it.  And then they run your

5  account to the negative.  Well, once your account is in the

6  negative, you can't get a bank account anymore, you know.

7  Q    Yeah.

8  A    So, I haven't had one.  It sounds strange, but it's just

9  -- it's the truth.

10 Q    How have you lived without a bank account?

11 A    My wife.

12 Q    Okay.  And do you use her bank account?  Do you --

13 A    She pays for everything.  I mean, so  --

14 Q    Okay.  Do you have any credit cards that you have access

15 to?

16 A    No.

17 Q    Okay.  You don't use -- you don't have a corporate card or

18 anything like that?

19 A    I have a company credit card, but I don't use it for

20 anything personally.

21 Q    And who is that through?

22 A    Uh --

23 Q    Is it through Baxley Corporation?  I think that's one of

24 the agents --

25 A    Yes.

1  Q    Okay.  How long have you had that for?

2  A    I don't know, 60 days maybe.

3  Q    Have you had an access to -- did you have a credit card

4  through the corporation, or any other entity prior to that 60

5  days?

6  A    No.

7  Q    Okay.  Do you own any bonds, mutual funds or publically

8  traded stocks?

9  A    The only thing I own is the -- my little SEP.  It's --

10 Q    Your IRA with SunTrust?

11 A    Yes.

12 Q    Okay.  Any -- own any non-publically traded stock,

13 interest in incorporated, unincorporated businesses, LLCs,

14 partnerships, joint ventures?

15 A    No, sir.

16 Q    Okay.  All right.  And this is as of the -- just so that

17 we're clear, it's as of the date of filing on July the 8th,

18 2018?

19 A    Yeah.

20 Q    Okay.  And then now -- I guess I'll -- some of these

21 questions will be -- and I'm going to go back because I kind of

22 jumped over this, but do you own any currently?

23 A    I do not.

24 Q    Okay.  In the two years immediately filing of this

25 bankruptcy case did you transfer any interests in any --

1  A    No, sir.

2  Q    -- corporations or interest or anything like that?

3  A    I'm sorry.

4  Q    That's --

5  A    No, sir.

6  Q    Okay.  How much cash do you have on hand currently?  I

7  know we asked about filing, you had $100, but -- you know, it

8  could be -- and I --

9  A    No, I mean I'm going to tell you, I don't know.

10 Q    But what you have in your wallet would essentially be --

11 A    That's it, yeah.

12 Q    -- all that you have?

13 A    Yeah.

14 Q    All right.  And do you have the Baxley Corp. credit card

15 in there?

16 A    No.

17 Q    Yeah, okay.  Do you know who that's through?  That'll be

18 my next question.  Is it --

19         MR. BARKLEY:  What bank is it --

20 Q    Yeah.  What -- how is it --

21 A    Chase.

22         MR. BARKLEY:  Does it say Chase on it?

23         THE WITNESS:  Yeah.

24 Q    Chase.  Okay.  And you said that's only used for company

25 --

Baxley - Behr                                    19

1  A    Yes.

2  Q    -- purposes?  All right.  Do you own any government or

3  corporate bonds or other negotiable or non-negotiable

4  instruments?

5  A    No, sir.

6  Q    All right.  And the only retirement or pension account you

7  have is the SunTrust IRA which you said is a SEP-IRA?

8  A    Yes, sir.

9  Q    All right.  Is there any security deposits being held

10 somewhere that you have any sort of interest in?

11 A    No, sir.

12 Q    All right.  Does anybody owe you any money?

13 A    No, I wish, but no.

14 Q    Okay.

15      MR. BARKLEY:  Do you have a question, Brandon?

16      THE WITNESS:  I do.

17 Q    Okay.  We're -- and if you're looking where I'm at, it's

18 on Page -- it's on this DOC-29.  It's that first one right

19 there, and then it's -- it's paginated.

20 A    This one?

21 Q    No, that one, I'm sorry, the one that's in your hand right

22 there.  I'm sorry.

23      MR. BARKLEY:  So when he says DOC, it's up here.

24 Q    That's a docket entry.

25      MR. BARKLEY:  Yeah.

Baxley - Behr                                        20

1  Q    And then it's paginated on the top right corner, so if you

2  see --

3  A    Okay, yeah, yeah, yeah.

4  Q    -- I'm on Page 4 of 13 right now.  So --

5            MR. BARKLEY:  Four of thirteen.  Oh, what are you

6  asking?

7  A    This right here might -- it's a little bit less.

8  Q    But that's your SEP-IRA, right?

9  A    Uh-huh.

10 Q    So what -- what you're -- you know, so there -- you said

11 there's been a fluctuation essentially in the value of your

12 IRA?

13 A    Yes.

14 Q    Okay.  That's fair enough.  And that -- you probably

15 claimed that as exempt on your schedules?

16 A    Oh yeah.

17 Q    So yeah.

18           MR. BARKLEY:  Are you asking a question about Page 4

19 now, is that correct?

20           MR. BEHR:  Yes, I'm on Page 4.

21 A    Okay.  I didn't realize you were going through this one.

22 Q    Yeah, I wasn't -- no, I can't remember all these things.

23 I'm just going through what's on this piece of paper.

24 A    Yeah, I got it.  It makes it easier for me.

25           MR. BARKLEY:  Then you can follow along.

1  Q    It would be weird if I asking you about horses off the top

2  of my mind.

3  A    I was wondering where you were going with the exotics.

4  Q    No, it's one of the listed examples, believe it or not.

5  Okay.  Do you -- and do you have an interest in any trust,

6  equitable future interest in property, anything like that?

7  A    No.

8  Q    Okay.  Do you own any -- or have an interest in any

9  patents, copyrights, trademarks, trade secrets or other

10 intellectual property?

11 A    No, sir.

12 Q    Do you hold any licenses, franchises or other general

13 intangibles?

14 A    No, sir.

15 Q    All right.  Do you have any professional licenses?

16 A    No, sir.

17 Q    All right.  And that would include like whether you're a

18 surveyor or a lawyer like myself or a dentist or any other sort

19 of license or major accreditation?

20 A    No.

21 Q    And I should have started off with this, what is your

22 educational background?

23 A    High school.  I went to Fayetteville Academy, and then I

24 went to NC State.

25 Q    Okay.  Did you graduate from State?

Baxley - Behr                                    22

1  A    I did not.

2  Q    All right.  Was your -- how many years were you at State?

3  A    Oh, God --

4  Q    Did you get -- well, first of all, did you get a diploma

5  from Fayetteville Academy, you graduated --

6  A    Yes.

7  Q    -- from high school?  Okay.  All right.  What did you

8  study at State?

9  A    Political science.  I wanted to be a lawyer.

10 Q    It's never too late.

11 A    Yeah.  I worked for -- I was telling him earlier I worked

12 for Bailey & Dixon upstairs for -- during college.  Political

13 science and business.

14 Q    Okay.  But you -- and how -- do you recall how many years

15 you were there for or --

16 A    I think four and a half.

17 Q    Four and a half.  Okay.  But you didn't get a degree?

18 A    I've got a semester left.

19 Q    Okay.

20 A    It's on the list of things to do.

21 Q    Okay.  It just -- and really it doesn't -- I'm just

22 curious as to whether it was a very short period of time or a

23 longer period of time.  And did you have any other educational

24 background or anything like that?

25 A    No.

Baxley - Behr                                      23

1  Q    Okay.  All right.  Are you owed a tax refund?

2  A    No.

3  Q    Okay.  When was the last time you filed taxes?

4         MR. BARKLEY:  If I may.

5         MR. BEHR:  Oh, what have we got here?

6         MR. BARKLEY:  So, I had previously I believe sent

7  these over.  Those are his --

8         MR. BEHR:  Sixteen and --

9         MR. BARKLEY:  -- informational tax returns showing no

10 income --

11        MR. BEHR:  Okay.

12        MR. BARKLEY:  -- for '16 and '17, if that helps to --

13        MR. BEHR:  Okay.

14        MR. BARKLEY:  -- answer the question.

15        MR. BEHR:  No, it does.

16 A    The last time I filed was recently, '17, and it said --

17 Q    Okay.

18 A    -- the same thing as that.  Do you need a copy of that?

19        MR. BARKLEY:  That's 2016 and '17.

20        THE WITNESS:  Oh, yeah.  Okay, okay, yeah.

21        MR. BARKLEY:  Yeah.

22 Q    All right.  And when was the last time you had any

23 reportable income?

24 A    Five years ago.

25 Q    Okay.  And who was that through?  Was that a -- were you a

Baxley - Behr                                                    24

1  wage employee?

2  A    No, it was -- maybe longer than that.  I don't -- I mean I

3  can get that to him, but I don't remember.

4  Q    Okay.

5         MR. BARKLEY:  You -- I think he's asking where you

6  worked at that time.

7  Q    Yeah, where you worked.  I don't need to know how much you

8  made.

9  A    For myself.

10 Q    For yourself.  Okay.

11 A    For myself.

12 Q    Was it through a corporation?

13 A    I don't remember the LLC name.

14 Q    Okay.

15 A    I mean because some of this -- some of this stuff as we

16 were losing the property, we were able to retain some, and when

17 things finally fell apart was in 2013 when I lost the remaining

18 property.

19 Q    Okay.

20 A    And that was significant.

21 Q    Do you receive any family support, be it palimony, other

22 spousal support, child support, maintenance, divorce

23 settlement, property settlement, anything like that?

24 A    No.

25 Q    Okay.  And you said nobody owes you any money.  Do you

Baxley - Behr                                    25

1  have any interest in any insurance policies?

2  A    No.

3  Q    Okay.  Do you -- has anybody passed away to which you'd be

4  entitled to life insurance proceeds or inheritance or anything

5  along those lines?

6  A    No.

7  Q    Okay.  Do you have any current lawsuits against -- where

8  you are the plaintiff against anybody where you --

9  A    No.

10 Q    -- have a claim for money?  Okay.  One of the -- let's see

11 here --

12 A    Which page are you on now?

13 Q    I am -- and I know -- I may have forgotten to ask you

14 about -- and you don't currently have any bank accounts either?

15 I know --

16 A    No.

17 Q    I want to make sure --

18 A    No, I don't have any.

19 Q    -- historically and currently.  Okay.  And do you have any

20 current interest in any business entities or anything like

21 that?

22 A    No, sir.

23 Q    All right.  And you know what I mean by business entities,

24 you've been involved in business.  How many years were you

25 involved in business, I guess, is a good question?  You were --

1  A    Well, that's the reason why I stopped going to NC State

2  because that's when I started.

3  Q    Okay.  You did development and things like that?

4  A    (No audible response).

5  Q    All right.  And was that primarily in the form of LLCs or

6  --

7  A    Oh man, you're asking -- that was way back.

8         MR. BARKLEY:  So, did you set up LLCs --

9  A    No, I think it was --

10        MR. BARKLEY:  -- or S corps?

11  A    I think it was an S corp.

12  Q    Okay.

13        MR. BARKLEY:  Was your initial company?

14  A    Yeah, yeah, Baxley Development.  I just can't remember if

15  it was S -- I mean, that was a long time ago.

16  Q    Okay.  Are there any financial assets you had -- you

17  didn't list on your schedules for any reason --

18  A    No.

19  Q    -- whether it be -- you know, somebody didn't -- somebody

20  told you didn't have to list it or you didn't think you needed

21  to list it or anything like that?

22  A    No.

23  Q    Okay.  And that's also a question that's on Page 5 of 35,

24  Question 35 on Page 5, yeah, there we go.  All right.  Let's

25  see here.  I think we are done with Docket Entry Number 20.

 1  You can kind of just put it off to the side over there.

 2  A    Do you need this back?

 3  Q    Yeah, you're going to -- so what's going to happen here is

 4  I'll put -- this one you're never going to need to look again,

 5  but it is part of the record and while --

 6  A    But you're going to get all this back?

 7  Q    Yeah, we're going to get all that.

 8  A    Okay.

 9  Q    So, yeah, keep track of it. You may need to look -- you

10  may say, hey, I want to look at something that I looked at or

11  -- and that's why I want to keep those kind of neat for you

12  there.

13  A    I understand.

14  Q    Yeah.  All right.

15        MR. BARKLEY:  And I also have copies of these,

16  Brandon.

17  Q    Yeah, and those would be for -- that will be your copy

18  that your attorney has.

19        MR. BEHR:  And if you need additional copies, Travis,

20  let me know.  I'll --

21        MR. BARKLEY:  That's fine.

22        MR. BEHR:  -- whatever we need to do to --

23        MR. BARKLEY:  We can disseminate this.

24        MR. BEHR:  Yeah.

25        MR. BARKLEY:  This is fine.

1          MR. BEHR:  I don't know if you'll need them or not.

2    Q    All right.  If we can flip back to the one that says DOC-1

3    on the top there.  That's your main petition that was filed on

4    July the 8th, 2018.  Now, did you review this with your

5    attorney prior to it being filed?

6    A     (No audible response).

7    Q    Is that a yes?

8    A     Yes, sir.

9    Q    All right.  And --

10          MR. BARKLEY:  He's on this one.

11          THE WITNESS:  Yeah, I know.  I was just looking at

12   something real quickly.

13   Q    All right.  And did you physically sign these documents?

14   A     I did.

15   Q    Okay.  And you signed them after reviewing them?

16   A     Yes.

17   Q    Okay.  And if you'll jump with me here to your Schedule I,

18   which is on Page 27, so if you see where -- are you there?

19   Okay.  Great.  All right.  And your attorney has --

20   acknowledged prior to filing that you anticipate filing an

21   amendment to Schedule I.  I'm going to talk about some of the

22   schedule even though it hasn't been filed yet.  I mean this is

23   what's currently on the docket.  It states that you're not

24   employed, is that -- was that correct at the time you filed on

25   July the 8th, 2018?

1           THE WITNESS:  Can --

2   Q    I'd like you to try to answer that question.  That's a

3   pretty simple question.

4   A    Yeah, yeah, I'm employed, but I don't make any income, if

5   that makes --

6   Q    Okay.

7   A    -- any sense.

8   Q    All right.  And who are you employed with?

9   A    Baxley Corporation.

10  Q    Baxley Corporation.  And what does Baxley Corporation do?

11  A    Tree removal.

12  Q    What sort of tree removal does it do?  I mean is it --

13  does it, you know, mainly do houses or, you know, like

14  residential or what sort of --

15  A    I mean anything.

16  Q    Okay.  And what did you do for Baxley Corporation?  How

17  would you describe your job duties?

18  A    I handle all the scheduling for them.

19  Q    All right.  And what does that entail?

20  A    Scheduling when crews go to work, where they go.

21  Q    All right.  Okay.  So, you kind of like -- is like working

22  on the calendar I guess or is there a -- I mean I try to

23  understand, you know, how much -- you know, how much of your

24  time -- how much of your time is spent working with Baxley

25  Corporation?

Baxley - Behr                                        30

1  A     Twenty, twenty-five hours a week.

2  Q     Okay.  And do you do it out of the home or --

3  A     Yes.

4  Q     Okay.  All right.  And, I mean, describe -- again, I don't

5  understand, you know, is -- does scheduling take 20, 25 hours a

6  week where like you're telling crews where to go or is there

7  more to it than that?

8  A     I mean, no.  I mean, you're -- I mean I'm scheduling who

9  goes where and what they do.

10 Q     Okay.

11 A     I'm not trying to avoid the question.  I'm just trying to

12 --

13 Q     No, and I'm trying to -- and I'm not trying to be

14 argumentative with you.

15 A     Yeah, yeah.

16 Q     I'm trying to understand, you know, so --

17 A     Like if you've got four people here for --

18 Q     Yeah.

19 A     -- this job, you send them here and you're going to handle

20 what they need, what they do, when they clock in, when they

21 clock out, directions to, directions from, when you remove the

22 tree or the debris or whatever it is that's got to go to a

23 landfill, so what is the closest, what are the hours of

24 operation there, so that's --

25 Q     Do you take the customer's call or --

1  A      No, I do not.

2  Q      Okay.

3  A      Mm-mm.

4  Q      Do you decide what jobs to do?

5  A      No, I do not do that.  I just handle the flow.

6           MR. BARKLEY:  Can I qualify something with Brandon?

7           MR. BEHR:  Sure.

8           MR. BARKLEY:  When we sat down, it was my

9  understanding you were volunteering time to Baxley Corp. and

10 you weren't technically employed, meaning you weren't on their

11 payroll, you weren't --

12          THE WITNESS:  No, I'm not.  I mean, it's --

13          MR. BARKLEY:  Okay.

14          THE WITNESS:  It's a startup.  They're running --

15          MR. BARKLEY:  Okay.  So we want --

16          THE WITNESS:  You know, it's not profitable.

17          MR. BARKLEY:  -- to come back to that original

18 question --

19          THE WITNESS:  Yeah.

20          MR. BEHR:  Yeah, yeah, you know, and I -- thank you,

21 Travis.

22 Q     And I want -- at any time we need to clarify something,

23 I'm going -- it's --

24 A     You're here to understand.

25 Q     Yeah, I'm here to understand, yeah, and I didn't want you

Baxley - Behr                                          32

1  to think I'm arguing with you or anything like that.

2  A    No, no, no, and I'm here to do my best to make you

3  understand.

4  Q    Yeah.

5  A    I just -- you could understand I don't want to say

6  something wrong.

7  Q    I don't want you to say anything wrong.

8  A    Yeah, yeah, and I mean we're here for the same reason and

9  I'm --

10  Q    To get to the bottom of things, yeah.

11  A    The reason why I wasn't getting paid is there wasn't money

12  to pay me.

13  Q    How -- I mean --

14  A    It's a new company.  I mean --

15  Q    What kind of -- so, who started Baxley Corporation?

16  A    My wife and my father.

17  Q    Okay.  And when was it started, do you know?

18  A    A year and a half ago.

19  Q    Does it have any -- where does it bank?  Do you know where

20  it banks?

21  A    Bank of America.

22  Q    All right.  Is it an LLC, an S corp, do you know?

23  A    LLC.

24  Q    All right.

25           MR. BARKLEY:  Can I ask a question?

1          MR. BEHR:  Actually let me finish.

2          MR. BARKLEY:  It actually would help.

3          MR. BEHR:  Okay.  Please, go ahead.

4          MR. BARKLEY:  What's the official name of the

5     company?

6          THE WITNESS:  Baxley Corporation.

7          MR. BARKLEY:  LLC?

8          THE WITNESS:  LLC.

9          MR. BEHR:  Okay.  Yeah, thanks.

10         MR. BARKLEY:  I'm sorry.

11         MR. BEHR:  No, it's all right, and I -- that's fine.

12    Q    Does it have like a lot of trucks?  What kind of assets

13    does it have?

14    A    Um.

15    Q    Are the trucks leased?  I mean I've had trees worked on my

16    house.  They're big bucket trucks.  I mean what's --

17    A    No, no, no, no, no, we don't -- uh-uh, uh-uh.  It's -- we

18    don't have --

19    Q    Okay.

20    A    -- any bucket trucks, any big equipment like that.  We --

21    everything is climb.

22    Q    Okay.  So, they're putting on the -- I forget what they're

23    called -- they're climbing with --

24    A    The spikes.

25    Q    -- their spikes and they're doing everything with ropes --

1  A     Yes.

2  Q     -- and --

3  A     Yes, yes.

4  Q     How do you -- so how do you move the trees, do you have

5  like a trailer that you put it in and out of or --

6  A     A trailer or a dump truck.

7  Q     Okay.  Does it own a dump truck or --

8  A     I don't know.  I don't know if it owns or leases it.  I

9  believe it does own one.

10  Q     Okay.  All right.  Who runs the operations of Baxley

11  Corp.?

12  A     Jonathan Keith.

13  Q     Jonathan Keith.  How long has he been doing that for?

14  A     Maybe a year and a half.

15  Q     A year and a half.

16  A     No, two years maybe, a year and a half.  I mean since --

17  Q     And I'm not going to hold you.  As you said it was started

18  about a year and a half ago, so roughly --

19  A     It may be two years ago.  I mean --

20  Q     So, since it started I guess.

21  A     Yes.

22  Q     Okay.

23  A     He's been around since the start.

24  Q     And one of the things is if -- I want you to feel

25  comfortable with, you know, roughly a year and a half.

1  A      Yeah.

2  Q     If you -- feel free through in that, you know, caveat,

3  year and a half, two years.  I don't -- I'm not going to hold

4  you to an exact date unless we --

5  A     Can I ask one specific thing here --

6  Q     Yeah.

7  A     -- off the record or does it have to be on the record?

8  I'm hesitant to specifically pinpoint does it own this or does

9  it lease this because I don't know.

10 Q     If you don't know, you don't know.  No, no, and --

11 A     And also this is public record and these guys all over me,

12 you know what I mean, and I don't want --

13 Q     Who's all over you?

14 A     The creditors.

15 Q     Okay.

16 A     I don't want this to be public record and --

17        MR. BARKLEY:  Well, Brandon, it is public record.

18        THE WITNESS:  Yeah.

19        MR. BARKLEY:  So what we're doing here, you know,

20 you're officially making a statement --

21        THE WITNESS:  Yeah, I know.

22        MR. BARKLEY:  -- so just be aware of that.

23        MR. BEHR:  Yeah.

24        THE WITNESS:  And I don't want to say something I'm

25 not a hundred percent positive on.  That's what I'm trying to

Baxley - Behr                                    36

1  say.

2  Q    Then -- and feel -- and let me -- and to the extent I

3  didn't give the instruction at the beginning, if you're not a

4  hundred percent certain on something, say you're not a hundred

5  percent certain.  If you don't know the answer to something,

6  say you don't know.

7  A    Got it.

8  Q    I may say, okay, who would know.  I don't know if we're

9  going to come to that, but that's --

10 A    Sure.

11 Q    -- tell me, and if you don't know the answer to that, say

12 I don't know the answer to that either.

13 A    Sure, and I can say -- I can answer that way, so.

14 Q    And this is a public record and, you know, so -- and it's

15 part of a bankruptcy investigation, so I mean this is, you know

16 -- we want you to be accurate and want to be correct.

17 A    I understand.

18 Q    And based on what I've just told you, anything you want to

19 change based on what you said?  I --

20 A    No, I mean, I believe it owns one dump truck.

21 Q    Okay.  No, that's fine.  That's fine.  Fair enough.  All

22 right.  Do you know who makes the purchasing decisions for

23 Baxley Corp.?

24 A    My father and my wife or Jonathan.

25 Q    Okay.  All right.  Now, and I suspect this is where, Mr.

Baxley - Behr                                          37

1  Barkley and I spoke earlier, is that there's going to be an

2  amendment to this, and this currently does not have you as

3  being married, but you are married, is that correct?

4  A    Yes.

5  Q    All right.  And where does -- where is your wife employed?

6  A    She's not now as of recently, as of recent.

7  Q    Where was she employed?

8  A    WakeMed.

9  Q    All right.  And why was she terminated or why did she

10 leave or --

11 A    She wasn't terminated.  Her father is sick.

12 Q    Okay.

13 A    So, she's taking a little bit of time.

14 Q    Okay.  Is she on leave from there and she intends to

15 return or --

16 A    She has been offered to return.

17 Q    Okay.  Does she have any other sources of income besides

18 WakeMed?

19 A    No.

20 Q    She doesn't receive a salary from Baxley Corporation --

21 A    No.

22 Q    -- or anything like that?  All right.  Are any of the --

23 A    I mean, just 401(k) --

24 Q    Okay.

25 A    -- loan.

1  Q    Just a 401(k) loan you said or --

2  A    Yes, well, that's not an income, is it?  Sorry.

3  Q    So, she had -- there was a 401(k) set up for her and now

4  she's taken a loan from what she put into that?

5  A    Yes.

6  Q    Okay.  Did she ever receive any compensation from Baxley

7  Corp.?

8  A    No.

9  Q    Okay.  How much is the 401(k) loan for?

10 A    I don't know.

11 Q    Okay.  Does she have any other sources of income besides

12 the job at WakeMed?

13 A    No, sir.

14 Q    How are you all making ends meet since she doesn't have

15 any income right now?  I think you mentioned you had two

16 children.

17 A    The 401(k) loan.

18 Q    The 401(k) loan.  Okay.  Is that a 401(k) loan from Baxley

19 Corporation or from WakeMed?

20 A    From her 401.  She's never made any income from Baxley

21 Corporation and there's no --

22 Q    Okay.

23 A    -- 401(k) for her for Baxley Corporation.

24 Q    Okay.  That's where I misunderstood you.  I want to make

25 certain there was no 401(k) with Baxley Corporation?

Baxley - Behr                                          39

1  A     No.

2  Q     It's from WakeMed.

3  A     Yes.

4  Q     Okay.  That makes a lot more sense there.

5  A     I'm sorry.

6  Q     Yeah.  All right.  And does Baxley Corporation pay for any

7  of you all personal expenses, personal household expenses?

8  A     No.

9  Q     All right.  Do you know what your wife's salary was prior

10 to her taking leave with WakeMed?

11 A     It was about 75,000 a year.

12 Q     Okay.  All right.  And your Schedule J is -- there was an

13 amendment filed to it that is Docket 21.  I'll help you out

14 here.  There it is.

15 A     Thanks.

16 Q     This is another area where I think there may be some

17 issues.  You do have dependents, is that correct?

18 A     Me personally, no.

19 Q     I mean so you don't -- so they're not dependent of you.  I

20 guess you would say they're dependent of your wife and that's

21 why you didn't list them?

22 A     Yes.

23 Q     Okay.  And that is a -- your -- and this isn't public

24 record, so we don't need to use the children's names, we'll

25 just kind of use their ages, and you said four and two, is that

1  right or two and --

2  A    Two and six months.

3  Q    Two and six months.  I'm sorry.  Two and six months.

4  Okay.  All right.  And you have a house payment of $1500, is

5  that correct?

6  A    She does, yes.

7  Q    Okay.  And I'm sorry, when I say Schedule J expenses --

8  and that's a good area to caveat, you don't pay for any of

9  these expenses, these are all covered by your wife?

10  A    Yes.

11  Q    Okay.  So, the real estate taxes are paid by her, the

12  homeowners insurance is paid by her, maintenance is paid by

13  her, is that correct?

14  A    Yes.

15        MR. BARKLEY:  So, can I bring him where we're at?

16        MR. BEHR:  Yeah, please, please.

17        MR. BARKLEY:  All right.  So, we're on this one now.

18  A    There's a "J" in here, too, though, right?

19  Q    Yes, but you filed an amended one, so we're going to work

20  of your amendment that was filed on August the 29th, 2018.  Do

21  you all have any child care expenses or anything like that?

22  A    No, sir.

23  Q    All right.  Who watches the children?

24  A    Myself or her.

25  Q    Okay.

 1  A     Or family.

 2  Q     Okay.  The car payment of $535, do you know what that

 3  relates to?

 4  A     Her car.

 5  Q     Okay.  What kind of car does she -- is that the -- I'm

 6  sorry, you already told us what car that was.  I can't

 7  remember.

 8        MR. BARKLEY:  She drives like an Audi.

 9  Q     She has an Audi.  Okay.

10  A     I think it's '11 or '12, so.

11  Q     And was that -- is that financed or leased or --

12  A     I --

13  Q     You don't know.  Okay.  Fair enough.  All right.  Okay.

14  You can speak to your attorney, so.

15        MR. BARKLEY:  Sure.

16              (Attorney/client discussion)

17        MR. BARKLEY:  Okay.  I mean, it's fine if you want to

18  state that for the record.

19  Q     Yeah, please go ahead.

20  A     The last payment was this month, so --

21  Q     Her car payment?

22  A     Yeah.

23        MS. AYCOCK:  Okay.

24  Q     Cool.

25  A     Which is a big help.

1  Q    All right.  And this may help you with -- so I went on the

2  Secretary of State's website and I just searched your name and

3  your wife's name, and it may help you with some of the dates

4  and it may help you with saying -- you know, I asked you some

5  questions about some of the entities I think you used to have,

6  and I think that will help us out here.  All right.

7          We'll start with your wife's name.  All right.  And

8  if you don't know, you don't know.  All right.  Here, all

9  right, the first entity, Baxley Corporation, that's the entity

10 we were previously talking about that does the tree service, is

11 that correct?

12 A    Yes.

13 Q    Okay.  And that was a company and -- I think the date

14 right there of 5/11/17 may be the date of incorporation, does

15 that seem about right?

16 A    (No audible response).

17 Q    You wouldn't know?

18 A    I --

19 Q    Okay.  And your wife incorporated that company?

20 A    No, no, that -- that's correct.

21 Q    Okay.  And, again, you're basing it roughly on the date.

22 I know you don't --

23 A    Yeah.

24 Q    -- have the document in front of you.  So -- and does

25 Baxley Corporation only do the tree removal, as best you know?

Baxley - Behr                                          43

1   A    Yes.

2   Q    Okay.  What is Baxley Leasing, do you know what that is?

3   A    It owns some of the equipment or leases it to --

4   Q    Okay.  All right.

5   A    -- Baxley Corporation.

6   Q    And do you know what equipment it owns?

7   A    I do not.

8   Q    All right.  And do you know who holds an interest in that

9   LLC?

10  A    I know it's her.

11  Q    Okay.

12  A    It might be my dad, as well.

13  Q    Okay.

14  A    But I think it's just her.

15  Q    Okay.  All right.  And these were -- so this is another

16  one I think that was attached to your name and it's Baxley

17  Commercial Properties and what was that entity?

18  A    Real estate.

19  Q    Okay.  And is it defunct?

20  A    Yeah, oh yeah.

21  Q    And did it -- so it was administratively dissolved and

22  (indiscernible) for 2003 it looks like or something around

23  those times.  Does it have any current assets or anything like

24  that?

25  A    (No audible response).

Baxley - Behr                                      44

1  Q    Okay.  And were you the individual who set it up?  You
2  were --
3  A    Well, I set it up.  I don't know if it was me or if it was
4  an attorney.
5  Q    Okay.  But it was a company that you ran and it did that
6  property development that you were talking about?
7  A    Yes.
8  Q    Okay.  And this may be duplicate.  No, all right.  Baxley
9  Development, are you familiar with Baxley Development?
10 A    Yes.
11 Q    And what did Baxley Development do?
12 A    Built houses and -- no, it developed property, sorry.
13 Q    Okay.  And what is its status?
14 A    Oh, it's gone.
15 Q    Okay.  And did it -- when did it cease operations?
16 A    I don't know.  It's been over a decade.
17 Q    Okay.  Did it have any assets at the time of its -- it
18 ceased operations?
19 A    No.
20 Q    Okay.  All right.  Here's another old one I think.  Wake
21 Ventures, LLC, is that you?
22 A    Yes.
23 Q    Okay.  And what did Wake Ventures, LLC do?
24 A    The same thing, owned real estate, developed real estate.
25 Q    And did it have any asset -- and it's defunct now?

Baxley - Behr                                        45

1  A    Yes, sir.

2  Q    Did it have any assets upon its ceasing of operations?

3  A    No.

4  Q    All right.  Baxley Construction Company, Inc., what is

5  that?

6  A    That's not mine.

7  Q    Okay.

8  A    That's my parents' company.

9  Q    Do you have any involvement with that?

10 A    No, it doesn't even operate.

11 Q    Okay.

12 A    Do you want me to explain why it went back into current

13 active?

14 Q    Yeah, please, because your name is associated with it, so.

15 A    My name is associated with it --

16 Q    Yeah.

17 A    -- because my parents are getting older.

18 Q    Okay.

19 A    And my name is associated with it because I live in

20 Raleigh --

21 Q    Yeah.

22 A    -- and I was able to take the stuff to the Secretary of

23 State.  My parents are thinking about building a house next

24 year, and we need this to be able to build the house.

25 Q    Okay.  And do you know if it has any assets or anything

Baxley - Behr                                    46

1  like that?

2  A     No, I mean, it hadn't operated in --

3  Q     Okay.  All right.  This is --

4  A     -- more than a decade.

5  Q     This is Number 7, Carolina Landscapes NC, LLC, do you know

6  what that is?

7  A     Yes.

8  Q     What is that?

9  A     It's a landscape company.

10 Q     All right.  And --

11 A     It's defunct.

12 Q     It's defunct.

13 A     It's got no -- yes, no assets, nothing.

14 Q     Okay.  And Commercial Holdings Corporation, LLC?

15 A     The same, defunct.

16 Q     Okay.  When did it cease operations?

17 A     I don't know.

18 Q     Okay.  What did it do?

19 A     Nothing, it had some real estate, and I think that had --

20 I think that managed some of the real estate.

21 Q     And when did it go defunct, do you know?

22 A     It's been --

23 Q     Or when did it cease operations?

24 A     I mean it's been years and years.

25 Q     Okay.

Baxley - Behr                                                        47

1  A    Because I don't -- I don't know the specific date.

2  Q    And what property did it manage?

3  A    It managed some of the property that I owned and also

4  managed a condo complex off of Millbrook Road.  What was the

5  name of it?

6  Q    This is real property?

7  A    Yes.

8  Q    All right.  But it no longer operates?

9  A    No, sir.

10 Q    Doesn't have any bank accounts?

11 A    No, sir.

12 Q    Didn't have any assets?

13 A    No, sir.

14 Q    When was the last time it had an asset, or did it even

15 have -- I guess a contract could have been an asset?

16 A    It never had assets.

17 Q    Okay.

18 A    It was started to operate to manage real estate, but that

19 never really happened.

20 Q    Okay.  And I forgot to ask this for Carolina Landscapes,

21 when did it cease operations?

22 A    2014 or -- '14 maybe.

23 Q    Okay.  And what did it do?

24 A    It's so hard to remember back these days.  It did

25 landscape maintenance.

1          MR. BEHR:  Okay.  See what else I got here.  What

2    number am I on, Tanya?  Seven.  Okay.

3          MS. AYCOCK:  Seven.

4    Q    All right.  And I think -- and at one point in time did

5    you own a piece of property out in Holden Beach, North

6    Carolina?

7    A    No, not that I'm aware of.

8    Q    And this was 114 Sand Dollar Street, Holden Beach, North

9    Carolina?

10   A    Yeah, I know the house.  It's my parents' house.

11   Q    Okay.  And it looks like it was transferred into your name

12   on --

13         MR. BARKLEY:  Is that your signature?

14         THE WITNESS:  No, it's similar to it, but it's not

15   it.

16   Q    I mean and it looks like you transferred it to your

17   parents on May 21st, 2010.  Did you --

18   A    I don't know.  No, I did -- not that I'm aware of.

19   Q    Okay.

20   A    It's my parents' house.  They built it in 1985.  I don't,

21   you know --

22   Q    Here is a deed transferring it into I believe your name on

23   -- I'm sorry -- when was it done --

24   A    1999.

25   Q    1999.

Baxley - Behr                                                    49

1   A    Oh, it was in college.  That's my college apartment.  I

2   don't -- I don't know.

3   Q    So, you weren't aware that the property was transferred

4   into your name in --

5   A    No.

6   Q    -- 1999.  It looks --

7   A    No.

8   Q    -- like February 16th, 1999.

9   A    I mean, I was in college, no.

10  Q    Okay.  And you weren't aware of the property being

11  transferred out of your name and into your parents' name on May

12  the 21st, 2010?

13  A    No.

14  Q    All right.  And --

15  A    I know -- I'm sorry, I'm not.

16  Q    Okay.  No, it's --

17  A    I --

18       MR. BARKLEY:  I mean, Brandon, it could be you just

19  don't recall.

20  A    I -- yeah, I don't remember it at all.  I mean this --

21  Q    Do you -- it looks like the one that you actually signed

22  was notarized by a Ronald J. Antonelli, are you familiar with

23  Mr. Antonelli?

24  A    I am.

25  Q    Okay.  And who is --

1   A    He may --

2   Q    Is he a notary public or --

3   A    He's an attorney.

4   Q    Okay.

5   A    Maybe I -- I mean --

6   Q    Is that your signature at the --

7   A    It's similar to it.  It looks like it.

8   Q    Okay.

9   A    I mean I -- like I said, I don't remember this.

10   Q    Okay.  That's a legitimate response, Mr. Baxley.  I don't

11 -- all right.  Exhibit Number 10 is a -- I suspect you may not

12 know the answer to that either, but it's a general warranty

13 deed from your parents into the Rudolph Baxley and Constance A.

14 Baxley Revocable Trust, are you familiar with that trust?

15   A    No.

16   Q    Okay.

17   A    What is this though?  Is this --

18   Q    This is again I think the property in -- on Holden Beach.

19   A    Yeah, I don't --

20   Q    Okay.

21   A    -- I'm sorry.

22   Q    No, no, you -- look, if you -- I can't -- I don't want you

23 to create answers for me.

24   A    No, I'm just -- you know, I'm not aware of this.

25   Q    Okay.  All right.

Baxley - Behr                                          51

1        MR. BARKLEY:  Whose house is this?

2        THE WITNESS:  Mr. -- it's my parents' house.

3        MR. BARKLEY:  Okay.

4   Q    Is it where they live currently?

5   A    Yeah.

6   Q    Oh, okay.  So, it's their home.  All right.

7   A    It's their house, and they've had it since like 1985, so.

8   Q    And you --

9        MR. BEHR:  What number are we on, Tanya?  Ten?

10       MS. AYCOCK:  We're on 11.

11       MR. BEHR:  Eleven, okay.

12  Q    And you just spoke to this, but I want to confirm with

13  you, this is the annual report for Baxley Corporation for 2015,

14  and I'm going to hand you the one for '16, and I think I have

15  one for '17, too.  And I believe it was your --

16       MR. BEHR:  This is Number 12, right, Tanya?

17       MS. AYCOCK:  Yes.

18  Q    All right.  And '17 here, that'll be Number 13.  You

19  previously testified that you filed these to help your parents,

20  is that right?  Is this what you were referring to?

21       MR. BARKLEY:  So I have an 11 and 13.  I don't see --

22       MR. BEHR:  I may have missed here.  This is --

23       THE WITNESS:  There's a 12 here.

24       MR. BEHR:  Yeah.

25       MR. BARKLEY:  I have a 10 and then 11.

Baxley - Behr                          52

1              MR. BEHR:  Oh, you know what, that's why I have two

2    12s.

3              MR. BARKLEY:  Okay.

4              MR. BEHR:  I'm sorry about that.

5              MR. BARKLEY:  All right.  That's fine.

6    Q    All right.  Everybody have 11, 12 and 13?

7              MS. AYCOCK:  No.

8              MR. BEHR:  What do you need, Tanya?

9              MS. AYCOCK:  I have a 15 and 16.

10             MR. BEHR:  You have a 15 and 16?  Maybe I just -- oh,

11   no, no, I'm talking about the exhibit number.

12             MS. AYCOCK:  Oh, I'm sorry.

13             MR. BEHR:  Yeah.

14             MS. AYCOCK:  I'm going for the year.

15   Q    So we have the reports for fiscal years ending '17, '16

16   and '15, and was this what you referring to earlier about

17   filing something for your parents in relation to Baxley

18   Construction Company?

19   A    Yes.

20   Q    All right.

21   A    Yes.

22   Q    And are you -- do you serve in the role as secretary of

23   that entity or --

24   A    I mean --

25             MR. BARKLEY:  Do you know?

Baxley - Behr                                    53

1  A    On paper, yes --

2          MR. BARKLEY:  Does he have --

3  A    -- but it's a non-operating entity.

4          MR. BARKLEY:  -- the originals of those?

5          MR. BEHR:  I mean he has the --

6          MR. BARKLEY:  Did you stack those up?  You might want

7  to be looking at those.

8          THE WITNESS:  Well, I mean, yeah, I mean I'm familiar

9  with them.

10          MR. BARKLEY;  Yeah.  Okay.

11  Q    And do you serve -- other than in this capacity, do you

12  serve in any other, you know, officer role in any corporation

13  or anything like that?

14  A    No.

15  Q    Okay.  Have you in the past two years prior to filing?

16  A    I'm -- would --

17  Q    Other than that entity, maybe you served in it that entity

18  for -- so I -- let's -- where's the -- let's go back to the

19  petition.  We may have jumped over this.  Let's go right here.

20  Go back to Docket Entry Number 1 and that is --

21          MR. BARKLEY:  Right here?

22  Q    -- right there -- turn with me to Page Number 32.  It says

23  you're married and you are married, correct, right?

24  A    Yes.

25  Q    All right.  What is your current address?

1  A     1211 Wake Forest Road.

2  Q     And is that where you've lived for the past three years?

3  A     Yes.

4  Q     Okay.  So, that's question Number 2.  Within -- that's for

5  community property states, never mind.  And the next question,

6  Question Number 4, pertains to you.  It talks about your income

7  from employment or from operation of business for the past two

8  years, you didn't have any income for the two years --

9  A     No.

10 Q     -- prior to filing?  Okay.  Did you receive any other

11 income during those two previous years, you answered no, is

12 that correct?

13 A     No.

14 Q     Okay.  All right.  Did you transfer any property within

15 one year prior to filing?

16 A     No.

17 Q     And that includes business interests, anything like that?

18 A     No.

19 Q     Cars?

20 A     No.

21 Q     Trains, planes, automobiles, things like that?

22 A     No, sir.

23 Q     All right.  Within one year prior to the filing of the

24 bankruptcy, were you a party to any lawsuits?

25 A     No.

Baxley - Behr                                                    55

1  Q    Okay.  I'm on Question Number 9, if you want to keep

2  following with me.  I don't know if you're --

3          THE WITNESS:  Can I grab some water from you all?

4          MR. BEHR:  Yeah.  Tanya, grab him some water.

5          MS. AYCOCK:  And I don't have a 13.

6          MR. BARKLEY:  So, we're on Page 34.

7          MS. AYCOCK:  Eleven, twelve.

8  A    Okay.  Got it.  And you're on Number 9, right?

9  Q    Yep.

10         MS. AYCOCK:  Did you need --

11         MR. BARKLEY:  Oh, I'm fine.  Thank you.

12         MR. BEHR:  Another thing I forgot to say, if you need

13 to take a break, use the restroom, let me know.  I want you to

14 be comfortable.  So don't --

15         MR. BARKLEY:  Do you want to take a break down now

16 since she's getting you water?

17         THE WITNESS:  I mean, I'm fine.

18         MR. BARKLEY:  Okay.

19         MR. BEHR:  Okay.  We'll get you -- look, I didn't

20 mean to cut you off.  If you want a break --

21         THE WITNESS:  No, no, no, I'm just trying to see what

22 time it is.

23         MR. BEHR:  It's two o'clock.  So, I mean, hopefully

24 we're not here for too long, but the other thing I would say,

25 and I tend to forget my instructions when I start, my

1  apologies, if you're uncomfortable, you want to take a break,

2  that door is closed for our privacy.

3              THE WITNESS:  Sure.

4              MR. BEHR:  The only thing I say is, you know, take a

5  break, that's just how much longer we'll be here, but I want

6  you to be comfortable.

7              THE WITNESS:  No, I --

8              MR. BEHR:  We're not locked in.

9              THE WITNESS:  Listen, I'm just here to --

10             MR. BEHR:  Yeah.

11             THE WITNESS:  -- answer your questions, you know --

12             MR. BEHR:  Yeah.

13             THE WITNESS:  -- I mean.

14             MR. BEHR:  And I'm here to make sure you're

15  comfortable also --

16             THE WITNESS:  Yeah.

17             MR. BEHR:  -- besides asking the questions.

18             THE WITNESS:  Listen, I understand.

19             MR. BEHR:  Yeah.

20             THE WITNESS:  You know, you see some of the stuff, I

21  get it.  The smell test --

22             MR. BEHR:  No, you --

23             THE WITNESS:  -- you know, it's just -- I get it.

24  Styrofoam cups in a government office, what?  Thank you.

25             MS. AYCOCK:  I personally purchased them.

**WWW.JJCOURT.COM**

Baxley - Behr                                                    57

1           MR. BEHR:  It's ironic, isn't it?

2           THE WITNESS:  I prefer Styrofoam.

3           MR. BEHR:  All right.

4           THE WITNESS:  But you can't say that.  It's not

5    politically correct anymore.

6    BY MR. BEHR:

7    Q    Did -- and you didn't have any bank accounts, so nobody

8    could set off against your account within 90 days prior to

9    filing, right?

10   A    No.

11   Q    All right.  Was any of your property repossessed,

12   foreclosed, garnished within one year prior to filing?

13   A    No, but it's all been --

14   Q    That happened --

15   A    -- foreclosed.  Every --

16   Q    -- many years ago?

17   A    Well, I mean back -- the last piece was my personal home,

18   yeah.

19           MR. BARKLEY:  Within one year is what he's asking.

20   A    No, no, yeah, no.

21   Q    Within the two years prior to filing bankruptcy, did you

22   give any gifts that were greater than $600 to any one person?

23   A    No.

24   Q    Did you give more than $600 to any charity?

25   A    (No audible response).

1  Q    Is that a no?

2  A    Yes, sir, I'm sorry.

3  Q    Okay.  Within one year prior to filing, did you lose

4  anything because of theft, fire, other disaster or gambling?

5  A    No, sir.

6  Q    All right.

7  A    What page are you on again?

8  Q    I am on Page 35 now at the very top.  Did you -- within

9  one year prior to filing, did you pay any -- let me ask the

10 question, within one year before you filed your bankruptcy, did

11 you or anyone else acting on your behalf pay or transfer any

12 property to anyone you consulted about seeking bankruptcy or

13 preparing a bankruptcy petition?

14 A    No.

15 Q    Okay.  Within one year before you filed for bankruptcy,

16 did you or anyone else acting on your behalf pay or transfer

17 any property to anyone who promised to help you deal with your

18 creditors or make any payments to your creditors?

19 A    No.

20 Q    Okay.

21 A    Which question are you on, so I can read it?

22 Q    Seventeen, yes.

23 A    Okay.

24       MR. BARKLEY:  Eighteen now.

25 Q    Yeah, I'm on 18 now.  Let me ask you this, did you pay Mr.

1  Barkley for his services?

2  A    Mm-mm.

3  Q    Is that a no?

4  A    No.

5  Q    Did anybody pay him for his services?

6  A    No.

7  Q    Okay.  This case is pro bono as far as you're concerned?

8  A    Yeah, I mean I haven't paid anybody yet, no.

9  Q    Okay.  Have you received a bill?

10  A    No.

11  Q    Okay.  Within ten years before you filed your bankruptcy,

12  did you transfer any property to a self-settled trust or

13  similar device of which you are a beneficiary?

14  A    No.

15  Q    Is it possible that somebody else paid your attorney on

16  your behalf and you're just not aware of it?

17  A    No.

18  Q    Okay.  Were any of your bank --

19  A    So what you're asking basically is -- I'm just trying to

20  figure this out, is this ten years thing here with this --

21  Q    Yeah, I think it's --

22  A    -- is that --

23  Q    -- even outside of that.  I was just -- look, there's very

24  little in your name and that is one of the few things that pops

25  up, so I wanted to ask you about it.

Baxley - Behr                                          60

1  A    I get it.  I get it.

2  Q    Yeah.

3  A    It --

4  Q    And that is a very old transfer and --

5  A    I don't -- you know, I don't -- I wish I could answer that

6  question.

7  Q    I understand.  Within one year prior to filing, were any

8  financial accounts in your name closed, moved or transferred?

9  A    No.

10 Q    Okay.  Did you have any safe deposit box currently or

11 within the past year?

12 A    No.

13 Q    All right.  Do you have any property stored in a storage

14 unit or place other than your home within one year before you

15 filed bankruptcy?

16 A    No.

17 Q    All right.  Do you currently have a storage unit?

18 A    No.

19 Q    Do you hold or control any property that someone else

20 owns, include property you borrowed from, are storing for or

21 hold in trust for somebody?

22 A    No, sir.

23 Q    These next questions relate to hazardous materials.  I

24 don't think that pertains to your case.  Within four years

25 before you filed for bankruptcy did you own a business or have

Baxley - Behr                                      61

1  any of the following connections to any businesses, sole

2  proprietor or self-employed and trade professional or other

3  activity, either full time or part time, member of a limited

4  liability corporation or limited liability partnership?

5  A    No.

6  Q    Partner in a partnership?

7  A    No.

8  Q    Officer, director, or managing executive of a corporation?

9  A    No.

10  Q    Were you --

11  A    Okay.  Where are you on?

12  Q    I'm on 37.  It switched.  It goes over to the top there.

13  A    Okay.

14  Q    An owner of at least five percent of the voting or equity

15  securities of the corporation?

16  A    No.

17  Q    All right.  Have you served as an officer or any sort of

18  non-profit or anything like that?

19  A    No.

20  Q    Any other sort of entity, business entity or anything like

21  that?

22  A    No, sir.

23  Q    All right.  All right.  Have you given anybody a financial

24  statement within the two years prior to filing your case?

25  A    No.

Baxley - Behr                                    62

1  Q    All right.  We're through that now.

2  A    We're done with this one.

3  Q    I think I intentionally tried to avoid it.  That's why --

4  all right.

5  A    So, what's up with the hazardous materials?

6  Q    I don't know.  I've never had to deal with that ever.  So

7  you don't have any hazardous materials, do you?

8  A    No.

9  Q    Okay.  Well --

10 A    I just was wondering how that would affect the bankruptcy.

11           MR. BEHR:  You need 13?

12           MS. AYCOCK:  Yes.

13           THE WITNESS:  Here you go.  You want mine?

14           MR. BEHR:  No, I've got one for her.  Those are

15 staying there.  The thing -- and I'm not going to give you any

16 legal advice about hazardous materials in bankruptcy.

17 Q    All right.  Let's see here, what do we got.

18 A    Are we done with --

19 Q    You can -- yeah, I think we're done with that.  Some of

20 these things we've already talked about.  We're going to go

21 over it real quick.

22           MR. BARKLEY:  Oh, just -- yeah, hold onto that right

23 here for a second.

24           MR. BEHR:  All right.  What number are we on, Tanya?

25           MS. AYCOCK:  Fourteen.

Baxley - Behr                                    63

1  Q    All right.  Some of this may appear to be redundant, and I

2  apologize in advance.  All right.  This is the articles of

3  organization for Carolina Landscapes of Raleigh, LLC, and I

4  have that as Exhibit Number 14.  It looks like this was

5  incorporated in 2007, is that correct?

6  A    Yes.

7  Q    At the top.  All right.  And you incorporated that, if you

8  turn the page, you were the organizer or one of the organizing

9  members?

10  A    Yes.

11  Q    Okay.  And you stated that's no longer in operation,

12  correct?

13  A    No.

14  Q    All right.

15  A    Can I put that here?

16  Q    Yeah, you can put that there.  All right.  I'm handing you

17  what's labeled as Exhibit Number 15.  This purports to be the

18  annual report for 2018 for Carolina Landscapes, LLC which was

19  filed on August the 17th, 2018 and it lists you as the manager.

20  Help me understand why that was filed.

21        THE WITNESS:  This was the one I was talking about

22  earlier.

23        MR. BARKLEY:  Talk to -- yeah, talk to him about it.

24  A    Okay.  So I have a pesticide license --

25  Q    Okay.

Baxley - Behr                                    64

1  A    -- that it took me forever to get.

2  Q    Uh-huh.

3  A    And I got notice that they couldn't renew it --

4  Q    Okay.

5  A    -- because the company was administratively dissolved.

6  Q    Okay.

7  A    So I had to do this to renew it to put it in my personal

8  name.

9  Q    Okay.  And --

10  A    Does that make any sense?

11  Q    No, it does.  And --

12  A    The company doesn't operate.  It doesn't -- hasn't done

13  work, won't do work, but I didn't want all those --

14  Q    Okay.

15  A    -- all that studying to go away.

16  Q    And that's a pesticide what you said?

17  A    Pesticide license.

18  Q    Okay.  I asked you about licenses earlier, are there any

19  other licenses --

20  A    But it wasn't -- no, but you said professional license.

21  Yeah, it's just -- it's a pesticide applicator's license.

22  Q    Okay.  Any other licenses that you have or --

23  A    No.

24  Q    Okay.  And this phone number here, 909-986-1519, is that

25  your personal line?

Baxley - Behr                                          65

1   A      I'm sorry, one more time.

2   Q      There's a phone number there on there, is that your

3   personal phone number?

4   A      That's a business number.

5   Q      And who -- and what business is that?

6   A      It's a Baxley number --

7   Q      Okay.  Whose address is 101 Cosgrove Avenue, Chapel Hill,

8   North Carolina 27514?

9          MR. BARKLEY:  I believe that's R. J. Antonelli.

10         MR. BEHR:  Okay.

11         MR. BARKLEY:  The attorney that was mentioned

12  earlier.

13  Q      Did Mr. Antonelli prepare this for you?

14  A      Yeah.

15  Q      Okay.  So you do have an interest in an LLC, Carolina

16  Landscapes NC, LLC?

17  A      I don't know.

18         MR. BARKLEY:  It's a yes or no question.

19  A      Yes.

20         MR. BARKLEY:  Do you own the company?

21  A      Yes.

22  Q      Does it have any assets?

23  A      No.

24  Q      Does it have a bank account?

25  A      No.

1  Q    It doesn't have any chemicals for pesticides?

2  A    No.

3  Q    Okay.  And whose e-mail is Alicia@turningleaf --

4  A    I have no idea.  I was just noticing that.

5  Q    -- solutions.net?  Okay.  You don't know who that is.

6  A    I have no idea.

7  Q    Okay.  All right.  Excuse me.  Okay.  Baxley Leasing --

8           MR. BEHR:  What number am I on, Tanya?

9           MS. AYCOCK:  Sixteen.

10          MR. BEHR:  Sixteen.

11 Q    All right.  Is it correct you don't have any involvement

12 with Baxley Leasing, is that right?

13 A    No.

14 Q    And that's an entity that -- is it your understanding that

15 your wife has an interest in?

16 A    Yes.

17 Q    And forgive me, did you say your father may also have an

18 interest in that?  You weren't -- you didn't know.

19 A    I believe that's just all her, but I can't be sure.

20 Q    All right.

21          MR. BEHR:  What number are we on, Tanya?

22          MS. AYCOCK:  Seventeen.

23          MR. BEHR:  Seventeen.  Okay.

24          THE WITNESS:  Can I run to the restroom real quick,

25 is that okay?

Baxley - Behr                                    67

1          MR. BEHR:  Yeah, go ahead.

2          MR. BARKLEY:  Sure.

3          MR. BEHR:  Take a break.  Yeah, go ahead.

4          THE WITNESS:  Thanks.  I'm going to get some more

5    water out there, too.

6          MS. AYCOCK:  Okay.

7          THE WITNESS:  Is it just in your little --

8          MR. BEHR:  Yep.

9                    (Recess)

10         MR. BEHR:  All right.  You ready?  I don't want to

11   keep you here too long, so let's plough ahead.  All right.

12         THE WITNESS:  I'm with you.

13   BY MR. BEHR:

14   Q    All right.  Mr. Baxley, we have returned.  You recognize

15   you're under oath and ready to get started again?

16   A    Yes.

17   Q    Great.  All right.  Where were we?  Okay.

18         MR. BEHR:  Tanya, what number are we on?

19         MS. AYCOCK:  Seventeen.

20         MR. BEHR:  Seventeen.  All right.

21         THE WITNESS:  Oh my God, he's got a lot more to go

22   through.

23         MR. BEHR:  We -- not maybe all of them.  We'll see.

24   Q    Here's 17.  This is Commercial Holdings Corp., and this is

25   the entity you said that owns and managed some property, is

1 that right or just managed property?

2 A    Yeah, it didn't do much of anything.

3 Q    Okay.  Now, the last annual report was filed in two

4 thousand and -- first of all, while we're on 17, you were the

5 organizer and member of this entity, correct?  Turn it over.

6 A    Yes.

7 Q    Okay.  Were there any other members of the LLC?

8 A    Yes.

9 Q    Who else was a member?

10 A    My father.

11 Q    Okay.  Anybody else?

12 A    I don't know.

13 Q    That was it?

14 A    Yes.

15 Q    Okay.  All right.  This was the last filed report in 2016

16 lists you as the member, is that right?

17 A    No.

18 Q    Or the manager?  I'm sorry.

19 A    Manager.

20 Q    Were you also a member at that time?

21 A    Not in '16, no.

22 Q    Okay.  What had you done with your interest?

23 A    I didn't have much interest to start in it.

24 Q    Okay.

25 A    And I don't know if I ever had interest in this.

Baxley - Behr                                    69

1  Q    Okay.  Well, it says you're a member manager on --

2  A    I know.  I'm reading now.

3  Q    -- or an organizer member.

4  A    In '08.

5  Q    Where would the records for --

6  A    I can't answer that question.

7  Q    Where -- who would have the records of the -- you know,

8  the books and records of Commercial Holdings Corp., yeah,

9  that's right, LLC?

10 A    They are probably gone.

11 Q    Okay.  What happened to them?

12 A    They were in my basement when Hurricane Matthew came

13 through and it flooded.

14 Q    Okay.  Have you thrown them away or --

15 A    It was all -- I mean, I had six feet of water in the

16 basement.

17 Q    Okay.  But they were thrown away?

18 A    Yes.

19 Q    Okay.  All right.

20 A    I'm sorry.  I should have --

21 Q    No, that's fine.  Okay.  So -- but you were the manager as

22 of 6/17/16?

23 A    Yes, sir.

24 Q    And when did you cease being the manager?

25 A    Around this time.

**WWW.JJCOURT.COM**

Baxley - Behr                                          70

1    Q    Okay.  Did -- there was a dissolution I think or

2    administrative dissolution.

3              MR. BEHR:  Are we on 19?

4              MS. AYCOCK:  Mm-mm.

5    Q    Okay.  And that occurred -- I have trouble reading these

6    documents,  I'm a fish out of water again with these state

7    documents -- the 28th day of February, 2018.  When did it cease

8    operations?

9    A    I can't -- I don't know.

10             MR. BEHR:  That's 19, right?

11             MS. AYCOCK:  Mm-mm.

12   Q    All right.  Okay.  Did it cease operations before this or

13   --

14   A    Yes.

15   Q    Okay.

16   A    Yes, sir.

17   Q    When do you think ceased operations?

18   A    I don't know.

19   Q    If you had to guess.

20   A    I don't -- so I don't --

21   Q    Okay.

22   A    I'm not trying to give you a short answer.  I just don't

23   remember.

24   Q    Okay.  Fair enough.

25   A    I'm sorry.

Baxley - Behr                                                71

1  Q    All right.  Are you familiar with a lawsuit that

2  Commercial Holdings Corporation filed against Jeffrey Neal

3  McTighe and Nello's Italy, LLC?

4  A    Yes.

5  Q    Okay.  Tell me about that.

6  A    I cannot.

7  Q    Okay.  Why can't you tell me about it?

8  A    I signed a non-disclosure.

9  Q    Oh okay.  Well, that's property of your estate and, you

10 know, we can -- did you receive any money as a result of the --

11 A    I did not.

12 Q    -- settlement?  Okay.  And when did the action cease?

13 A    (No audible response).

14 Q    So the complaint was filed in July of 2016, when did you

15 sign the non-disclosure agreement or whatever you have?

16 A    I don't know.

17 Q    Okay.  Was that part of the records that you -- were

18 destroyed in Hurricane Matthew?

19 A    I don't know.

20 Q    So, was there a settlement of this action?

21 A    I can't -- I mean I signed a non-disclosure.  I don't want

22 to get sued.

23        MR. BARKLEY:  Well, I think you can answer yes or no

24 that there was.  You're not --

25        THE WITNESS:  You mean --

**WWW.JJCOURT.COM**

1  A     Yes, there was a settlement.

2  Q     Okay.  And did Commercial Holdings Corporation receive any

3  monetary or other relief as a result of that settlement?

4  A     No.

5  Q     Okay.  Do you have a copy of the settlement?

6  A     No.

7  Q     Who has a copy of the settlement?

8  A     I don't know.  I don't really know.

9  Q     Okay.  Did you ever receive any compensation as a result

10 of your involvement in or Commercial -- let me ask it this way,

11 did Commercial Holdings Corporation have an interest in Nello's

12 Italy, LLC?

13 A     Yes.

14 Q     Okay.  And that -- what percentage interest did it have?

15 A     I don't know.

16 Q     Would it be a 29 percent interest?  If you go towards the

17 end, there's an affidavit that you signed or it purports to

18 have been signed by you.

19 A     Yes.

20 Q     Okay.  And did Commercial Holdings Corporation, LLC or

21 yourself ever receive any compensation from Nello's Italy, LLC

22 at all?

23 A     Not that I'm aware of.

24 Q     Okay.  Would -- who represent -- did Vann Attorneys

25 represent you in relation to this action?

1  A    They represented Commercial Holding Corporation.

2  Q    Okay.  All right.  Do you recall how soon after July the

3  6th, 2016 this complaint was resolved?

4  A    Shortly, I don't have an exact date.  I'm sorry.

5  Q    Okay.

6  Was it a month?  Was it two months?  Was it three months?  Was

7  it five months, six months?

8  A    It was during 2016.

9  Q    Okay.

10  A    I do remember that.

11  Q    Was it in the wintertime, summertime?

12  A    I --

13  Q    You don't know.  Okay.  Would you --

14  A    Fall.

15  Q    Okay.  All right.  If you look at the affidavit, and I can

16  help you, it's near the back, it's the one that you prepared, I

17  believe it's right there, right there, do you recall preparing

18  that affidavit?

19  A    I didn't prepare it, but I signed it.

20  Q    You signed it.  Okay.  And it purports that you were a --

21  do you see Line Number 3, that I am a member of Commercial

22  Holdings Corporation, LLC and its manager?

23  A    That's what it says, right.

24  Q    And I it was -- it looks like it was signed on June the

25  1st, 2016?  It's on the bottom there.

1  A     Oh.

2  Q     Okay.

3  A     It says July.

4  Q     I think that's the -- oh, July.  Okay, July the 1st, 2016.

5  It was crossed out there.  So, would you -- do you have any

6  reason to doubt that was true at that time?

7  A     That's what it says.

8  Q     Okay.  And do you recall signing that?

9  A     I don't -- it my signature.

10  Q     Okay.  And is this the tomato sauce that is like produced

11  locally?

12  A     (No audible response).

13  Q     How did you become involved with that entity?

14  A     Byrne Huddleston, I mean it was ideas on how to grow it.

15  Q     Okay.

16  A     But it's no longer.

17  Q     You can still buy it, right?  I think I --

18  A     Mm-mm.

19  Q     Didn't they just change their name to Nellino's?

20  A     Yeah, well, it's not the same.

21  Q     Okay.  What happened?

22  A     That's part of that non-disclosure.  I can't --

23  Q     Do you have an interest in the new entity?

24  A     I do not.

25  Q     All right.  Well, we'll leave this line of questioning

1  open.  I don't think that -- we'll have to -- I'll have to

2  speak to the trustee about this to determine whether it's

3  something he wants to look into further.

4          MR. BEHR:  All right.  What number are we on, Tanya?

5          MS. AYCOCK:  Twenty-one.

6          MR. BEHR:  Twenty-one.  Okay.

7  Q    All right.  Mr. Baxley, this is the articles of

8  organization for Baxley Corporation, and you'll see that you

9  are listed as the organizer of Baxley Corporation, do you

10 recall organizing this entity?

11 A    Can I ask a question real quick?

12 Q    Sure.

13         THE WITNESS:  I did this, but the -- when you're

14 talking about --

15         MR. BARKLEY:  An organizer does not mean you own the

16 company.

17         THE WITNESS:  No, I don't, but I didn't prepare the

18 corporate docs, none of that.  I just printed this and took

19 this down.  That's all I did.  Does that make --

20         MR. BARKLEY:  You can answer that officially.

21 A    Okay.  When you say organizer, I'm just trying to make

22 sure I answer --

23 Q    That's just what is on the thing there, right there.

24 A    Yes, I signed this.

25 Q    Okay.

Baxley - Behr                                    76

1  A    Yes.

2  Q    Okay.

3  A    But I didn't prepare any of the corporate docs and all

4  that.

5  Q    Okay.  I think we're onto 22.  All right.  This is

6  information from the Department of Motor Vehicles in relation

7  to a 2008 Toyota SUV, are you familiar with that?

8  A    Uh-huh.

9  Q    And do you recall signing the reassignment of title on

10  behalf of Baxley Corporation on March 8th, 2018?

11  A    (No audible response).

12  Q    Did you purchase this car on behalf of Baxley Corporation?

13  A    I don't believe so.

14  Q    Or this truck, whatever it happens to be.

15  A    That's my signature right there.

16  Q    So it lists you as the agent of Baxley Corporation?

17  A    Yes, sir.

18  Q    Okay.  And what is this 2008 Toyota, are you familiar with

19  it?

20  A    Mm-mm.

21  Q    What is it?

22  A    It's Jonathan -- what Jonathan drives.

23  Q    Okay.  And who made the determination that this automobile

24  should be purchased on March 8th, 2018?

25  A    I don't -- I know Robert so, you know, that's probably why

Baxley - Behr                                      77

1  my signature is there, but --

2  Q    I mean you went down to the dealership and purchased it on

3  behalf of Baxley Corp.?

4  A    No, no, I mean this is -- I mean it wasn't purchased

5  through -- you know, through Robert, yeah.

6  Q    Okay.

7  A    I'm sorry.  I'm trying to --

8  Q    Okay.

9  A    -- look at what you're talking about and --

10  Q    That's fine.

11  A    What's the question again?

12  Q    So in addition to scheduling, do you purchase automobiles

13  --

14  A    No, I didn't.

15  Q    -- on behalf of Baxley Corp.?

16  A    I didn't.  I know Robert --

17  Q    Okay.

18  A    -- who -- through Russell Motors and likely he called me

19  and said, hey, I've got this at a great deal --

20  Q    Okay.

21  A    -- would -- you know, do you all need something and

22  Jonathan needed a car.

23  Q    I mean that's --

24  A    All right.

25  Q    I just -- I know I've known him for a long time.  That's

1  likely why my signature is on that.

2  Q    Okay.  And the same goes I guess for the BMW, you were --

3  your signature is on that as well for Baxley Corp.  Turn just

4  one page over.

5  A    Yeah, I mean likely so, I mean I know him, so that's --

6  Q    Okay.  How did you pay for it?

7  A    I don't know the answer to that, likely a company check.

8  Q    A company check.  Okay.  You don't contest the fact that

9  you -- that's your signature and that you transacted this

10 transaction on behalf of Baxley Corp.?

11 A    I don't.  Like I said earlier, I mean I know Robert, so

12 likely that's why my signature is on it.

13         MR. BEHR:  What number are we on?

14         MS. AYCOCK:  Twenty-four.

15 Q    All right.  And Baxley Corp. does contracting with the

16 City of Durham, correct?

17 A    Well, it did.

18 Q    Okay.  All right.  Well, actually, here, if you'll switch

19 with me, I gave you the wrong one there.  I think you have --

20 that may have a little highlighting on it.  Okay.  Turn with me

21 to the first page there.  There's a cover letter.  You sign as

22 director of Baxley Corporation.

23 A    Uh-huh.

24 Q    Were you the director of Baxley Corporation?

25 A    At that time I was, yes.

Baxley - Behr                                      79

1  Q    Are you the director currently?

2  A    I am not.

3  Q    When did you cease being the director?

4  A    May.

5  Q    All right.  May of this year?

6  A    Yes.

7  Q    All right.  And was that as an officer of Baxley

8  Corporation as a director?

9  A    Well, I don't -- does -- I don't believe that LLCs have

10 officers, do they?

11 Q    Okay.  What -- so that was -- you did a little bit more

12 than just scheduling then, right?

13 A    Then I did, but I do not now.

14 Q    Okay.  Do you -- are you certified arborist?

15 A    I'm not.

16 Q    Okay.  Who is the certified arborist on staff or who was

17 or was there one?

18 A    We contract them out when we need them.

19 Q    Okay.

20 A    Where does it say that?

21 Q    It says it on the same page, Brandon Baxley -- it's on the

22 --

23 A    Got it.  Hold on.

24 Q    -- Baxley has ISA certified arborist on staff.

25 A    Yeah, likely we just contract that.

Baxley - Behr                                                    80

1   Q    Okay.  And this contract -- and is this a contract that

2   Baxley is able -- are you familiar with this particular RFP and

3   contract and did Baxley win the bid?

4   A    Yes.

5   Q    Okay.  And this was on April the 5th, 2017 or that's the

6   date of the contract or the date of the RFP I should say maybe?

7   A    Oh, I didn't know if you were talking RFP, sorry, request

8   for proposals.

9   Q    Yeah, sorry, yeah.

10       MR. BEHR:  What are we on now, 25?

11       MS. AYCOCK:  Mm-mm.

12   A    I've got two of them.

13   Q    There might be two.  You can hand one to your attorney if

14   you --

15   A    No, that's okay.

16   Q    All right.  Are you familiar with this contract between

17   the City of Durham and Baxley Corporation dated June the 7th,

18   2017?

19   A    (No audible response).

20   Q    Are you familiar with it?

21   A    Yes, sir, I'm sorry.

22   Q    Turn to the last page, you have a notarized signature that

23   you are the manager of Baxley Corporation on -- and this is

24   dated June the -- or June 20th, 2017.

25   A    Mm-mm.

1  Q    Were you the manager of Baxley Corporation?

2  A    I was.

3  Q    Okay.  So, when did you cease being the manager?

4  A    May 2018.

5  Q    Just prior to filing bankruptcy?

6  A    I stopped being the manager in May of 2018, yes.

7  Q    Okay.  When did you cease being the director?

8            MR. BARKLEY:  Can I ask a question --

9            MR. BEHR:  Sure.

10           MR. BARKLEY:  -- to help clarify that?  Did you use

11 manager and director interchangeably?

12           THE WITNESS:  Yes.

13           MR. BEHR:  Okay.

14 Q    When did you cease being the manager and director?

15 A    May 2018.

16 Q    May 2018.  All right.  And Exhibit Number 26.  Turn with

17 me to Page Number 2, or Page -- yeah, June 20th, 2018, you

18 signed as a managing director and then on the next page, June

19 22nd, 2018 as the director, is it possible you maintained that

20 title through the June the 22nd of 2018?

21           MR. BARKLEY:  The first two pages.

22           THE WITNESS:  Yeah, I was looking at this.

23 A    Yes, is the answer.

24 Q    Okay.

25 A    So, can I get one -- can I ask him one question?

1  Q    Sure.

2         MR. BARKLEY:  Okay.  I think that's worthy of

3  mentioning.

4  Q    Okay, please.

5  A    The company attorney did -- I can't remember what it's

6  specifically called, maybe -- is it a corporate resolution or

7  something like that where I specifically stepped down.

8  Q    Okay.

9  A    I can provide that to you.  I don't --

10 Q    Who's the corporate attorney?

11 A    RJ Antonelli.

12 Q    Okay.  And where are the corporate records held?

13 A    1211 Wake Forest Road.

14 Q    They weren't in the basement I hope.

15 A    No.

16 Q    Okay.

17 A    That was before.

18 Q    All right.  While we're still on Docket -- the Number 26,

19 if you'll look with me to the Page -- go one, two, third page,

20 if you could -- that sentence that was just prior to where his

21 contact is -- here, let me show you.  All right.  I'm going to

22 reach over here.  If you can start reading right there.

23 A    Brandon is an ISA certified arborist.

24 Q    Are you a certified --

25 A    I am not.

Baxley - Behr                                    83

1   Q    Okay.  Why does that say that?

2   A    I did not create this document.

3          MR. BARKLEY:  I'm sorry.  Where are you reading?

4          THE WITNESS:  It says Brandon is an ISA certified --

5          MR. BARKLEY:  Okay.

6          THE WITNESS:  -- arborist.

7   A    I am not, but I did not create this document either.

8   Q    Who created the document?

9   A    Jonathan Keith did.

10  Q    Okay.

11         MR. BARKLEY:  I think the previous RFP said something

12  different, in effect, that's where they mention it.  It said

13  Brandon Baxley and Baxley Corporation holds a pesticide license

14  with multiple endorsements.

15         THE WITNESS:  That's not true either.

16  Q    Okay.  Here is a August 1st, 2018 RFP from the City of

17  Durham, and this one is signed by Mr. Keith and is this -- did

18  he start taking over as the manager around that time on August

19  22nd, 2018?

20  A    That's part of that corporate resolution.

21  Q    Okay.

22  A    So I can get that to you.

23  Q    All right.  If you'll turn the next page, again, here's

24  that informational sheet and it says Brandon Baxley as director

25  of Baxley Corporation is based in Raleigh, North Carolina.

**WWW.JJCOURT.COM**

Baxley - Behr                                      84

1  A    Which page are you on?  I'm sorry.

2  Q    The next page over.

3  A    This one?

4  Q    Yeah.  Were you the director at the time that was

5  submitted to the City of Durham?

6  A    No.

7  Q    Okay.

8  A    And like I said, I think this is just they used the same

9  --

10 Q    Right.  And if you turn to the last page of that request

11 for proposal, there's a -- the non-collusion affidavit is

12 signed by you, did you have authority on -- it looks like it's

13 just the old one that was added on there, is that what you

14 recall there?

15 A    I don't know.  I'll find out.  It looks like it's the same

16 one reused.

17 Q    Okay.  All right.  Just a few more.

18       MR. BEHR:  Travis, we don't have extra copies of

19 these, but --

20       MR. BARKLEY:  That's fine.

21       MR. BEHR:  -- I will send you a copy.  What number

22 are we on?

23       MS. AYCOCK:  Twenty-eight.

24       MR. BEHR:  Eighty-eight.  Okay.

25       MR. BARKLEY:  I'll look on with him.

Baxley - Behr                                                    85

1        MR. BEHR:  Yeah.

2   Q    I'm going to walk through these real quick.  These are

3   contract proposals to the state, correct, are you familiar with

4   these documents, in general?

5   A    (No audible response).

6   Q    Have you submitted contracts to the State of North

7   Carolina?

8   A    The company has, yes.

9   Q    All right.  And if you'll -- I've tabbed them here and on

10  May the 23rd, 2017 under the first tab, is that you signing on

11  behalf of Baxley Corp. as the member manager authorized agent?

12  A    Yes, it shows I was manager.

13  Q    All right.  If you go to the next tab, is that you signing

14  on behalf of Baxley Corp. as the manager on May the 23rd, 2017?

15  A    Yes.

16  Q    All right.  The next page is a certificate of liability

17  insurance.  Does Baxley -- where does Baxley Corp. and Baxley

18  Leasing insure the personal property that it owns?  Do you know

19  who the carrier is?  Is it the same carrier as this?  Sentinel

20  Risk Advisors or --

21  A    I don't know.

22  Q    Okay.  If you go to the next tab, actually turn to the

23  next page, and is that you signing on behalf of Baxley

24  Corporation for the execution of the non-collusion affidavit on

25  July the 26th, 2017?

Baxley - Behr                                                86

1         MR. BARKLEY:  I think the signature up at the top

2    there.

3    A     This one?

4    Q     Actually go to the next one.  I'm not certain what you

5    were signing for on that one.  That one has a date on it.

6    A     Yes, that's correct.

7    Q     That's correct.  All right.  And there's another signature

8    at the next tab, is that your signature?

9    A     Yes.

10   Q     All right.  And if you go to the last tab -- or second to

11   the last tab, there's another non-collusion affidavit signed by

12   you on December the 5th, 2017, is that correct?  It's the

13   previous -- it's at the very top, right here.

14        MR. BARKLEY:  I got you.  That one, yeah.

15   A     Yes.

16   Q     And then you go to the last page and is that you signing

17   on behalf of -- electronic bid submission on behalf of Baxley

18   Corp. on 12/7/17?

19   A     Yes.

20   Q     Okay.  So, suffice it to say you had a significantly

21   larger role in Baxley Corporation than scheduling, is that

22   correct?

23   A     Well, you asked what do I do at Baxley Corporation and I

24   handle scheduling now.

25   Q     Okay.  I understand you handle scheduling after your --

Baxley - Behr                                              87

1   throughout the time you started filing for bankruptcy, but what

2   did you do prior to filing bankruptcy?

3   A    Let me clarify something here, I didn't step down from my

4   manager position to file bankruptcy.

5   Q    Okay.

6   A    I stepped down from my manager position because the

7   company attorney said he -- this has to happen.  So it had --

8   this was before I even thought about bankruptcy.

9   Q    Well --

10  A    So, I completely understand what you're thinking here, but

11  it's not true.  I didn't step down to file bankruptcy.

12  Q    Okay.  I'm asking from a purely chronological sort of

13  situation here, you say it was in roughly May of 2018 that you

14  stepped down and that was at the direction of the company

15  attorney, is that what you said?

16  A    Yes.

17  Q    Okay.

18  A    I believe it was May.  It might have been May or June, but

19  it was in that time frame.

20  Q    And did he -- and what was the basis for his

21  recommendation that you do that?

22  A    I don't --

23       MR. BARKLEY:  Was there something you discussed at

24  that time that would be problematic for the company?

25       THE WITNESS:  Well, no, I told him that I had gotten

1  letters from attorneys, and he was like, you know, you need to

2  step down from your position.

3          MR. BEHR:  All right.  I don't know that we need to

4  go through all these.

5          THE WITNESS:  I hate to do it again, but can I get

6  some more water?

7          MR. BARKLEY:  Yeah, let's take a --

8          THE WITNESS:  I'll go get it.  Did you tell him I

9  broke your (indiscernible)?

10         MS. AYCOCK:  No, I didn't.

11                        (Off the record)

12         MR. BEHR:  Mr. Baxley, we're back on the record.

13 BY MR. BEHR:

14 Q    So, it was at the direction of Mr. Antonelli that you --

15 or I take it did the members of the LLC take a vote and remove

16 you as the manager or how did that work?

17 A    I don't know.

18 Q    Okay.  And where are all the corporate records located?

19 At your home, is that correct?

20 A    Or RJ's office, yes.

21 Q    Okay.  And prior to your stepping down, did you take a

22 salary from Baxley Corporation?

23 A    No, sir.

24 Q    Okay.  Do you know what the gross revenues of Baxley were

25 for 2017?

1  A    I do not.

2  Q    Okay.  Do you create P&Ls and other stuff?

3  A    I do not.

4  Q    Do you have an accountant that does all that?

5  A    Yes.

6  Q    Who's the accountant?

7  A    Dan Minor.

8          MR. BEHR:  Tanya, do you have any questions?

9          MS. AYCOCK:  I don't think so.

10          MR. BEHR:  Okay.  I don't have any further questions.

11  That'll conclude your 2004 --

12          THE WITNESS:  Thank you for your --

13                  *  *  *  *  *

14              **C E R T I F I C A T I O N**

15          I, CALLED MEHESKI, court approved transcriber,

16  certify that the foregoing is a correct transcript from the

17  official electronic sound recording of the proceedings in the

18  above-entitled matter, and to the best of my ability.

19

20

21  /s/ Colette Meheski_____

22  COLETTE MEHESKI

23  J&J COURT TRANSCRIBERS, INC.   DATE:   February 1, 2019

24

25

**WWW.JJCOURT.COM**