EXHIBIT D
IN THE MATTER OF: BRANDON SCOTT BAXLEY
30(b)(6) Jonathan Keith on 10/29/2019

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN THE MATTER OF: )
) Chapter 7
BRANDON SCOTT BAXLEY, )
) Case No. 18-03406-5-DMW
Debtor )

DEPOSITION

OF

BAXLEY CORPORATION, LLC, BY AND THROUGH ITS

30(B)(6) DESIGNEE,

JONATHAN KEITH

October 29, 2019 - 9:05 a.m.

Raleigh, North Carolina

Reported By: Lisa A. Wheeler, RPR, CRR

www.huseby.com Huseby, Inc. Regional Centers 800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

A P P E A R A N C E S:

On behalf of the Trustee:

George Mason Oliver, Esq.
Oliver & Cheek
405 Middle Street
New Bern, North Carolina 28563
(252) 633-1930
george@olivercheek.com

On behalf of the Bankruptcy Administrator:

Brian C. Behr, Esq.
Kirstin Gardner, Esq.
U.S. Bankruptcy Administrator Office
434 Fayetteville Street, Suite 640
Raleigh, North Carolina 27601
(919) 334-3881
brian_behr@nceba.uscourts.gov
kirstin_gardner@nceba.uscourts.gov

On behalf of Martha Baxley and Baxley Corporation, LLC:

Benjamin E.F.B. Waller, Esq.
Hendren, Redwine & Malone
4600 Marriott Drive, Suite 150
Raleigh, North Carolina 27612
(919) 420-7867
bwaller@hendrenmalone.com

On behalf of the Debtor:

William P. Janvier, Esquire
Janvier Law Firm
311 East Edenton Street
Raleigh, North Carolina 27601
(919) 582-2323
bill@janvierlaw.com

Also Present: Tanya Aycock

This is the deposition of BAXLEY CORPORATION, LLC, BY AND THROUGH ITS 30(B)(6) DESIGNEE, JONATHAN KEITH and JONATHAN KEITH, INDIVIDUALLY, taken pursuant to Notice of the parties and in accordance with the Federal Rules of Civil Procedure before Lisa A. Wheeler, RPR, CRR, in the offices of the U.S. Bankruptcy Administrator, 434 Fayetteville Street, Suite 640, Raleigh North Carolina, on the 29th day of October, 2019, beginning at 9:05 a.m.

The reading and signing of this transcript is reserved.

I N D E X


| | PAGE |
|---|---|
| EXAMINATION BY MR. OLIVER | 8 |
| EXAMINATION BY MR. BEHR | 132 |
| EXAMINATION BY MR. OLIVER | 154 |


E X H I B I T S


| KEITH NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 1 | Letter to To Whom It May Concern from Jonathan Keith, February 25, 2018 | 17 |
| EXHIBIT 2 | Articles of Organization, Raleigh Foods, LLC | 24 |
| EXHIBIT 3 | E-mail Message from Jonathan Keith to jonathan@baxleycorp.com, February 15, 2019, Subject: Scan.pdf, with Attachments | 25 |
| EXHIBIT 4 | E-mail Strings, Top String Dated November 7, 2018, Subject: Emergency Contracting Opportunity for Hurricane Florence, with Attachments | 38 |
| EXHIBIT 5 | Letter to Mr. Perez from Brandon Baxley, January 18, 2018, with Attachment | 46 |
| EXHIBIT 6 | Non-Collusion Affidavit, 7/18/18 | 55 |
| EXHIBIT 7 | Execution of Bid, with Attachment | 57 |

| | | |
|---|---|---|
| EXHIBIT 8 | Payroll Form for Week Ending 3/31/18 | 58 |
| EXHIBIT 9 | E-mail String, November 1, 2016, Subject: Shane Edge & Password Changes | 61 |
| EXHIBIT 10 | E-mail String, September 11, 2018, Subject: Cut and shove durham | 63 |
| EXHIBIT 11 | E-mail Message from Brandon Baxley to Jonathan Keith, et al., November 1, 2018, Subject: BASF - PO & Order | 64 |
| EXHIBIT 12 | E-mail String, September 24, 2018, Subject: Invoice 59798 from Baxley Corporation, with Attachment | 65 |
| EXHIBIT 13 | North Carolina Licensing Board License Details, Baxley Corporation | 66 |
| EXHIBIT 14 | Letter from Jonathan Keith, May 28, 2019 | 67 |
| EXHIBIT 15 | Chart of Credit Card Charges, Capital One - Spark Business Account Ending 9690 | 83 |
| EXHIBIT 16 | Chart of Credit Card Charges, Brandon Baxley, Capital One - Spark Business Account Ending 9690 | 89 |
| EXHIBIT 17 | Capital One Credit Card Statements, August 16, 2018, through November 15, 2018 | 91 |
| EXHIBIT 18 | State of Delaware Limited Liability Company Certificate of Formation, Baxley Corporation, August 7, 2015 | 100 |

| | | |
|---|---|---|
| EXHIBIT 19 | E-mail Message from Brandon Baxley to Jonathan Keith, January 23, 2018, Subject: Merger Notice, with Attachment | 101 |
| EXHIBIT 20 | IRS Employer Identification Number Letter, 5/17/2016 | 104 |
| EXHIBIT 21 | Bank of America Bank Checking Account Statement, May 31, 2016, to May 31, 2016 | 104 |
| EXHIBIT 22 | Bank of America Signature Card and Account Opening Documents, April 4, 2019 | 106 |
| EXHIBIT 23 | Business Signature Card with Substitute Form W-9, 4/4/19 | 109 |
| EXHIBIT 24 | Check Images, February 1, 2019, to February 28, 2019 | 113 |
| EXHIBIT 25 | Bank of America Bank Statement, March 1, 2019, to March 31, 2019, Account Ending 9348 | 116 |
| EXHIBIT 26 | Bank of America Bank Statement, March 1, 2019, to March 31, 2019, Account Ending 9364 | 119 |
| EXHIBIT 27 | Baxley Corporation Profit and Loss Statement, January - December 2017 and Balance Sheet, December 31, 2017 | 122 |
| EXHIBIT 28 | Baxley Corporation Balance Sheet, December 31, 2018 | 124 |
| EXHIBIT 29 | Baxley Corporation Profit and Loss, January - December 2018 | 126 |
| EXHIBIT 30 | E-mail String, March 11, 2019, and March 12, 2019, Subject: Bid Bond, with Attachments | 129 |

IN THE MATTER OF: BRANDON SCOTT BAXLEY

30(b)(6) Jonathan Keith on 10/29/2019 Page 7

| | | |
|---|---|---|
| EXHIBIT 31 | E-mail Message from Jonathan Keith to jonathan@baxleycorp.com, February 15, 2019, Subject: Scan.pdf, with Attachment | 131 |
| EXHIBIT 32 | Baxley Corporation LLC Corporate Resolution | 134 |

www.huseby.com Huseby, Inc. Regional Centers 800-333-2082

Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

P R O C E E D I N G S

Whereupon,

JONATHAN KEITH,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. OLIVER:

Q. Mr. Keith, we met a couple minutes ago. I'm George Oliver. I'm representing the trustee in this matter, Mr. Holmes Harden. And can you please give your full name for the record.

A. Jonathan Maxwell Keith.

Q. All right. Thank you for coming today. You're being deposed in your individual capacity and also on behalf of Baxley Corporation --

A. Uh-huh.

Q. -- is that right?

A. Right.

Q. Okay. As I ask you questions, if the answer's different for you individually than answering on behalf of the company, please let me know that. And some of my questions will only relate to the company, but I'll try to keep it clear if you will, okay?

A. Okay.

Q. Have you ever been deposed before?
A. Yes.
Q. Okay. How many times?
A. Once or twice. Twice.
Q. Okay. Recently?
A. No.
Q. Okay. This will probably be similar to that. I'll ask questions, you'll answer them, we'll try not to talk over each other, and we'll all try to use verbal answers.
A. Uh-huh.
Q. Like that.
A. Yes.
Q. Yeah.
A. Yes.
Q. There you go. Exactly. Sometimes that gets hard in a conversation so we just need to try to be aware of it and I may remind you from time to time. I'm not trying to be rude, but it does help our court reporter, okay?
A. Yes.
Q. Great. If you need a break for any reason at any time, please let me know. I'd just ask that you answer whatever question that's been asked so that I don't lose my place --

A. Sure.
Q. -- okay? Are you -- have you taken any medicine or any sort of substance that might impair --
A. No.
Q. -- your ability to testify today?
A. No.
Q. Okay. So how long have you known Brandon Baxley?
A. Since we were children.
Q. Okay.
A. Probably three or four.
Q. And how old are you now?
A. 47.
Q. So about 45 years?
A. Yes.
Q. Okay. You guys grew up in the same town?
A. Yes.
Q. How long have you worked together?
A. Just over three years, I believe.
Q. Okay. And that's with Baxley Corp.?
A. Yes.
Q. When I say Baxley Corp., it's Baxley Corporation, LLC? Is that the full name?

A. Yes.

Q. Okay. So what did you do before you started working for Baxley Corp.?

A. Been in construction for a lot of years, had -- but at the time, I had gone into a restaurant with my father and got out of that and decided then -- decided to come to work with the Baxleys.

Q. Okay. What restaurant did you work with?

A. It's in Fayetteville. My father and I had a biscuit place, Biscuit -- Biscuit Kitchen.

Q. Okay.

A. Yeah.

Q. Is that still open?

A. It's not.

Q. Okay. So when you came to work for the Baxleys, what was your role?

A. Predominantly estimating. Estimating, project manager.

Q. What sort of projects did you estimate?

A. At the time, a lot of tree work, some smaller construction projects.

Q. That was when you started three years ago?

A. Yes.
Q. What other sort of business relationships have you had with Brandon Baxley?
A. Just this.
Q. Just Baxley Corp.?
A. Yes.
Q. So you started three years ago as an estimator. And what other roles have you had with Baxley Corp.?
A. Project manager and estimator up until he was -- he asked me to step up and -- and take over as a management role, which I don't recall the date off the top of my head. You -- I mean, you got -- we -- I think that's been -- I want to say spring year and a half ago. Spring maybe.
Q. Spring of 2018?
A. I believe so.
Q. Okay. When you say a management role, what is your role?
A. I still estimate, sell most of the jobs, deal with engineers and issues in the field, direct the crews and, you know --
Q. What's your title?
A. -- make key decisions. Manager.
Q. Manager with a capital M?

A. Yes.
Q. You're the manager of the LLC?
A. Yes.
Q. Are you also the manager of the business?
A. Yes.
Q. Are there any other managers of the LLC?
A. Rudy and Ginger as well.
Q. Okay.
A. Rudy Baxley and -- and Ginger Baxley, Martha Baxley.
Q. Okay. In the spring of 2008 when you became manager with a capital M, did your role change at that point from what it had been before?
A. Considerably.
Q. Okay. And you gave -- you said you had been an estimator/project manager before.
A. Uh-huh.
Q. You still do those things?
A. Yeah. Yes.
Q. And the additional duties that you just listed for me is what changed in the spring of 2018?

A. Uh-huh.
Q. Sorry.
A. Yes.
Q. Okay. You had not done any of those duties prior to spring of 2018?
A. No.
Q. Who had done those duties prior to spring of '18?
A. Brandon Baxley and Martha and Rudy.
Q. How do you know that Brandon Baxley had those duties prior to spring of 2018?
A. I dealt with him on a daily basis.
Q. How do you know that Martha had those duties before spring of 2018?
A. I dealt with all three of them on a daily basis.
Q. So on a daily basis --
A. A weekly basis at least I would hear from -- from any -- any one of them.
Q. Okay. So you dealt with Brandon on a daily basis. Did you deal with Martha on a daily basis?
A. Key decisions I would -- Martha would -- I'd speak to Martha weekly, sometimes twice a week.

Q. And how about Rudy?
A. About the same.
Q. Do you have more or less interaction with them on these decisions now that you're a manager than you did before spring of 2018?
A. More.
Q. Okay. So now instead of talking to Martha weekly or twice a week and Rudy weekly or twice a week, how often --
A. Rudy daily.
Q. -- do you talk to them now?
A. Martha two, three times a week, some weeks daily. It just depends on what the -- what the workload is and what we're dealing with.
Q. And how often do you talk to Brandon Baxley about those key decisions?
A. These days, very little.
Q. You don't still talk to him on a daily basis?
A. I talk to Brandon about -- Brandon is a project manager now and handles scheduling, so I'm in contact with him but not on -- not in that role.
Q. So you're saying that your change to be the manager with a capital M was not just a

change in title but a change in the role and the relationship between yourself and Brandon?
A. Yes.
Q. And that happened in spring of 2018?
A. I believe so, yes.
Q. So as of spring of 2018, you no longer took direction from Brandon?
A. No.
Q. On any issues?
A. No. No.
Q. And before spring of 2018, you did take all your direction from Brandon?
A. Not all of my direction from Brandon but --
Q. The only direction you took from anyone other than Brandon before spring of 2018 was Martha and Rudy?
A. Yes.
Q. Okay. And since spring of 2018, you've taken no direction from Brandon, but you have taken direction from Martha and Rudy?
A. Yes.
Q. What joint ventures have you been in with Mr. Brandon Baxley?
A. I don't recall being in any joint

ventures with Brandon.

Q. What partnerships have you been in with Mr. Brandon Baxley?

A. None.

Q. Okay.

(KEITH EXHIBIT 1, Letter to To Whom It May Concern from Jonathan Keith, February 25, 2018, was marked for identification.)

BY MR. OLIVER:

Q. I'm going to mark this as Exhibit 1, ask if you could review that.

MR. JANVIER: Thanks.

MR. OLIVER: Uh-huh.

BY MR. OLIVER:

Q. Do you recognize this document that I've marked as Exhibit 1?

A. Yes.

Q. Is that your signature?

A. It is.

Q. And you had -- you say -- signed it in front of a notary, Ms. Ruth Harrell?

A. Yes.

Q. This is dated February 25th of 2018. You wrote this to the North Carolina Board of General Contractors?

A. Yes.
Q. Does this say that I've entered into joint ventures and partnerships with him, him being Brandon Baxley, in the past?
A. Yes.
Q. And this is dated February 25th of 2018?
A. Yes.
Q. So what -- what joint ventures were you referring to?
A. I -- I don't know what I was referring to at this time. It's a reference letter.
Q. What partnerships were you referring to?
A. We had -- I don't -- I don't recall, honestly.
Q. So you've never had a partnership or joint venture with Brandon Baxley?
A. You know, there -- we had a -- I had a food truck as part of the restaurant that I had in Fayetteville --
Q. Okay.
A. -- that we had looked into entering into, but it just kind of never -- didn't really come to fruition. We had looked into working

together on that, kind of a false start, I guess.
Q. You and Mr. Ba- -- Mr. Brandon Baxley?
A. Yes.
Q. And when was that?
A. Would have been in 2015 or '16.
Q. Is that what you were referring to in this letter?
A. I would assume so.
Q. Did you write this letter?
A. I did.
Q. So when you wrote it, what were you thinking about when you wrote those words?
A. I've -- I would assume I was thinking -- thinking of that. I don't recall exactly what I was -- what I was -- that would have to be it, but --
Q. Okay. What was the name of that business that you started with Mr. Baxley on the food truck?
A. I don't know if it was even -- if there was even an entity filed or not at this point.
Q. Do you remember what it was called, though?
A. The food truck? I mean --
Q. The -- the business --

A. I do not.
Q. -- the food truck --
A. I do not. I --
Q. -- whatever you -- whatever you want --
A. Like I said, it --
Q. -- to call it.
THE REPORTER: One at a time.
MR. OLIVER: Yeah.
BY MR. OLIVER:
Q. Whatever you want to call it. I don't --
A. It was kind of a false start. I think we -- I worked an event or two. We looked at doing a partnership together on it and did not. It just did not turn into anything.
Q. Did it have a name?
A. That's what I'm saying. I don't recall that -- that there ever was an entity filed to have a name.
Q. What did you call it when you did an event? Did you have a name at all, any kind of name?
A. It was -- the truck was still Biscuits and Burgers, which was part of my restaurant in Fayetteville.

Q. Okay.
A. But as far as forming an entity together, I don't know if that ever happened or not. It was a period of probably less than 45 days that we...
Q. And that was in '14 or '15 -- '15 or '16 I think you said?
A. '15 or '16.
Q. So was it called Raleigh Foods, LLC?
A. It's possible.
Q. Did you -- were you an -- one of the initial five members of a company called Raleigh Foods, LLC?
A. Like I say, I don't recall whether that's the case or not.
Q. Who are the other people that were involved in that?
A. I don't recall whether I was a -- a part of that.
Q. If you were part of it, do you know who else --
A. If I was --
Q. -- was involved?
A. -- part of -- yeah. I mean, I -- I -- I do not.

Q. Do you know Sam Bradford?
A. I had a -- I do know Sam Bradford. I had a -- was dealing with a brick and mortar business that -- that was failing at the time and had quite a bit on my plate, so I don't have a lot of --
Q. Do you remember hiring R.J. Antonelli to file with the Secretary of State a -- or articles of organization for Raleigh Foods, LLC, in September of 2016?
A. I don't think that I directed him per se. If -- I'd have to look at it. I don't recall, you know, whether -- like I say, I don't recall whether there was an entity filed or not. I'm assuming that that's it.
Q. Was Byrne Huddleston involved with it?
A. Yes.
Q. Okay. Can you --
A. I think that --
Q. -- remember anyone else that was involved with it?
A. Byrne, Brandon, and -- and I, Sam, maybe.
Q. And R.J., Arnold J. --
A. Yeah, R.J. --

Q. -- Antonelli?

A. -- is -- would have -- yes. It would have been typical that he might have been part of something like that.

Q. Why do you say it would have been typical for him to be part of something like that?

A. As I was explaining, I think he may have had a small piece of -- of it for helping organ- -- organize everything and for representing the company. That's --

Q. Okay. What did he represent the company in?

A. What did he represent the company in?

Q. Yeah. You said he represented the company. What was that?

A. I mean, it didn't-- like I said, this was kind of a false start. It never really happened. It never amounted to anything. It was probably over before this was -- shortly after this was filed.

Q. Wasn't it called Bicycle Burger?

A. I don't have anything to do with Bicycle Burger.

Q. So that's different?

A. Yeah. I don't know anything about it.
Q. You've never heard of it?
A. I've heard of it, but I didn't have anything to do with that.
Q. Okay. So this is a -- this is from Byrne Huddleston's deposition so I don't have multiple copies, but it was Exhibit 5.
A. Uh-huh.
Q. This is the filing with the Secretary of State's office by Mr. Antonelli. He lists you as one of the five members.
A. Uh-huh.
Q. Were there any other documents associated with Raleigh Foods, LLC?
A. Not that I recall.
Q. Okay. I -- I'm going to keep that one. Thank you. Don't want to lose it.
MR. BEHR: Do you want to mark it as Exhibit 2?
MR. OLIVER: We could, yeah. Okay. So Brian has a copy. We'll mark it as Exhibit 2.
(KEITH EXHIBIT 2, Articles of Organization, Raleigh Foods, LLC, was marked for identification.)
BY MR. OLIVER:

Q. And, again, this is the same thing we just showed you, Mr. Keith.

A. Uh-huh.

Q. So there were -- I know you said you thought it was spring of 2018 when you became manager and Brandon stopped being a manager.

(KEITH EXHIBIT 3, E-mail Message from Jonathan Keith to jonathan@baxleycorp.com, February 15, 2019, Subject: Scan.pdf, with Attachments, was marked for identification.)

BY MR. OLIVER:

Q. I'm going to show you Exhibit 3 and ask you to review that, please.

A. Yes.

Q. You've seen that before?

A. Yes.

Q. This is an e-mail from you to --

A. Uh-huh.

Q. -- yourself to yourself, I guess. The two e-mail addresses, are you JKeithNC@iCloud.com?

A. Yeah. I guess the personal e-mail address.

Q. Okay. And then Jonathan@Baxleycorp.com is your e-mail address also?

A. Right. So it was June rather than spring.
Q. Okay. Looks like you took over the manager by June 29th of 2018?
A. Uh-huh. Yes.
Q. Do you know why there are two corporate resolutions signed and they're different?
A. I do not.
Q. Did you draft this?
A. I did not.
Q. Either one of them?
A. I did not.
Q. Do you know which one is the -- in the corporate books for Baxley Corporation, LLC?
A. I do not.
Q. Where are the books for Baxley Corporation, LLC?
A. I would assume with -- with Martha.
Q. Have you ever seen them?
A. Have I ever seen the books?
Q. Yeah. Any of the corporate documents for the company.
A. I've seen -- I don't know if I've seen the articles themselves for the initial formation of it, but...

Q. Do you believe that both of these signatures on Exhibit 3 are Brandon's signatures?
A. I do.
Q. How are you compensated by Baxley Corp., LLC?
A. How am I paid?
Q. Yeah.
A. Are you asking how much?
Q. How often, how much?
A. How often, weekly; 1300 a month before bonus. 1300 a week. Excuse me.
Q. 1300 a week?
A. Yeah. 1325, I believe.
Q. Did your salary change when you became a manager of the company?
A. I don't recall if it changed at that point or not. I couldn't tell you when. I mean, I had -- had a few raises since I started, but I couldn't tell you when they happened.
Q. Who determines what your compensation is now?
A. Right now it's -- it's been the same thing for a good while.
Q. When you -- when you became the manager, did you have any say in what your

compensation would be after that point?

A. There was no -- it wasn't there to increase it at that point as I recall.

Q. Who would make that decision?

A. It would be Martha and Rudy at this point.

Q. You don't have any input in that as the manager?

A. I mean, I would have some inpoint in it -- some input in it, but ultimately, it would be their decision as owners.

Q. Have you had -- have you had any raises since you became manager in June of 2018?

A. I do not -- I do not know when my last raise was. I couldn't tell you that.

Q. Do you recall ever deciding to give yourself a raise as the manager?

A. No, I do not.

Q. So that would have come from who?

A. Would have come from Martha and Rudy as owners --

Q. Not --

A. -- not from --

Q. Not from Brandon?

A. No.

Q. Did you continue to refer to yourself as the estimator for Baxley Corp. after June 29th of 2018?

A. That -- that was still one -- one of my duties and I -- you know, I may have on -- I still bid -- bid projects, the majority of them, and I -- that may be -- I may have out of habit put that on something at some point.

Q. Do you refer to yourself as the manager of Baxley Corporation?

A. I do.

Q. You have held yourself out as the manager to people outside of the Baxley Corporation, LLC?

A. I have.

Q. What other employees are there of Baxley Corporation, LLC?

A. There are probably 20 men at this point. 20, 2- -- between 20 and 25 men.

Q. Are they all full-time?

A. Yes.

Q. Is it 20 or 25?

A. I'm not -- I'm not certain at this point.

Q. Who --

A. We have some -- some come and go.
Q. Okay. Who would know the answer to that?
A. Martha would know the answer to that, I would assume. Rudy would know the answer.
Q. Okay. Do you have the power to hire and fire people?
A. I do.
Q. Have you hired and fired people?
A. I have.
Q. Is Sam Bradford an employee of the company?
A. Yes.
Q. Okay. And he works in bridge or traffic control?
A. Correct.
Q. What is Martha's role as manager of Baxley Corp., LLC?
A. Martha handles any -- helps with any key decisions.
Q. What does that mean?
A. What does that mean? I mean -- I don't know how to answer that. I don't know what you're asking.
Q. Can you give me one example of a key

decision that Martha --
A. Sure.
Q. -- helps with?
A. Whether to -- we're -- we're -- currently we're dealing with -- there's a DOT budget shortfall.
Q. Okay.
A. Martha and I have discussed what to do, where to go to -- to be able to make up for that, to find other work, getting us approved in other markets, other states.
Q. What does --
A. Martha's on every -- she handles every account. Every -- every bit of credit that we have is -- is in Martha's account -- her name as the guarantor.
Q. So you're saying she -- when she handles every account, what you mean is the accounts are in her name?
A. Correct.
Q. Bank account?
A. She initially funded, you know, the -- the company. It was her money that started this.
Q. How much was that?
A. I wasn't in this role at that time,

but --

Q. How do you know she funded the company initially?

A. Because I've had that discussion with her.

Q. Okay. What other type of work has she been able to find for Baxley Corporation under the DOT budget shortfall?

A. What has she been able -- we've discussed which -- which markets we're going to go into and what's involved in doing that, whether or not to go ahead and file as -- as a WBE or not, a women-owned enterprise.

Q. Has the company done that?

A. We have not yet, no.

Q. What other markets has she led the company into with the DOT budget shortfall?

A. Has she led. We are looking at Virginia and Georgia and a greater percentage of municipal jobs rather than just DOT.

Q. So has she found jobs in Virginia and Georgia for the company?

A. I'm the estimator. I -- I still do the estimation stuff and -- and find the -- find most of the work. I run by projects that I'm

interested in to her and discuss whether she -- what she thinks of them and what Rudy thinks of them.

Q. Okay. Have they ever told you not -- no on any projects --

A. Yes.

Q. -- that you wanted to do?

A. Yes.

Q. Okay. Those are the -- any other key decisions that she is involved with?

A. I'm sure there are. Off the top of my head, I can't...

Q. The discussions that you just described having with her do you also have with Brandon Baxley?

A. Not -- not at this point.

Q. Have you since June of 2018?

A. I've asked for his advice on things, but I don't get direction or directives from him.

Q. He doesn't give you any directives?

A. No. And any other position that I've had if I had access to the person that handled it before them -- before me I've looked for advice as well.

Q. How much is Martha paid from the

company?

A. I don't know.

Q. As a manager you don't feel like you should know that information?

A. I don't know the answer whether --

Q. You've never asked?

A. No, never asked.

Q. What is Rudy Baxley's compensation?

A. Thousand a week.

Q. Okay. And what are his duties?

A. Rudy wears a lot of hats. He's -- this past weekend he was -- he's in the field more than anything else, helps run crew, helps prob- -- problem solve on -- on the job.

Q. Uh-huh.

A. He's always been in construction his whole life. He's a -- he's great in the field.

Q. Okay.

A. Deals with engineers when there are issues, deals with safety inspections and...

Q. How many hours a week would you say you work for Baxley Corp.?

A. Me? 60ish.

Q. Okay.

A. 60, 70.

Q. How many would you say a week Rudy works?
A. The same.
Q. And how many hours a week would you say Martha works?
A. I would say -- I'm sure she's 40, you know, somewhere in there.
Q. Okay. And how many a hours a week do you think Brandon works for the company?
A. Probably more like me and Rudy. 60ish.
Q. And how much is Brandon paid by the company?
A. Brandon's not paid at this time.
Q. Has he ever been paid by the company?
A. Not to my knowledge.
Q. Why isn't he paid for the work he does?
A. It hasn't been there.
Q. You mean there hasn't been money to pay him?
A. There hasn't been -- we're rapidly grow- -- you know, we're -- we're growing, but we're -- he has not taken compensation other than, I think, health insurance, maybe. I mean, I'm not sure what his -- his compensation package is.

Q. Is he accruing money that's owed to him for payroll?

A. I don't know.

Q. Do you know if the company owes him any money?

A. I do not know.

Q. Who would know that?

A. Martha would know that.

Q. You're here to answer questions on behalf of the company, aren't you?

A. I am.

Q. And you think Martha would be able to answer that question on behalf of the company better than you?

A. Martha's an owner and I'm not. There is -- I manage the operations, but that doesn't make me privy -- privy to every decision.

Q. Who are the owners of Baxley Corp., LLC?

A. Martha Baxley, Rudy Baxley.

Q. What percentages do they own?

A. I want to say Rudy has 25 percent, Martha the rest.

Q. Brandon is not an owner?

A. He is not.

Q. Has he ever been an owner?
A. He has not.
Q. You mentioned health insurance. Is any other amount paid to or on behalf of Brandon Baxley by the company?
A. No, not that I'm aware of.
Q. Does he receive any other sort of benefit from the company?
A. No, not that I'm aware of.
Q. Does he receive any sort of -- are any of his bills paid by the company?
A. I believe we -- we pay some -- we store some equipment there at the home and use the home as a corporate office and I think some of the home -- household bills may be paid through the company -- or are paid through the company, but --
Q. Which ones?
A. -- potentially -- I -- I don't --
Q. You don't know whether or how much?
A. I don't know which, whether or how much.
Q. So since June of 2018, you've not taken any directives from Brandon; he's not told you what to do with the company?

  
A. No.
Q. You -- you've been telling him what to do?
A. Yes.
Q. Okay. So he's not still making decisions for Baxley Corp., LLC?
A. No, he's not.
Q. Okay. Doesn't -- doesn't Brandon tell you which jobs to bid?
A. We've discussed jobs that are out there and I've asked for his input and what he thinks about them, but I'm not told what jobs to bid or not to bid by him.
Q. Okay.
MR. OLIVER: We'll mark this as Exhibit 4.
(KEITH EXHIBIT 4, E-mail Strings, Top String Dated November 7, 2018, Subject: Emergency Contracting Opportunity for Hurricane Florence, with Attachments, was marked for identification.)
BY MR. OLIVER:
Q. There are a number of e-mails here. I'll just ask you about the first one and then we'll go through. This is an e-mail from Brandon

to you in November of last year. Isn't he directing you to bid the elastometric concrete portion of this project and bid high?

A. Yes.

Q. Is that what that e-mail says on the first page of --

A. Yes.

Q. -- Exhibit 4?

A. Yes.

Q. On the next page there's an e-mail from him to you December 20th of 2018, Jonathan, see bid attached. Please e-mail immediately confirmation that you received this opportunity and the date you expect the bid to be submitted.

That's from Brandon, isn't it?

A. Uh-huh.

Q. Is he directing you to place a bid?

A. This doesn't take into -- into account the context of, you know, phone calls before and after this e-mail, though. It does -- it does appear that way, but --

Q. Okay. And you write --

A. -- typically --

Q. -- back, receipt confirmed.

A. Yeah.

Q. I'll read over it this morning and let you know when I have the bid ready when I see you today.

A. Uh-huh.

Q. Next one, e-mail from him January 4th of 2019, to you, I want this one. Please confirm you received.

A. Yeah.

Q. And you say, got it, look over this a.m., right?

A. Uh-huh.

Q. Next one is e-mail from Brandon to you January 22nd, 2019, we will bid this project. It is bonded and there is a prebid. Add this to your list and confirm you have received this bid invite, correct?

A. Right.

Q. Is that him directing you to bid another project?

A. As I -- like I said, this doesn't account for phone calls that we've made before for discussions that we had in the field about what jobs were --

Q. Well, am I reading it wrong? Is he not --

A. It doesn't --

Q. -- directing you --

A. It does come --

THE REPORTER: One --

MR. OLIVER: Yeah. I'm sorry.

THE REPORTER: One at a time.

BY MR. OLIVER:

Q. Am I reading it wrong? Is he not directing you to bid a project?

A. It comes off as that, but that's not the case.

Q. The next one, just an e-mail to you that says, sign and return, please check first, and this is a -- attached to it is a change order --

A. Uh-huh.

Q. -- which I'm assuming you signed on behalf of Baxley Corporation?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. We have another one January 28th of '19 telling you to sign and return, please check first; is that right?

A. Yes.

Q. Next one, bid this. Confirm it's on your list from February of this year.

A. Yes.

Q. Next one from February this year, it's back again. We get it this time. Is he also directing you to do a new -- new bid? Am I reading that right?

A. You're reading it correctly.

Q. The next one's in all caps to you, add this to your list. Is that another bid he's directing you to do?

A. He's -- Brandon bringing a bid to my attention is not necessarily giving me a directive to bid it.

Q. Is this different from how it -- he directed you before June of 2018 or is it the same?

A. I don't know that I could answer that. I mean, I don't -- I believe it is different, yes.

Q. In what way?

A. I bid jobs -- bid the ones that I prefer to bid. There have been many that I've taken off -- that I have the authority to take off on my own. I'm not -- I don't have to answer

to Brandon at this stage.
Q. But do you answer to Brandon when he tells you to bid a project?
A. I may reply to Brandon, but I'll tell him why I don't want to bid it and why we shouldn't and why I'm not.
Q. You've never done that by e-mail, though, have you?
A. I -- I don't know. I don't recall.
Q. Okay. What is the business of Baxley Corporation? What does it do?
A. We are largely a construction company.
Q. Okay. What sort of construction?
A. Mostly highway/bridge maintenance and repairs. We don't put in roads or put in bridges but maintenance and repair on -- on those types of projects.
Q. Anything else?
A. Clearing.
Q. Anything else?
A. Tree work. Municipal tree work.
Q. Is that tree removal?
A. Yes.
Q. Tree trimming?
A. Uh-huh.

Q. Okay. Anything else?
A. I think that is about it.
Q. I saw a bunch of different projects that you worked on. I'm going to give you some descriptions and I don't know what all of them mean, but I'll ask you if this is the business of Baxley Corp. Cut and shove?
A. Uh-huh.
Q. What is cut and shove?
A. Cut and shove is storm cleanup, on-call storm cleanup for clearing the roads after a weather event.
Q. Do you install culverts?
A. Yes.
Q. Bridge preservation?
A. Yes.
Q. Installation of fencing?
A. Yes.
Q. Moving fencing?
A. Yes.
Q. Installation of flagpoles?
A. Yes. We did a --
Q. Road closures?
A. Yes.
Q. Traffic control?

A. Yes.
Q. Landscaping?
A. Yes.
Q. Shoreline stabilization?
A. Yes.
Q. Installation of irrigation systems?
A. We had one landscaping project that we -- that we performed last year. Several of those items showed up on that one, but, yes.
Q. Repair and replace median curbs?
A. Yes.
Q. Drainage improvements?
A. Yes.
Q. Road reconstruction?
A. Yes.
Q. Remove and replace drainage pipes?
A. Yes.
Q. Excavation?
A. Yes.
Q. Installation of mulch?
A. Yes.
Q. Wetlands restoration?
A. Yes.
Q. Polypropylene barrier wall construction?

A. Yes. We bid it. We've not performed any.

Q. Oh, you bid it but not -- not gotten the bid?

A. Right.

Q. Were you qualified to give the bid?

A. Yes.

(KEITH EXHIBIT 5, Letter to Mr. Perez from Brandon Baxley, January 18, 2018, with Attachment, was marked for identification.)

BY MR. OLIVER:

Q. Exhibit 5 is something that Brandon sent out to a Mrs. Perez [sic] as a -- as qualifications of Baxley Corporation back in January of last year.

A. Uh-huh.

Q. Do you agree with the statements he's made on the letter there to Mrs. -- Mr. Perez? I'm sorry.

A. Yes.

Q. Does Baxley Corporation, LLC, have certified arborists on staff?

A. Yes.

Q. What are the names of the certified arborists?

A. I'm not sure which -- I'm not sure which of the employees that hold the certification. Antonio Aristeo. Two of our key men, I know they've been through the -- but I'm not -- I'm not certain who holds the certification.

Q. Does Brandon Baxley have one?

A. I believe so.

Q. Okay. The next two pages there's some qualifications and references and further description of Baxley Corp., LLC. On the bottom of the second page it says, Baxley is the tree maintenance and removal contractor for the NCDOT, and then it lists a number of counties.

A. Uh-huh.

Q. Is it still the contractor for those counties for those projects?

A. I don't believe so, no.

Q. Is it a contractor -- NCDOT contractor for any of those counties?

A. We still hold some cut and shove contracts that -- for some of these counties. I, off the top of my head, can't tell you which ones.

Q. Was it true in January of '18, that

statement?

A. I believe so.

Q. So when did Baxley lose those contracts?

A. The contracts come up -- can come up yearly. Some of them have renewals, some don't. I believe everything expires -- expires or has the -- or has expired this year -- expired this year.

Q. So is that not an area of -- of business that Baxley Corp. is interested in pursuing?

A. It's not -- these contracts can be misleading. They -- some of -- one of these is for -- I think there's one in Division 4 that I believe the contract price is 1.6 mil. Well, they've spent 15,000 in two years, you know, so it's -- you know, some of them are...

Q. So is that an area --

A. And they're --

Q. -- of business that Baxley Corp. is interested in pursuing?

A. We're not. We're getting away from that.

Q. Okay. And more into the --

A. More into --

Q. -- other types of things we discussed?

A. Yes.

Q. Okay. When did Baxley Corp. make that shift away from tree work and more into the other types of construction services we discussed?

A. As I've come on, you know, we -- my background was in construction.

Q. Uh-huh.

A. Did not have -- I had very little experience in the tree stuff that was -- Baxley was focused on when I got here, and as we -- we've chased more and more real construction jobs.

Q. Why did Brandon resign as manager of Baxley Corp.?

A. Because of all -- of the time that all of this was taking.

Q. The bankruptcy?

A. Yes. Yes.

Q. Okay. So he's still working 60 hours a week, right?

A. But it's not a -- I don't -- I think -- I'm not -- I -- I couldn't speak to exactly how many hours Brandon is working when he's, you

know -- I mean, he's at -- he works from home as well, you know, just as I do. I couldn't tell you. I know I gave that answer a little while ago, but I'm not certain how many hours he's working. But just the stress level was quite a bit higher.

Q. Do you know when he filed bankruptcy?

A. The previous summer from stepping down as I recall, right?

Q. Do you think he filed in summer of 2017?

A. I believe so. I -- I don't recall.

Q. So the reason why he stepped down as manager was because of the stress of the bankruptcy?

A. That's part of it.

Q. What was the other part of it?

A. That's --

Q. I'm sorry?

A. I -- I don't -- you would have to ask -- I -- that's all I've got. That's all I know.

Q. You're not aware of any other reason?

A. No.

Q. Would it surprise you to know that he

filed bankruptcy July 8th of 2018?

A. I -- no.

Q. That was, what, eight or nine days after he resigned as manager?

A. Yeah. No.

Q. It wouldn't surprise you?

A. No, I -- it wouldn't.

Q. You were thinking it was the year prior. That's why I'm asking.

A. Yeah. I'm -- dates are not my strong point and I have -- with -- I've told you just about every one to the best -- you know, as I recall. I don't -- I'm not certain. If I'm certain, I'll tell you I am.

Q. That's fine. Did -- did he resign manager because he was going to file bankruptcy?

A. No, not that I'm -- not that I'm aware of.

Q. What is a prime NCDOT contractor?

A. There are different levels of approval. You have to have a certain -- be an approved contractor to work on DOT jobs. There are different levels of jobs that you can then bid. Prime is in the middle, I guess. It's a mid-level --

Q. Okay.
A. -- DOT approval.
Q. What is higher than prime?
A. Bidder.
Q. Bidder?
A. Uh-huh.
Q. What's higher than bidder?
A. I don't think there's anything higher than bidder.
Q. What's lower than prime?
A. Sub. Subcontractor.
Q. Anything lower than sub?
A. Not that I'm aware of.
Q. Okay. Is Baxley a prime NCDOT contractor?
A. We are.
Q. Okay. And you were back in February of '18 --
A. Yes.
Q. -- or January of '18?
A. Yes.
Q. Does Brandon Baxley hold a pesticide license with multiple endorsements?
A. I believe he does, yes.
Q. And is he an ISA certified arborist?

A. I believe so.
Q. Does Baxley --
A. I need to take a break and get some --
Q. Oh, yeah, please.
A. We can finish this question, but after this --
Q. No. No. Go ahead.
A. -- I'm going to --
Q. We -- we can --
A. -- take a break and --
Q. -- take a break now.
A. -- get some water.
Q. Yeah. Sure.
A. Yeah.
(Whereupon, there was a recess in the proceedings from 9:46 a.m. to 9:54 a.m.)
BY MR. OLIVER:
Q. All right. Back on the record after a little break.
A. Yes.
Q. Do you hold a general contractor's license?
A. Not currently.
Q. Did you have --
A. It's expired.

Q. Did you have one in January of last year?

A. January of last year, I did not.

Q. When did your contractor's license expire?

A. Probably 2011, 2012. My contractor's license is expired for a good while.

Q. Do you know whether Baxley Corp. is still giving the same qualifications information to bids that it makes as it did on this Exhibit 5? I'll just point out on the last page that it says you hold a general contractor's license.

A. It's not accurate. It does -- it does say that.

Q. Do you know if the information that you give out on bids for the company still says that?

A. I don't -- I do not send out -- I have not sent out anything that says that that I'm aware of.

Q. Does Brandon still send out letters like this one that he sent last year?

A. Does he still? No.

Q. And he hasn't since June of 2018?

A. Not that I'm aware of, no.

Q. Does Baxley Corporation hold a general

contractor's license?

A. Yes.

Q. Who is the qualifier for it?

A. Brandon is the qualifier.

Q. How long has he had his general --

A. Highway license. I --

Q. How long has he had his general contractor's license?

A. I do not know.

Q. So prior to June 29th of 2018, Brandon Baxley did represent himself to be a member and a manager of Baxley Corp., LLC?

A. He did.

(KEITH EXHIBIT 6, Non-Collusion Affidavit, 7/18/18, was marked for identification.)

BY MR. OLIVER:

Q. Exhibit 6. It's difficult to read this copy, but I think we can make it out. This is some sort of non-collusion affidavit for a bid. Are you familiar with a form like this?

A. Yes.

Q. Do you see that Brandon has signed on behalf of Baxley Corporation?

A. Uh-huh.

Q. I'm sorry. Yes?
A. Yes.
Q. Okay. This was back in, looks like --
A. Yeah. I've signed, you know, hundreds of these.
Q. You have?
A. And I think out of habit, Brandon has signed -- you know, it doesn't state that he's a manager or owner or anything here that I can see as -- as well. I mean, it's -- may have been one that was delivered -- hand delivered and so he signed it here in Raleigh. It doesn't indicate that he's -- I don't see where it indicates anything about his role.
Q. You don't see where it indicates if he was a member -- member or manager?
A. Do you?
Q. I recognize this copy doesn't word -- but if he did sign as member or manager, would that surprise you?
A. You know, he did frequently, you know, be- -- before stepping down from this role. If he signed one some place in error out of habit, that's possible. That could have happened.
Q. Okay. You mean if he signed one since

June 29th --

A. Since stepping down --

Q. -- of 2018?

A. -- correct.

Q. I'm sorry. We need to make sure we're careful. You mean if he signed one that was after June 29th of 2018, that would have been an error? Is that what you're saying?

A. Yes.

(KEITH EXHIBIT 7, Execution of Bid, with Attachment, was marked for identification.)

BY MR. OLIVER:

Q. This is Exhibit 7. Do you see on the first page of Exhibit 7 that Brandon has signed as member/manager and he circled member/manager on the first page?

A. I do.

Q. And that's on behalf of Baxley Corporation, LLC?

A. Yes.

Q. And then on the last page of this exhibit, the third page, he's also signed again as manager. And this was in January of 2018. That would not surprise you, would it?

A. No.

Q. Do you know if he's ever represented himself to be a director of Baxley Corporation?
A. I do not.
Q. Who are the directors of Baxley Corporation?
A. I'm not certain. I would assume -- I'm not certain.
Q. Are there directors for Baxley Corporation?
A. There are officers, I'm sure.
Q. Who are the officers?
A. Martha and Rudy.
Q. What are their positions?
A. I'm not sure how they're listed on the corporate docs. I wasn't here when it was formed.
Q. Have you ever seen them sign their names with any sort of title beside them?
A. Member/manager.
Q. Anything other than member/manager?
A. No, I have not.
(KEITH EXHIBIT 8, Payroll Form for Week Ending 3/31/18, was marked for identification.)
BY MR. OLIVER:
Q. Show you what's marked as Exhibit 8.

This is something else signed by Brandon on behalf of Baxley Corp. and this is to the Department of Labor, U.S. Department of Labor. Do you see on the second page where he has signed, Brandon Baxley, director?

A. I do.

Q. So the dates that I see on here -- this is a payroll certification for the week ending 3/31/18; is that right?

A. It is.

Q. I saw -- we saw in the documents that he resigned as member/manager. Did you see anything where he resigned as director?

A. I did not.

Q. Have you ever received information that he resigned as director of Baxley Corp.?

A. I have not.

MR. JANVIER: I'm going to object to form. I don't represent this witness, but since I --

MR. OLIVER: Okay.

MR. JANVIER: -- represent the debtor, I'm going to object to form.

MR. OLIVER: Okay.

BY MR. OLIVER:

Q. When somebody objects to form, it usually means there's something wrong with the way I worded the question. Maybe it's not clear. Did you not understand what I meant?

A. Ask the question again, please.

Q. Have you ever received any information, I'll add, from anyone or any source that Brandon had resigned as a director of Baxley Corp., LLC?

MR. JANVIER: Same objection.

MR. OLIVER: Yeah. Okay.

BY MR. OLIVER:

Q. He's objecting for the record, but you can still answer it, and if you don't understand it, I'll try to reword it.

A. No, I have not.

Q. When did Brandon first become the managing director of Baxley Corp.?

A. I do not know.

Q. He was the managing director of Baxley Corp. at some point, wasn't he?

A. I do not know.

Q. Did you ever receive e-mails from Brandon where he signed them as managing director of Baxley Corp.?

A. Not that I'm aware of. Not that I

recall.

(KEITH EXHIBIT 9, E-mail String, November 1, 2016, Subject: Shane Edge & Password Changes, was marked for identification.)

BY MR. OLIVER:

Q. Show you this Exhibit 9 and see if that refreshes your recollection. This is just an example of one such e-mail. Do you see that you received an e-mail from Brandon on November 1st, 2016, on the first page of Exhibit 9? Do you see that?

A. Yes.

Q. And how did he sign his name? What's his signature block say?

A. It says, managing director.

Q. And on the second page there's another e-mail from the same date and what does the signature block say?

A. Same, managing director.

Q. Do you know when he changed that designation?

A. I do not.

Q. You started about three years ago with the company. Was that 2016?

A. It would have been, yes.

Q. Was it -- what time of year was it?
A. I -- I'm not certain when I -- what -- I'm not certain which month.
Q. Do you remember if it was the summer or the winter or the spring or the fall?
A. Late spring, summer.
Q. So November 1st of '16 would have been relatively early in your time at Baxley Corp.?
A. Yes.
Q. Do you ever remember a time prior to November 1st of '16 where Brandon did not sign his e-mails as managing director of Baxley Corp.?
A. I don't remember what he signed his e-mails at -- as in -- in 2016 at all.
Q. Did he continue to sign on behalf of Baxley Corp. after he stepped down as manager in June of 2018?
A. Not that I recall.
Q. Did he continue to man- -- represent himself as managing director after he stepped down as manager in June of 2018?
A. I don't recall.
Q. Do you remember being copied on e-mails after June of 2018 in which Brandon was representing himself to be the managing director

of Baxley Corp.?

A. I do not.

(KEITH EXHIBIT 10, E-mail String, September 11, 2018, Subject: Cut and shove durham, was marked for identification.)

BY MR. OLIVER:

Q. I'll show you Exhibit 10 and see if that refreshes your recollection. This is an e-mail to several people including yourself from September 11th, 2018. I'll say this is one of many examples. Does that refresh your memory as to Brandon signing e-mails as managing director of Baxley Corp. after June of 2018?

A. Could you rephrase that?

Q. Does this refresh your memory as to Brandon signing e-mails as managing director of Baxley Corp. after June of 2018?

A. I can see that he has. It doesn't refresh my memory, not particularly, not a -- not a detail that would stand out --

Q. You don't remember telling --

A. -- six years later.

Q. You never told Brandon, hey, stop calling yourself managing director, I'm the manager now, you're not?

A. Not that I recall, no.

(KEITH EXHIBIT 11, E-mail Message from Brandon Baxley to Jonathan Keith, et al., November 1, 2018, Subject: BASF - PO & Order, was marked for identification.)

BY MR. OLIVER:

Q. Show you what I'm marking as Exhibit 11. This one takes us to November 1st of 2018. Do you see that Mr. Brandon Baxley continued to hold himself out as managing director of Baxley Corp. at least as of November 1st, 2018?

A. I see this, yes. Likely, he never changed his --

Q. Position?

A. No, the -- the footer on his e-mail.

Q. Okay.

A. Just neglected to change that. It's not something he would have entered in each time.

Q. And this is an example of him telling you something to do for the business, right? Let's get this order in Monday at the latest. As of yesterday, we've doubled up crews to increase production. I want to finish the year on a strong note. I would like product here in ten days.

A. I don't see that as a directive.
Q. Okay. What do you see it as?
A. We were discussing a job and this is a -- a snapshot that you're looking at that doesn't -- it doesn't include conversations that we had about it. It's out of context. It doesn't -- it doesn't show me much.
Q. Is this the typical e-mail you might have received from --
A. We're both --
Q. -- Brandon --
A. -- fairly direct with each -- I'm sorry.
Q. Is this a typical e-mail you might have received from Brandon after June of 2018?
A. Is this a typical e-mail? It's an e-mail I received from Brandon. As to whether it's typical or not, I do not know.
Q. It doesn't strike you as unusual in any way?
A. Does not.
(KEITH EXHIBIT 12, E-mail String, September 24, 2018, Subject: Invoice 59798 from Baxley Corporation, with Attachment, was marked for identification.)

BY MR. OLIVER:

Q. Exhibit 12 is another series of e-mails from Brandon you're copied on where he's holding himself out to be managing director back in September of '18; is that right?

A. Yes.

Q. And he is sending an invoice on behalf of Baxley Corporation to the North Carolina Department of Transportation; is that right?

A. He is.

Q. And that invoice on the second page is just over $189,000?

A. Yes.

Q. That cut and shove work, would that have been related to Hurricane Florence likely?

A. Yes.

(KEITH EXHIBIT 13, North Carolina Licensing Board License Details, Baxley Corporation, was marked for identification.)

BY MR. OLIVER:

Q. This is a -- it's Exhibit 13. It's something printed from North Carolina Licensing Board for General Contractors and it gives information about -- at least as of May of this year about the contractor's license for Baxley

Corp., LLC, and it shows that Brandon Baxley is the qualifier and it's a highway license, limited, correct?

A. Yes.

Q. And I think you testified he is still the qualifier?

A. Yes.

Q. This was renewed in March -- March 26th of 2019. Do you know if he was the qualifier for the company prior to that date?

A. Prior to the renewal? Yes.

Q. Okay. And you don't know how long he was the qualifier for the company?

A. I don't recall when he got his license.

Q. Did he have his license when you started working for the company sometime in 2016?

A. I do not know if -- I don't know.

(KEITH EXHIBIT 14, Letter from Jonathan Keith, May 28, 2019, was marked for identification.)

BY MR. OLIVER:

Q. Next Exhibit 14 is a letter from you as manager of Baxley Corporation. If you'd take a look at that, please. It's dated May 28th of 2019.

A. Yes.
Q. Why did you write this letter?
A. Why?
Q. Yes. Who asked you to write it?
A. It was pertaining to his bankruptcy case.
Q. Was it due to a request for information maybe sent by my office?
A. I believe so.
Q. Okay. Is the information -- was the information true in this letter as of May 28th, 2019?
A. It was.
Q. This says, Martha Baxley has received no compensation or distributions, and you had testified earlier that she's receiving a thousand dollars a week.
A. I don't recall testify- -- Rudy Baxley --
Q. Oh, I'm sorry. Rudy --
A. -- a thousand a week.
Q. -- Baxley.
A. Yes.
Q. So Martha receives no compensation?
A. Right.

Q. And Brandon receives no compensation?
A. Yes.
Q. And has never received compensation from the company?
A. Not that I -- not that I'm aware of while I've held this role.
Q. Both of them? Neither has received any --
A. Yes.
Q. -- compensation or distributions since June of 2018?
A. Not that I'm aware of, no.
Q. And then you have Rudy's compensation in the amount of 88,801.52 --
A. Uh-huh.
Q. -- in a roughly five-month period -- I'm sorry, three- -- two-and-a-half-year period?
A. Uh-huh.
Q. Okay. This excludes 24,000 in loan repayments made to Rudy during 2019. What were those loans for?
A. I don't know. I don't recall.
Q. So when you wrote this letter, where did you get information that he had been paid 24,000 in loan repayments during 2019?

A. From Rudy and Martha, I recall.
Q. Did you review any company records before you wrote this letter?
A. I did.
Q. Which records?
A. The company books, QuickBooks.
Q. Okay. Did you find on there loan repayments to Rudy?
A. I don't recall. I mean, this has been months and months ago. I don't recall.
Q. You don't recall whether you saw on the company books that Rudy had made loans or that he had been paid back loans?
A. I know Rudy has made loans. I'm not sure what he's been paid back.
Q. So is it fair to say the information you put in this letter was information that you received from Rudy as far as what he had been paid in 2019?
A. Combination of Rudy and -- and the QuickBooks and -- and Martha.
Q. So you have access to the company QuickBooks?
A. I do.
Q. Is it on your computer?

A. It's web-based.
Q. Okay. So you have a password that allows you to --
A. Yes.
Q. -- anywhere you have an internet connection to access it?
A. Yes.
Q. Do you input any information into the company QuickBooks?
A. I do.
Q. What sort of information?
A. Invoicing, invoice jobs, quote -- some quotes for jobs.
Q. Have you had access to the company QuickBooks since you became a manager in June of 2018?
A. Yes.
Q. How about prior to that?
A. Yes.
Q. All the way back to when you started in 2016?
A. I don't know at what point I started invoicing some of my -- some of my projects but sometime between those two dates.
Q. Do you know whether the company had

QuickBooks all the way back when you started in 2016?

A. I believe so. I do not know.

Q. Other than health insurance and perhaps some payment for the use of his residence as an office, you testified that Brandon Baxley has received no monetary benefit from the company; is that right?

A. Yes.

Q. Okay. Doesn't he have the use of a Baxley credit card -- Baxley Corp. credit card?

A. Yes. There -- our foremen have them, I have one, and there are quite a few of those.

Q. And do you review the charges on that credit card?

A. I do not.

Q. Who does?

A. I would assume Ginger and Rudy do.

Q. You don't know if they do?

A. I -- I don't know if they do.

Q. Who gave Brandon authorization to use the credit card?

A. I do not know.

Q. Did he have the credit card before he resigned as manager?

A. Yes.
Q. And he's had it since then, too, right?
A. I would assume so.
Q. What type of expenses is he authorized to use on the card?
A. I mean, we use them for all -- all -- all kinds of things. Materials. These are the kinds of work we do. Our people are on the job. You know, you can't typically leave for lunch. There are food -- there's food, meals, groceries, hotel rooms. Typical items. I mean, I -- you know, there may be other things I'm leaving out, but --
Q. So business-type expenses?
A. Business expenses.
Q. You don't ever use your credit card for personal expenses, do you?
A. I do not.
Q. Does Brandon use his for personal expenses?
A. I don't believe so.
Q. Have you authorized him to?
A. I have not.
Q. Does Baxley Corp. pay for Brandon's cell phone?

A. Baxley Corp. pays for all of the cell phones, probably 20 of them.
Q. Including Brandon's?
A. Including Brandon's.
Q. Do you know whether Brandon has a personal cell phone in addition to the cell phone he uses for business?
A. I do not.
Q. Do you only know one number that you call him on?
A. Yes.
Q. Does Brandon have the use of a vehicle owned by Baxley Corp.?
A. Yes.
Q. What kind of car?
A. It's a work truck, GMC. I'm not sure if he's -- which truck he's in.
Q. Okay.
A. We move them around quite a bit.
Q. Is that his primary vehicle?
A. Ginger has an Audi that they use for, you know, weekends and trips and whatever. It's -- you wouldn't drive these trucks as your personal vehicle if you don't have to.
Q. Other than the Audi --

A. They're big and heavy and...

Q. Other than the Audi that Ginger has, are -- have you ever seen him drive any other vehicles?

A. There was a BMW, and I'm not sure who's driving it now. It's an old -- old BMW X5 that's floating around, someone's using as a company car at this point.

Q. Okay. You don't see Brandon drive anything other than the company car and the Audi?

A. I see him in the Audi and -- and the company vehicle -- or the company truck that he's -- whichever one he's in.

Q. Does the company pay Brandon's vehicle insurance?

A. Pays for the company's policy --

Q. Does --

A. -- which he would be covered under as an employee.

Q. Does it pay for his meals?

A. If they're in -- you know, if they're in regards to business. If we're out on the jobs, any one of us may pick up -- pick up meals.

Q. Okay. Is there any kind of limit on what he can charge for meals in a given day?

A. I don't have one on me. I don't know what his -- I don't -- don't believe so, no.

Q. Or any limit on what he can spend on meals in a week or a month?

A. No.

Q. Do you know how much Brandy -- excuse me, Brandon spends on his Baxley Corp. credit card in a -- in an average month?

A. I do not.

Q. Or an average week?

A. I do not.

Q. Or even yearly?

A. I do not.

Q. How is the company doing financially?

A. Ask that again, please.

Q. How is the company doing financially?

A. I mean, could you be more specific? What are you -- what exactly -- in -- in regards to what?

Q. You had said earlier there wasn't money to pay Brandon --

A. Yes.

Q. -- which leads me to think maybe the company's not profitable, but I'd like to hear your view on it.

A. We've had four million in work dissolve off the books through the DOT's budget crisis this year and there are -- things have -- have been tight at times. We have -- the DOT typically pays very quickly. We've gotten invoices that are 90 days old at this point, so there have been times when there's a cash flow crunch for sure.

Q. Okay. So would you say the business is profitable or not profitable for 2019?

A. I -- if so, not by much.

Q. Okay. Do you -- as a manager do you get regular reports on the profitability of the company?

A. Yes.

Q. How often?

A. Yearly.

Q. Okay. So those are annual statements?

A. Uh-huh.

Q. You don't get any reports any sooner than that or more regular than annually?

A. Not a -- a formal report, no.

Q. How do you describe a formal report? What sort of report is that?

A. I mean, I try to always have an idea of

what we have coming -- you know, what expenses are coming up and when -- and what our accounts receivable is.

Q. Okay.

A. But as far as whether we're profitable at a -- at a snapshot of that, I don't have that.

Q. Well, with the formal reports, are they profit and loss statements?

A. Yes.

Q. Are they balance sheets?

A. Yes.

Q. Okay. Do you have like a year-over-year comparison?

A. Yes.

Q. As far as the less formal reports that you get more often than annually, what do those look like?

A. What do they look like? What --

Q. Yeah. You said you -- you get formal reports once a year. I'm -- I'm asking about the more --

A. I got --

Q. -- informal reports.

A. There's not a -- I think I just answered that.

Q. I don't understand what you said. Then I'll ask you again.
A. Yeah. I don't -- let's do that --
Q. Do you receive --
A. -- please.
Q. -- any sort of reporting more regularly than annually and, if so, what does that look like?
A. Then, no. Then the answer's no. As far as a -- a report, I -- no.
Q. So how do you keep abreast of what expenses are coming up? You testified that you always know what expenses are always coming up, so how --
A. I --
Q. -- do you get that information?
A. I didn't testify that I always know. I said I try to keep -- keep -- keep my finger on the pulse to some extent and know what expenses are coming up. I didn't state that I always do.
Q. How do you -- how do you do that? How do you keep the finger on what expenses are coming up?
A. What in- -- the invoices that come in, I keep a -- we try and keep a running total of

what invoices are -- are coming in and what's due.

Q. Do you do that through QuickBooks?

A. Somewhat. And --

Q. How else -- how else do you do that? Do you keep a --

A. Well, I --

Q. -- notebook?

A. -- I typically see the invoices as they come in.

Q. Okay. And as far as the accounts receivable, you say you try to keep a -- I'll say --

A. Yes.

Q. -- I'll use your words, keep a finger on what the accounts receivable are. How do you do that?

A. About -- I -- I generate a good bit of the invoices that are out there so I know how -- how old most of them are.

Q. Do you -- QuickBooks allows you to make all kinds of reports. Do you run an accounts receivable report in QuickBooks?

A. I don't typically run one. It -- it will, of course, but...

Q. What are the accounts receivable of Baxley Corp. today?

A. I would say probably 250- in accounts receivable right now.

Q. Okay. And how much of those make up the DOT that's out 90 days?

A. I -- I couldn't answer that. I couldn't tell you that accurately.

Q. Do you have a guess as to what percentage of the 250-?

A. I'm not going to guess.

Q. Okay. Again, I'm not asking specific. I'm asking general.

A. Yeah.

Q. Is it half? Is it more than half?

A. Again, I'm not going to guess. I -- I couldn't -- if I can't give you an accurate answer, I'm just not.

Q. What are the monthly expenses of Baxley Corp., LLC?

A. I mean, it's -- it -- depending on -- it varies considerably depending on what type of projects we're on, what -- you know, some jobs require a good bit of materials; some don't. I just -- I couldn't answer that.

Q. What is the range? What is the leanest month you would have versus what you would expect to be --
A. The leanest month?
Q. -- a heavy --
A. Something --
Q. Sorry. Let me -- versus what you would expect to be a more heavy month?
A. It could be as low as 150-; could be as much as -- as half a mil in a month depending on the projects.
Q. Okay. How -- how much money does Baxley Corp. have in the bank right now?
A. Less than 50-.
Q. How much is the payroll expense for Baxley in a given month?
A. At this point, about a hundred thousand a month.
Q. That's for the 20 or 25 folks that you --
A. Yeah.
Q. -- talked about earlier? You -- are you the person that knows the most about the finances of the business?
A. I would say no.

Q. Who would you say that is?
A. Ginger and Rudy. I can't answer that. I don't know. I'm not certain.
Q. Well, who signs checks?
A. All three of us.
Q. Do you each sign different types of checks?
A. Whoever's convenient to sign the checks, signs the checks.
Q. No. But the office is in Ginger and Brandon's home?
A. Yes.
Q. So is it safe to say Ginger's home to --
A. Yes.
Q. -- sign checks more than you are?
A. Yes.
Q. Does she sign more checks than you do?
A. Yes.
Q. Does she sign more checks than Rudy?
A. Rudy signs a good -- Rudy signs quite a bit as well.
Q. You don't sign many checks?
A. I sign some checks.
(KEITH EXHIBIT 15, Chart of Credit Card

Charges, Capital One - Spark Business Account Ending 9690, was marked for identification.)

BY MR. OLIVER:

Q. This next document is Exhibit 15. We received credit card statements from you, from the company --

A. Uh-huh.

Q. -- and looked at what the relative charges were for different -- different credit cards that --

A. Uh-huh.

Q. You -- have you seen the credit card statements before?

A. Yes.

Q. Do you know that they show whose card charged what?

A. Yes.

Q. So Martha Baxley has a card, right?

A. Uh-huh.

Q. And Dencil Harrison?

A. Yes.

Q. All the --

A. Which is no longer with us, but all of these people had cards.

Q. Okay. And this -- and you can see this

is from August of '18 through November 15th of '18, right?

A. Uh-huh.

Q. The other people still with you, Sam Bradford?

A. Yes.

Q. Rudy Baxley?

A. Yes.

Q. Dustin Johnson?

A. Yes.

Q. Jeff Jackson?

A. Yes.

Q. And, of course, you, Jonathan Keith, right?

A. Yes.

Q. So this is how much was spent by -- on each of these cards in a -- in these three months, just looking at three months. Looks like you don't use your card very much or you didn't back then?

A. I didn't at that point.

Q. And this is -- for these three you have 15,000 in one month, 22,5-, almost 29,000. Would you -- are these higher than typical, average? What would you say about these amounts being

charged on the company credit card in a given month?

A. It can vary consider- -- it varies considerably depending on the projects.

Q. Who --

A. These are -- a lot of these -- Dustin's are materials and equipment maintenance. Sam's, you know, $10,000 -- $10,000 worth of charges for Sam would definitely be materials. You know, it just -- it depends on what's going on in that particular month.

Q. Okay.

A. They -- these are not, you know -- majority of these are not meal expenses and things like that. These are -- you know, the bigger ones are going to be some materials typically --

Q. Okay.

A. -- or stone or --

Q. So there's nothing surprising about these --

A. No.

Q. -- numbers to you?

A. No.

Q. Okay. Who is it that looks at the

company credit card statements to verify that charges are valid charges and should -- and were authorized to be charged by the employee?
A. Martha or Rudy, I would assume.
Q. You don't as a regular course --
A. Not typically.
Q. -- get a copy of the credit card statements?
A. I don't pay much atten- -- I don't typically, no.
Q. Do you -- do you get a copy of them?
A. I have.
Q. Do you get them on a regular basis?
A. I have.
Q. When was the last time you looked at a credit card statement for the company?
A. I don't recall. It's been months.
Q. Okay. Have you looked at one this year?
A. Yes.
Q. In August, September, and October of last year, were you looking regularly at credit card statements?
A. No.
Q. Okay. Do you know whether you've ever

seen the credit card statements for these months for the company?

A. I do not.

Q. If -- if you were to look at -- or someone -- or Ginger, someone -- one of the managers were to look at a credit card statement and saw a charge that was not authorized, what would the company do?

A. I'm not aware that we've had any that were not -- not authorized.

Q. So you can't remember an instance where somebody charged something on a company credit card that was not authorized?

A. I do not.

Q. Okay. Does the company have a policy of what it would do if someone charged an unauthorized charge on the company credit card?

A. I don't believe we do.

Q. Okay. As the manager what would you do?

A. It would depend on the situation, on who it -- who it was and -- and, you know -- too many variables to give you that answer.

Q. If Sam Bradford's charges in October of '18, which are 10,885.55, which you've just

described as most likely materials --

A. Uh-huh.

Q. -- if you looked at it and found that he had charged a family vacation on that, what would you do?

A. Likely, I would let him go.

Q. Right. Because that would be --

A. That's -- would be embezzlement, embezzling.

Q. Okay. I understand.

(KEITH EXHIBIT 16, Chart of Credit Card Charges, Brandon Baxley, Capital One - Spark Business Account Ending 9690, was marked for identification.)

BY MR. OLIVER:

Q. So this is a chart for the same period of time analyzing the charges made by Brandon Baxley, Exhibit 16. Do these numbers surprise you?

A. No.

Q. They are considerably higher, aren't they?

A. They are.

Q. Is it a typical month for Brandon Baxley to charge between 31- and $44,000 on a

credit -- company credit card?

A. It happens when -- depending on what projects are going on there.

Q. It doesn't surprise you as the manager to see that?

A. It does not.

Q. Would it cause you to want to look at the credit card statements to verify that they were authorized charges?

A. No, it would not.

Q. If you got a credit card statement from Sam Bradford in the amount of 43,219.36, would you look at that statement?

A. I likely would.

Q. Why wouldn't you look at it for Brandon?

A. Sam is a foreman. It's a -- it's a different -- you know, Sam as a foreman picking something up, some counter sales materials or something like that, is -- is not the same thing.

Q. What is it about Brandon's role --

A. This -- this card --

Q. -- that makes it different?

A. I mean, he would pay on accounts with his card, you know, pay --

Q. So during this three-month period --

A. -- make bigger material purchases.

Q. During this three-month period, these seven employees charged $67,040.92 and Brandon charged 111,548.43 by himself. That doesn't seem strange to you?

A. Does not.

Q. And you've never looked at the credit card statements from these months, have you?

A. No.

Q. Let's look at them.

(KEITH EXHIBIT 17, Capital One Credit Card Statements, August 16, 2018, through November 15, 2018, was marked for identification.)

BY MR. OLIVER:

Q. Show you what I'm marking as Exhibit 17, which are the statements from August, September, and October, I believe, or are they just -- let me see what I have here. These are --

MR. OLIVER: What's the number?

MR. BEHR: Oh, it's 17.

MR. OLIVER: 17. Okay.

BY MR. OLIVER:

Q. So we have here October of '18, November, and December so not exactly these but from the same time frame.

A. Uh-huh.

Q. If you turn to the third page, do you see how they're broken down by name of the people that have --

A. I do.

Q. -- a card? The first one's Martha Baxley?

A. Yes.

Q. Sam -- then we have Brandon Baxley, Sam Bradford, another Martha Baxley which start transactions, so you have credits, then transactions, and then Dencil Harrison.

A. Uh-huh.

Q. And then Brandon Baxley is on the October one.

A. Uh-huh.

Q. I'm sorry. So this is -- so it's -- I'm sorry. This is -- the payment due date's October 12th, but the -- the first one is August 16th, '18, through September 5th [sic], '18. The third page we start Brandon Baxley is 5301.

MR. JANVIER: Sorry. George, where are

you?

MR. OLIVER: The --

MR. BEHR: It's Page 3.

MR. OLIVER: Page 4 of the --

MR. BEHR: Oh, 4.

MR. OLIVER: -- the one that says, payment due date, October 12th.

MR. BEHR: Oh, wait a minute. I thought that -- Page 4.

MR. OLIVER: Yeah.

MR. BEHR: Sorry.

MR. OLIVER: Sorry.

BY MR. OLIVER:

Q. Would you expect an employee to pay $348.98 to Seaboard Wine on the company credit card?

A. This was what month?

Q. August 31st.

A. I don't have an explanation.

Q. There are on that same page two other charges to Seaboard Wine, one for 216.84 and one for 153.99 on September 5th and 6th, also September 1st, 52.86 at the ABC store in Wake County. Any explanation for that?

A. No.

Q. Would you expect an employee to charge $3,135 to a resort at Turks and Caicos on the company card?
A. Would I expect?
Q. Yes. Does it surprise you to see that on Brandon's charges?
A. It's the first I've seen it.
Q. Is that something you would expect an employee to charge on the company card?
A. No.
Q. Would you expect the com- -- the company card to pay for Netflix charges?
A. No.
Q. Would you expect the company to pay for groceries for a company -- for an employee?
A. We pay for groceries all the time. We have crews that are out in the field who oftentimes cook in the field. We do -- you know, groceries is a common charge.
Q. You know what Coquette of Raleigh is?
A. I do not.
Q. You know why Brandon charged $130 to that on September 2nd?
A. I do not.
Q. Do you see as you look at this all the

different food items that are charged?
A. Yes.
Q. What is Soccer Shots?
A. What is what?
Q. Soccer Shots.
A. I do not know.
Q. Is that something you'd want to ask an employee about if you saw a hundred dollar charge on the company card?
A. Possibly.
Q. If you don't know what it is, would you like to know what it is and find out from the employee?
A. Sure.
Q. Go to the next series of state- -- the next statement, which says, payment due date, November 12th, 2018. Would you expect the company to pay for his medical expenses on the company credit card?
MR. WALLER: Are you looking at a specific page now or --
MR. OLIVER: I am.
MR. WALLER: Show him.
BY MR. OLIVER:
Q. I'm on -- Page 4 of 8 is what it says

at the top right. It's the -- it's actually the fifth page of the --

MR. BEHR: You guys Bates numbered them, Ben, so if you look at the bottom, it's 992, I think --

MR. OLIVER: Okay. There you go. Thank you.

BY MR. OLIVER:

Q. Would you expect WakeMed Outpatient to be something you would see on a company credit card for an employee?

A. I don't know what that is. I don't know if -- I don't know who it is.

Q. You didn't ask Brandon why he charged that, did you?

A. I did not.

Q. What about gooutdoorsflorida.com, do you know what that is?

A. I do not.

Q. Or charges in Panama City, Florida, do you know why those would be on the company credit card?

A. What month was this?

Q. September of 2018.

A. I was in Florida, throughout Florida

after Florence and I believe Brandon was as well.
Q. For company business?
A. Looking at -- on company business looking for -- looking at or for work in that area.
Q. Okay. Yeah, there are a lot of charges in Florida, so that would -- that would make sense to you, wouldn't it?
A. Yeah.
Q. More charges to Seaboard Wine, Netflix. Do you know how those items were expensed on the company books?
A. I don't recall.
Q. Do you know whether Brandon paid the company back for any of those charges?
A. I'm not aware.
Q. Going to the next one on -- starting on Page 4, which is Bates stamped 1000, do you know why Brandon would have charged $536.43 to Nordstrom on the company card?
A. No.
Q. Or why it would be paying his Hulu expense?
A. Likely an oversight, but I do not.
Q. Why do you say it's an oversight?

A. I don't think he would intend to pay his Hulu expense on -- on -- with the company card. It's easy to pick up the wrong card.
Q. Does he have another card?
A. I don't know what he -- I don't know what cards he has, if he has a personal one or not, but I can see where that could happen.
Q. When you pay for meals when you're on a job, does it tend to be fast food?
A. Sometimes it's fast food. Sometimes we entertain potential clients. You know, sometimes when we have meetings with -- with our foremen and whatnot, they're -- you know, a hu- -- a big range.
Q. On this same page, 3 of 9, Bates Stamp 1000, there's an AT&T bill pay of $690.18. Do you know what that would be for?
A. AT&T bill pay?
Q. Uh-huh.
A. It's likely the phone bill.
Q. The phone bill for the company?
A. For the company, correct.
Q. Is it through AT&T?
A. It is.
Q. Safe to say nobody at the company is

reviewing these charges done by Brandon Baxley?
A. I can't answer that. I don't know.
Q. If you had seen those sort of charges done by one of the other employees that has a card, would you let that person go?
A. I don't see a problem with most of these charges and it would be in -- we would handle any -- any type of situation like that on a case-by-case basis.
Q. Did you handle Brandon's on a case-by-case basis?
A. I have not handled Brandon's.
Q. Did anyone with the company handle Brandon's?
A. I know that I have not. I can only speak for myself.
Q. You're here to speak on behalf of the company, aren't you?
A. Yes.
Q. Do you know whether anybody --
A. I'm not aware of -- that anyone else has.
Q. Okay. What is Baxley Corporation, LLC, that was formed in Delaware? What do you know about that?

A. I do not.
Q. Were you aware that there is one in Delaware?
A. I am not.
Q. Are you associated with that company in any way?
A. I am not.
(KEITH EXHIBIT 18, State of Delaware Limited Liability Company Certificate of Formation, Baxley Corporation, August 7, 2015, was marked for identification.)
BY MR. OLIVER:
Q. I'll show you what's marked Exhibit 18 just to make sure you don't know anything about it. Have you ever seen this before?
A. I have not.
Q. What do you know about Baxley Construction?
A. I -- I don't.
Q. Did it merge with Baxley Corp.?
A. Not to my knowledge. I believe Baxley Construction is Rudy's business, a home builders business. I don't -- I don't have any familiarity with it whatsoever.
Q. You've never heard of any merger

between Baxley --
A. No, I have not.
Q. Let me just make sure I finish.
A. Sorry.
Q. -- between Baxley Construction and Baxley Corp., LLC?
A. I have not.
(KEITH EXHIBIT 19, E-mail Message from Brandon Baxley to Jonathan Keith, January 23, 2018, Subject: Merger Notice, with Attachment, was marked for identification.)
BY MR. OLIVER:
Q. All right. This is Exhibit 19. I'll ask you if this refreshes your recollection. It's an e-mail from Brandon to you January 23rd of 2018. It attaches some merger documents.
A. I don't remember this at all.
Q. Does it say -- it's dated January 18th, 2016, re: Baxley Construction/Baxley Corporation purchase and merger agreement. Pursuant to the terms of the merger and purchase agreement effective January 18, 2016, all assets, including, but not limited to, materials, property, equipment, licenses, contracts, immediately become the property of Baxley

Corporation.

A. I don't recall seeing this.

Q. Did you receive the e-mail that is the first page of Exhibit 19?

A. Did I rec- -- did it -- did I receive it?

Q. Yes. Was it sent to you by Brandon on January 23rd of 2018?

A. It appears that it was, but I don't recall opening -- I don't recall seeing this.

Q. Was Brandon the sole member of Baxley Corp., LLC, when it was formed?

A. Not to my knowledge, no.

Q. Was that a no or you don't know?

A. That's a no.

Q. Do you know why he would have represented himself as such to the IRS in 2016?

A. I was not -- in 2016 I was an estimator.

Q. Okay. This --

A. I wouldn't have been privy to any of that --

Q. This is --

A. -- and cannot answer it.

Q. -- June 1st of 2016. I'm assuming this

is one of the company records, but see if you've ever seen it before.

A. I have not seen it before.

Q. Do you see where it says in the middle of the page on the left side, Baxley Corporation, Brandon Baxley, sole member?

A. I do.

Q. And it's assigning the employer identification number.

A. Uh-huh.

Q. This notice was dated 5/17/16, wasn't it?

A. It is.

Q. Do you know -- do you know when Brandon stopped being the sole member of Baxley Corporation?

A. I do not. I don't know that he was.

Q. You've seen -- you -- you have access to sign checks on behalf of Baxley Corp., LLC, don't you?

A. Yes.

Q. Do you know when Baxley Corporation started business?

A. 2016.

Q. Right about the time it got its

employee identi- -- employer identification number in --

A. Yes.

Q. -- May of '16?

A. Yes. Yes.

Q. And you started right after that, didn't you?

A. Yes.

(KEITH EXHIBIT 20, IRS Employer Identification Number Letter, 5/17/2016, was marked for identification.)

BY MR. OLIVER:

Q. As a manager do you have access to the bank records of the company?

A. Yes.

Q. And as the manager did you assist in compiling information to send to my office in response to the request?

A. Yes.

(KEITH EXHIBIT 21, Bank of America Bank Checking Account Statement, May 31, 2016, to May 31, 2016, was marked for identification.)

BY MR. OLIVER:

Q. I'm going to show you something marked as Exhibit 21. At the bottom it says,

BANA_Baxley0001. I believe this is the first bank account statement for Baxley Corp., LLC. See the beginning balance was zero?

A. Yes.

Q. And this was in May of 2016. Is that when you understand the bank account would have been opened?

A. Yes.

Q. And who was the member/manager when this was opened?

A. I didn't open the account. I couldn't tell you. Who was the member -- member/manager?

Q. Yeah, when the company started, when the bank account was opened.

A. It would have been Ginger, Martha.

Q. Okay. No one else was a member at that time?

A. Again, at that time, my role was as an -- as an estimator and project manager. I wasn't privy to any of this.

Q. You said it was Ginger. Was anyone else a member at that time?

A. I do not know.

Q. Well, how do you know it was Ginger?

A. I -- I believe my answer was I would

assume it was Ginger, but it...

(KEITH EXHIBIT 22, Bank of America Signature Card and Account Opening Documents, April 4, 2019, was marked for identification.)

BY MR. OLIVER:

Q. Show you what's been marked as Exhibit 22. This is the opening of the account signature card with Bank of America.

A. Uh-huh.

Q. You see it lists who the three authorized persons are as signer on the first page?

A. I do.

Q. And that's Rudy, Brandon, and yourself?

A. Yes.

Q. So were you involved in the company when it first started?

A. I guess, yes.

Q. This is dated April 4th of -- I'm sorry. This is dated April 4th of 2019 and it is signed by whom on the third page?

A. That is Brandon's signature.

Q. Okay. Why was Brandon signing on behalf of the company on April 4th of 2019?

A. I'm not sure.

Q. On the next page -- I'm sorry. It's Page 4 of this exhibit. Down at the bottom it's BANA_Baxley-930. Do you see that on May 31st of 2016, Brandon has signed as member/manager of Baxley Corporation, LLC?

A. I do see it.

Q. And then, again, on the next page that's his signature?

A. Yes.

Q. Then on the page after that for a different account, also May 31st, '16, I believe? Do you see his signature there on the following page?

A. Yes.

Q. And then on -- so you don't know when he stopped being the member/manager of Baxley Corp.?

A. I don't know when he stopped signing as member/manager on -- this -- I have not seen -- seen this before.

Q. Do you think he -- are you saying he was not --

A. See, this --

Q. -- the member/manager when he signed it?

A. Not to my knowledge, no. He had resigned as member/manager.

Q. In May of '16?

A. Uh-huh. May of '16, no.

Q. So do you see the ones that are dated May 31st of '16 where he signed as member/manager?

A. I do.

Q. And you were referring to the one in April of '19. You don't know why he would have signed then, right?

A. Yes. Correct.

Q. You see on the first page of Exhibit 22, this is where it's adding you, I suppose, as a signer on the account?

A. What page?

Q. The first page.

A. Yes.

Q. Were you aware that you were being added as a signer?

A. Yes.

Q. Do you see on the top of that page where it says, state where organized/registered/principal place of business, Delaware, DE?

A. I do.

Q. Is the company organized in Delaware?

A. Not to my knowledge.

Q. Is there a different company in Delaware called this Baxley Corporation, LLC?

A. No.

Q. Do you remember signing the signature card with Bank of America that would have allowed you to sign on behalf of the company starting in April of 2019?

A. Yes.

Q. Do you remember who else signed it?

A. Rudy.

Q. Anyone else?

A. I'm not aware.

Q. Did you read it before you signed it?

A. Probably not.

Q. Didn't read any part of it? Will you -- would you have read the part where your name was?

A. I would -- yes, I would assume so.

(KEITH EXHIBIT 23, Business Signature Card with Substitute Form W-9, 4/4/19, was marked for identification.)

BY MR. OLIVER:

Q. Okay. This is Exhibit 23. Do you see where you signed there as Jonathan Keith?
A. I do.
Q. You see what's right above that, don't you?
A. I do.
Q. That's Brandon Baxley?
A. Uh-huh.
Q. You would have seen that, wouldn't you?
A. I would assume so, yes.
Q. So this is April 4th of '19. Why is Brandon authorized to sign checks for the company as of that date?
A. I do not know.
Q. The next page of this goes back to May of '16 and it shows Brandon Baxley signing something else as member/manager on 5/31/16. Do you see that?
A. I do.
Q. On the next page he actually crossed through the word director and wrote, member/manager, to make sure it was clear, did he not?
A. Yes.
Q. You're aware that Commercial Holdings

Corporation had a lawsuit against the company that owned Nello's?

A. I was not privy to the -- those details at -- I was an estimator --

Q. Right.

A. -- when this stuff went on.

Q. And that was settled in December of '16, right?

A. I -- like I said, I don't know.

Q. So you're aware that it happened. I'm not asking you details.

A. I have heard -- I have heard of it, yes, but I don't know the details.

Q. Okay. Do you know why settlement proceeds were paid from that lawsuit into Baxley Corporation?

A. As I understand, there were loans by Rudy into Baxley Corporation. The company had had some -- some projects that didn't go well and needed some cash and it was loaned to -- but that's -- again, it's hearsay. I mean, I wasn't part of that at the time.

Q. Okay. I'm really asking you more as a member of Baxley Corp., LLC.

A. Uh-huh.

Q. Do you remember how much money was paid to Baxley Corp.?
A. I do not.
Q. But the only -- if you have any explanation for it, it's only that Rudy had loaned money to some -- one of Brandon's companies, I guess? Is that what you're saying?
A. As to -- he had loaned the proceeds of that to Baxley Corp. as I recall.
Q. Who had loaned proceeds of what?
A. Of what?
Q. No. Tell -- I -- you're using too many pronouns. I'm confused.
A. Okay.
Q. Tell me -- tell me who he is.
A. Why don't you -- Rudy had loaned that money to Baxley Corporation.
Q. He had loaned what money?
A. The proceeds of this lawsuit that you're -- the -- that you mentioned.
Q. Okay. So you think --
A. Okay.
Q. -- the lawsuit was settled and the money went to Baxley Corp. because Rudy at that time was loaning money to Baxley Corp.?

A. Something to that effect, yes --

Q. Okay.

A. -- my understanding. I need to take another break as well.

Q. Yeah. Let's do it.

(Whereupon, there was a recess in the proceedings from 10:54 a.m. to 10:59 a.m.)

BY MR. OLIVER:

Q. All right. Back on record. I believe we were on Exhibit 23.

(KEITH EXHIBIT 24, Check Images, February 1, 2019, to February 28, 2019, was marked for identification.)

BY MR. OLIVER:

Q. All right. I'm going to show you what's been marked as Exhibit 24. These are check images from Baxley Corp. account at Bank of America. I'd just ask you if you could look on that first page and tell me if those signatures are Brandon's signature on the checks.

A. Yes.

Q. And on the bottom right there's a check to you --

A. Yes.

Q. -- for 1320. Is that his signature on

your check?

A. Yes.

Q. So when I asked you earlier who signs checks you gave me three names, but you didn't give me Brandon. Does he continue to sign checks for Baxley Corp.?

A. I'm not -- I don't know. I'm not aware.

Q. This was in February of 2019.

A. Uh-huh.

Q. That was after you became manager, right?

A. Right. There have been a good bit of payroll checks that Rudy has signed as well. I've signed some so...

Q. If you look through this one, this exhibit, which is the check images from February 1st, 2019, to February 28th, 2019 --

A. Uh-huh.

Q. -- I don't think I see any signature other than Brandon's. Do you?

A. I don't.

Q. I did notice on here two checks to Rudy Baxley for $3,000 each signed by Brandon. Do you know what those would have been for?

A. I do not.

Q. I see a check to R.J. Antonelli for $7500 signed by Brandon. Do you know what that's for?

A. I do not.

Q. Were you aware that that was written at the time it was written?

A. No.

Q. Were you aware that the checks to Rudy were written at the time they were written?

A. No.

Q. Were you aware that any of these checks were written at the time they were written other than your paychecks?

A. I know payroll checks are written every week.

Q. Are these all payroll checks?

A. I -- for one thing, I can't see them.

Q. Okay. A check to R.J. Antonelli would not be a payroll check --

A. That would not --

Q. -- would it?

A. -- be a payroll check, no.

Q. Okay.

MR. JANVIER: George, I'm sorry. What

page is that on?

MR. OLIVER: The R.J. check? Let me see.

MR. BEHR: 2026.

MR. OLIVER: Up there at the top left on --

MR. JANVIER: I see. The numbers --

MR. OLIVER: -- 2026.

MR. JANVIER: -- go across. Got it.

MR. OLIVER: Yeah.

MR. JANVIER: Okay.

MR. OLIVER: Yeah.

MR. JANVIER: Thanks.

MR. OLIVER: Uh-huh.

BY MR. OLIVER:

Q. Are you aware of the reason why the company would have large transfers from its bank account to another bank account in March of 2019?

A. No.

(KEITH EXHIBIT 25, Bank of America Bank Statement, March 1, 2019, to March 31, 2019, Account Ending 9348, was marked for identification.)

BY MR. OLIVER:

Q. Exhibit 25 are the bank statements from

the company account in March of 2019.

A. Yeah, I'm not sure what that's for.

Q. Which one are you referring to, which page?

A. The online banking tran- -- bank transfers on the first page so Page 3 of 26.

Q. Yeah.

A. Is that what you're referring to?

Q. I'm trying to catch up to you. Yes.

A. Yeah.

Q. So on March 4th of '19 there's a $30,000 transfer. You don't know what that was for?

A. I do not.

Q. Or on the same day, another 18,000?

A. I do not.

Q. On the following day, 50,000?

A. I do not.

Q. On the 7th, 50,000?

A. No.

Q. And the 8th, 15,000?

A. No.

Q. And then on the 13th, 20,000? I mean, just -- there's 400 and -- these are -- these are actually deposits, right?

A. It appears.

Q. These are deposits into the account. How many bank accounts did the company have at this time?

A. Bank of America.

Q. Just the one?

A. Just one.

Q. And this bank account ends in Account Number 9348, right? That's the main account -- or the one account that you're aware of?

A. Yes. Yes.

Q. Do you see that on March 29th of '19, there was an online banking transfer from Account 9364 for a hundred thousand? Do you see that there?

A. I do.

Q. And you don't know what Account 9364 is?

A. I do not.

Q. There was another transfer on that -- from that same account that same day for another 40,000.

A. I do not.

Q. Starting on Page 17 of 28, there are the check images. I don't see any signature

other than Brandon's with the exception of on Page 20 of 28, looks like there's a Martha. Do you agree?

A. Yes.

Q. Do you see -- on the last page, 28 of 28, you see some of these transfers. Do you see the last two on the bottom of that page? The first one says, Check Number 3489, amount 25,000 --

A. Uh-huh.

Q. -- signed by Brandon?

A. Yes.

Q. And it says, transfer to Baxley Corporation?

A. It does.

Q. So Baxley Corporation only had one bank account, right?

A. To my knowledge.

Q. So where was that money going?

A. I don't know.

(KEITH EXHIBIT 26, Bank of America Bank Statement, March 1, 2019, to March 31, 2019, Account Ending 9364, was marked for identification.)

BY MR. OLIVER:

Q. I'll show you what we've marked as Exhibit 26. These are bank statements from March of 2019 to the Baxley Corp. account. Have you seen this before?

A. I'm not sure.

Q. Do you regularly receive bank statements from the company accounts?

A. No.

Q. Do you remember the last time you saw one?

A. I couldn't tell you -- I couldn't tell you when that was.

Q. It looks like the company deposited $493,000 in this month and withdrew/transferred/debited $460,000, some of them very large chunks like the last thing we saw.

A. Uh-huh.

Q. If you go to Page 4 of 6, which is BANA_Baxley-778, you see a 3/29/19 online banking transfer for a hundred thousand dollars.

A. Yes.

Q. Do you know what that's for?

A. I do not.

Q. Do you know what any of these transfers

are for?
A. I do not.
Q. What is Baxley Leasing, LLC?
A. What is Baxley Leasing? Baxley Leasing owns the equipment that we use and leases it to Baxley Corporation. Fairly typical in construction.
Q. Who are the owners of Baxley Leasing, LLC?
A. Martha solely as I understand.
Q. Has Brandon ever been an owner or member of that?
A. No, not to my knowledge.
Q. Who are the managers of Baxley Leasing, LLC?
A. I -- I'm not a part of Baxley Leasing other than dealing with the equipment and then, you know -- I'm not -- not privy. I don't work for Baxley Leasing and I'm not a member and I don't have any information on it.
Q. How much is the lease paid from Baxley Corp., LLC, to Baxley Leasing every month?
A. It's less than -- it's less than our -- our United Rentals, which is probably -- runs between 40- and 50- a month.

Q. So United Rentals is 40- to 50- a month.

A. And that's -- you know, that's -- it can be -- depending on the project can be much bigger, some less, much --

Q. But Baxley Leasing is a set amount, though, isn't it?

A. Fairly -- fairly set, yes.

Q. And what's the ballpark range of that every month?

A. I'm not certain.

Q. And you say less than 40- to 50- a month. That could mean $1; it could mean 30,000.

A. Yeah. I --

Q. Is there a range?

A. I don't know. I -- I'm not going to guess. I don't have -- I don't have that information.

Q. As part of the information given to us from the request by the company, we received some financial information.

(KEITH EXHIBIT 27, Baxley Corporation Profit and Loss Statement, January - December 2017 and Balance Sheet, December 31, 2017, was marked for identification.)

BY MR. OLIVER:
Q. And I'm going to mark this Exhibit 27. It's a -- first page is a profit and loss for Baxley Corp. in 2017. Is the company on cash-based or accrual accounting?
A. Cash based.
Q. So behind the profit and loss is a balance sheet as of 12/31/17.
A. Uh-huh.
Q. How did the company have negative $50,000 in its account at the end of the year in 2017?
A. I -- I don't know.
Q. And this was before you became the manager?
A. Correct. It is before and I -- I -- I do not know.
Q. So you produced this, I think -- the company produced this. Did you have any part in generating this?
A. Did I have any part in generating --
Q. Either of the reports, the profit and loss or the balance sheet as of 12/31/17 that makes up Exhibit 27.
A. I believe -- I'm not sure who did.

Q. And I'm just asking if you had any role in it.

A. No.

Q. When you searched the company records for what we asked for, was this something that already existed that you just made a copy of?

A. It may have. I -- I don't recall.

(KEITH EXHIBIT 28, Baxley Corporation Balance Sheet, December 31, 2018, was marked for identification.)

BY MR. OLIVER:

Q. I also have the 2018 information -- I'll mark it as Exhibit 28. -- 2018 balance sheet that was produced to us from the company. You were the manager as of that date, weren't you?

A. Uh-huh.

Q. And is this information accurate to the best of your knowledge?

A. It is.

Q. It was accurate as of 12/31/18?

A. I believe so.

Q. How did the company have negative $147,000 in the bank account at the end of the year in 2018?

A. I -- I'm not certain.
Q. Did the company have 147,000 negative balance at the end of 2018?
A. I don't know right -- I do not know.
Q. Did you help generate this report?
A. I don't believe so, no.
Q. Who did?
A. I'm not sure.
Q. Is it accurate that at the end of 2018, the only liabilities owed to anyone by the company was $185.75?
A. On this date I'm not certain. I'm not cer- -- sure what had been collected or what had not.
Q. Do you -- do you remember a time since you've been manager that the company only owed $185.75 to all of its --
A. Was only owed or only owed?
Q. So these are liabilities.
A. Right.
Q. Okay. So that would be what the company owes to other people. You think it's accurate that the company only owed $185.75 to other people as of that date?
A. I'm -- I'm not certain. I don't know.

Q. Does it sound right to you? Have you ever had a time where the company had paid everything owed to everyone except $185.75?

A. We have typically paid our bills and stand currently and -- and have tried -- I don't think it's inaccurate.

Q. Do you remember a time when the company had negative $147,430.47 in its bank accounts?

A. I don't recall, no.

Q. You'd remember that, wouldn't you?

A. Yeah, I would remember that I would think.

Q. So do you think this is an accurate report or an inaccurate report?

A. I don't know.

(KEITH EXHIBIT 29, Baxley Corporation Profit and Loss, January - December 2018, was marked for identification.)

BY MR. OLIVER:

Q. Exhibit 29 is a 2018 profit and loss that was produced by the company. Have you seen this before?

A. I believe so.

Q. Where are the payments to officers listed?

A. I'm not sure.
Q. Where is the payroll listed?
A. I don't know.
Q. Did you have 20 to 25 people in 2018 working for Baxley Corp.?
A. End of 2018, probably more like 12 to 15.
Q. Would you expect to see payroll numbers on this profit and loss?
A. Sure.
Q. Do you see them?
A. I do not.
Q. Does Baxley Corp. own its vehicles or are they owned by Baxley Leasing, LLC?
A. Baxley Leasing owns the vehicles with the exception of a -- the -- that old BMW and an '08 Toyota and there's a -- an excavator that's financed in Baxley Corp.'s name.
Q. Did Brandon Baxley have authority to -- to buy and sell vehicles for Baxley Corp. after he resigned as manager?
A. For Baxley Corp.?
Q. Yeah.
A. Baxley Corp. doesn't own any vehicles.
Q. Doesn't own any trucks?

A. No, does not. They're all under Baxley Leasing --
Q. Okay.
A. -- all owned by Baxley Leasing.
Q. Have you ever applied for bonds on behalf of Baxley Corp., LLC?
A. Have I? Yes.
Q. Has Brandon?
A. Yes.
Q. Has he applied for bonds on behalf of Baxley Corp., LLC, since he resigned as manager?
A. Yes, I would assume.
Q. Why would he apply for bonds on behalf of the company? Is he authorized to do that?
A. We're a small company. We -- whatever -- I've applied for them on -- on my jobs and he's applied for some as well.
Q. When you apply for those, do you give your personal financial information?
A. No.
Q. Whose personal financial information do you -- do you give to get the bonds?
A. I mean, at this point, everything -- our agent has everything on file.
Q. Back in March of '19, whose personal

financial information was being given to get bonds on behalf of the company?

A. I would assume Martha's.

Q. Not Brandon's?

A. I wouldn't think so, no. What dates?

Q. March of 2019.

A. Martha's, I would assume.

Q. But you don't know?

A. I don't know.

(KEITH EXHIBIT 30, E-mail String, March 11, 2019, and March 12, 2019, Subject: Bid Bond, with Attachments, was marked for identification.)

BY MR. OLIVER:

Q. Okay. This is just Exhibit 30, a series of e-mails about some bid bonds that were being applied for. Looks like it was handled by Brandon and then Brandon forwarded the information to you?

A. Yeah.

Q. So on the fourth page of this exhibit, which is InBox2019-661, do you see halfway down the page -- or at the bottom of the page, Melanie Airington with TriSure Insurance is saying, Brandon, Selective has asked for some current personal and corporate financials, please.

You see that?

A. I do.

Q. Do you see that Brandon says, do you have a form I could fill out?

A. I do.

Q. Do you know whether Brandon submitted his own financials for that?

A. I do not.

Q. How many company meetings for Baxley Corp. have you participated in?

A. Company meetings. I --

Q. Like corporate meetings for the LLC.

A. I don't recall.

Q. Do you recall any?

A. We have had numerous meetings. As far as corporate meeting, I -- I don't recall.

Q. Do you remember ever having a meeting of the managers that would have been documented in minutes?

A. I just -- I'll say I don't recall.

Q. You haven't had any yearly meetings, have you?

A. I don't recall being in any yearly meetings since I've been asked to take this different role so, no.

Q. Okay. So you didn't keep any minutes for any meetings?
A. No, I did not.
Q. Okay. Do you remember getting any agendas for any meetings that people talked about having?
A. I do not.
(KEITH EXHIBIT 31, E-mail Message from Jonathan Keith to jonathan@baxleycorp.com, February 15, 2019, Subject: Scan.pdf, with Attachment, was marked for identification.)
BY MR. OLIVER:
Q. I'm going to show you what I marked Exhibit 31. So this says you had a meeting with Martha and Rudy and it says you kept the mean -- minutes, but I guess that's not accurate, right?
A. I -- I don't recall.
Q. Okay. So if you didn't -- don't recall a meeting, you weren't the one to call it to order, were you?
A. I would assume no.
Q. And you weren't the one to adjourn it?
A. (Shakes head).
Q. Is that a no?
A. That's a no.

Q. Okay.

MR. OLIVER: All right. Let's take a break. I think I'm done.

MR. BEHR: I just have a few questions, but we can --

MR. OLIVER: Well, you can go ahead and --

MR. BEHR: Let me --

MR. OLIVER: -- because I know he's on a short time.

MR. BEHR: Yeah.

MR. OLIVER: He has to get back for childcare.

EXAMINATION

BY MR. BEHR:

Q. Mr. Keith, my name is Brian Behr. I'm a staff attorney with the Bankruptcy Administrator's Office here. Thank you for coming in today. I've just got a few follow-up questions to Mr. Oliver's questions.

Starting off with Exhibit Number 3, if you could go through your pile here and find Exhibit Number 3. There you go. And this is the -- do you recall Mr. Oliver bringing this exhibit to your attention and reviewing it?

A. Yes.
Q. All right. And this is an e-mail that you sent to yourself on February the 15th, 2019.
A. Yes.
Q. And the attachment is a scan and -- it's two scans, actually, it appears, both of which are corporate resolutions bearing Mr. Baxley's signature on them or purportedly Mr. Baxley's signature. Did you see Mr. Baxley sign this?
A. I did not.
Q. All right. And did you ever sign this document?
A. I don't recall.
Q. Why did you send this to yourself on February the 15th, 2019?
A. I don't remember that either. I don't know why it would have ended up in my personal e-mail account. It was just a mistake.
Q. Well, it looks like these two documents were scanned and then an attachment was essentially attached to it.
A. Likely a mistake and it was just to get it back into my company e- -- into my work e-mail.

Q. So then is it -- did you -- do you recall scanning these documents on February 15th, 2019?

A. I do not.

Q. They don't bear your signature. Do you recall whether these documents were signed prior to February 15th, 2019?

A. I do not recall.

Q. All right. Did you review the production by -- give me one moment -- by Baxley Corp. prior to it being submitted to our office?

A. Did I review what?

Q. The production. Documents were produced. Well, see if I can find it. Hold on.

MR. BEHR: I'm going to label this as Exhibit Number 3- --

THE REPORTER: -2.

MR. BEHR: -- -2.

MR. WALLER: 32.

MR. BEHR: All right.

(KEITH EXHIBIT 32, Baxley Corporation LLC Corporate Resolution, was marked for identification.)

BY MR. BEHR:

Q. Have you seen that document before?

A. Yes.

Q. And do you recall when you signed that document?

A. I do not.

Q. Are you certain that you signed it on the date that it purports to have been signed?

A. I don't remember signing anything. Why I -- no reason that I would have signed it another date.

Q. Why did you have a version that wasn't signed?

A. Why did I have a version -- I probably had not signed it yet and scanned it back in. I have no idea.

Q. I understand. But -- but you're sending yourself a -- that in August of 2019.

MR. OLIVER: February.

A. I may have --

Q. Sorry. February -- I'm sorry. February 16th of 2019.

A. Yeah. I don't know.

Q. Okay. You're not certain that that -- that wasn't backdated or anything along those lines?

A. No, nothing -- no.

Q. Mr. Oliver asked you some questions about the business that Baxley Corporation was in and it's fairly lengthy and involved contracting and cleanup and things like that. Was there any other sort of business that Baxley Corporation, LLC, has been in since you started working there in 2016?

A. Since I started working here, yes.

Q. What other business has it been involved in?

A. There was the -- there was a vehicle thing they invest- -- had -- had been some money invested in some -- some cars with a used car dealer in Southern Pines, maybe.

Q. Was that East Coast Auto Sales?

A. Yeah.

Q. And what's your level of familiarity -- excuse me. What is your level of familiarity with that business arrangement?

A. Lost money. The -- all of the stuff was sold except for the Sequoia and the -- which is like a '08, and they have the -- I'm not sure what -- what year that old BMW is.

Q. So that BMW was part of that East Coast Auto Sales?

A. Yeah.
Q. Okay. And was Baxley Corporation an investor in that?
A. Yes. I'm not sure how it was -- you know, at the time I was in a different role, but I don't know if they were buying the cars directly, you know, or if they were an investor in East Coast Auto Sales. I'm not quite sure how that worked.
Q. Okay. So two of the vehicles made their way into Baxley Corporation, LLC --
A. Yeah.
Q. -- a Sequoia and a BMW?
A. I believe they all did is my understanding, but they've all been sold with the exception of these two.
Q. All right. And with respect to -- you mentioned much earlier that -- and I'm going to paraphrase and correct me if -- if I'm -- if I'm mischaracterizing. You said that somebody had asked Brandon to step down and that was the reason why he was no longer the member/manager.
A. I don't remember --
Q. Okay.
A. -- that answer.

Q. Let me -- let me -- I'll -- we'll start fresh on that then. So do you know why Brandon stepped down as member/manager in June of 2018?

A. I -- no. I have not --

Q. You didn't ask any questions?

A. It was too much -- too much stress on him from other directions and asked if I could step up.

Q. Okay. Was there any discussion about potential liability the company might have if he didn't step down?

A. I don't remember the conversations. It's been a long time ago.

Q. Okay. Were you the only party to this conversation with Brandon or was anybody else involved?

A. I don't know what other conversations were had.

Q. Okay. The food truck, you said -- you mentioned you -- you ran a food truck in Fayetteville; is that right?

A. Yeah.

Q. What was the name of that?

A. Biscuits and Burgers.

Q. What happened to the -- to the truck?

A. It was sold at a loss. I don't think we ever put it into -- like I said, that was a false start kind of business and nothing -- nothing really happened. We never purchased -- the vehicle was never purchased from me and I sold the vehicle.

Q. Okay.

A. It was never purchased by the business.

Q. All right. And --

A. We really -- we worked a couple of events, lost our ass, and I got out of it on my own.

Q. Okay. And was that Bicycle Burger?

A. I don't know much about Bicycle Burger.

Q. Is it -- is it a different --

A. It's a different --

Q. Okay. So Bicycle Burger was different?

A. Yes.

Q. Okay. And do you know who was involved in Bicycle Burger?

A. Sam.

Q. And who else?

A. That's all I know.

Q. Do you know if Brandon was involved?

A. I'm not a party -- I'm not a party to

it so I don't really know.

Q. Okay. And Sam is an employee of Baxley Corporation; is that right?

A. He is now.

Q. Okay. And are you familiar with an entity called Cue Burger?

A. No.

Q. Or food truck called Cue Burger?

A. No.

Q. Okay. Do you know who Steve Day is?

A. Yes.

Q. Who's Steve Day?

A. Steve Day owned Plates Kitchen.

Q. Okay. You say owned. Is he no longer the owner?

A. I -- honestly, I'm not certain. I know that he did own it at a certain -- at, you know -- I don't know if he still owns it or not --

Q. Okay. And how did you come --

A. -- when they were involved.

Q. Who was involved?

A. When -- just -- just ask your -- go with your next question.

Q. Who was involved?

A. I believe Brandon was involved.
Q. And how was Brandon involved?
A. They had -- Brandon and maybe Sam had invested some money into Plates.
Q. Okay. And do you know if they're still involved?
A. They are not.
Q. Okay. And how -- how did their involvement end?
A. Lost money.
Q. I'm sorry. But did they buy an interest in it?
A. I don't believe so. I don't think it ever went -- again, I don't think it ever went that far, but I wasn't a party to it and I don't have any -- any real details on that tran- -- on those transactions.
Q. Okay. And as far as you're aware, was Baxley Corporation involved or was it Brandon individually?
A. Baxley Corporation.
Q. Baxley Corp. Okay.
A. Uh-huh.
Q. Are you familiar with a -- the loan that Steve Day may have made to Baxley

Corporation?

A. I am not.

Q. Okay. Do you know when Baxley Corporation ceased its involvement with Plates Kitchen?

A. I don't know the dates.

Q. How would you characterize Baxley Corporation, LLC? Is it an established business? Is it a startup?

A. It is a -- I mean, it's a -- it's a new and -- and -- it's a -- a young business -- young and small -- young, small business.

Q. What is it -- tracking to be its gross revenue for the year?

A. Right now I don't have -- we lost -- we had four million worth of contracts that disappeared. I don't know where we'll be at the end of this year right now.

Q. Okay.

A. Just -- at this point, I'm chasing jobs and buying -- buying some jobs, you know, to keep our people together, to keep the team.

Q. When you say buying jobs, what do you mean by that?

A. I mean -- buying jobs means taking

projects at a very, very low margin.
Q. Okay. You mentioned that --
A. DOT is not putting much out at all so...
Q. Okay. You mentioned that the funds -- it was your understanding that the funds received from Commercial Holdings Corporation were a loan from Rudolph Baxley; is that correct?
A. Yes.
Q. How did you come to learn that?
A. Just heard discussion of it. Between who I couldn't tell you and the specifics I could not --
Q. When did you learn --
A. -- at this point.
Q. -- about it?
A. I couldn't tell you.
Q. Okay. Did you learn about it over the past few weeks?
A. No. I mean, just -- I had heard, you know, way back.
Q. Okay.
A. I couldn't tell you if it was riding down the road hearing a phone conversation or if there was a discussion I was a part of. I

don't -- I don't know.

Q. Did you have any discussions with Brandon in advance of your testimony today about how you were going to characterize certain transactions?

A. No.

Q. Or how you should characterize certain transactions?

A. No.

Q. What discussions -- strike that.

Did you have any discussions with Brandon regarding your testimony today?

A. No.

Q. Did you have any discussions with Rudolph Baxley about your testimony today?

A. Not -- nothing specific.

Q. Okay. If --

A. Just that this is what we're going to be dealing with today.

Q. Okay. That you would be here but not --

A. Yes.

Q. -- how to characterize certain things or --

A. No.

Q. -- anything like that? And the same question as to Martha or I think she goes by Ginger Baxley, did you have any discussions like that with her?

A. No.

Q. All right. Did you have any discussions with anyone else other than the -- and --

A. Just our counsel.

Q. All right. And you're speaking about Mr. Waller and the --

A. Mr. Hendren.

Q. Mr. -- and -- and perhaps other members of their firm?

A. Yes.

Q. No discussion -- and would you say that the only party that represents you as to this matter is the Hendren, Redwine & Malone firm?

A. Yes.

Q. Okay. Did you have any discussions with Mr. Antonelli with respect to how to characterize --

A. No.

Q. -- your testimony today or that you would be testifying?

A. No.
Q. No discussions at all with Mr. Antonelli?
A. Uh-uh.
Q. Is that a no?
A. That's a no.
Q. When's the last time you spoke to Mr. Antonelli?
A. Oh, I spoke with R.J. last -- I guess the end of last week --
Q. Okay.
A. -- about an outstanding -- outstanding invoice in accounts receivable.
Q. Does he do collection work for you?
A. Yes.
Q. I'm going to draw your attention to Exhibit Number 5. If you'll turn to the last page of that. Who -- who drafted these bios or what I'm characterizing as a bio?
A. I'm not sure when they were drafted or -- or -- or by who or at what point. I mean, we -- no.
Q. Did you do it?
A. I have cut and pasted things from other ones that you -- but this specific one that we're

looking at today, I don't know when it was done or by who.

Q. All right. Well, this initial language, though, do you -- do you know who --

A. I -- again, I don't know.

Q. Okay. And what basis do you have for testifying that Brandon is an ISA-certified ard- -- arborist?

A. What basis?

Q. Yeah.

A. I was told that -- that he was an ISA-certified arborist, I guess. Have I seen his -- seen his credentials? No.

Q. Okay. Other than Bicycle Burger, other than Plates Kitchen, other than East Coast Auto Sales, and all the things that Mr. Oliver went over with you about what Baxley Corporation, LLC, does, was there any other lines of business that Baxley Corp., LLC, does that haven't been discussed today that you're aware of?

A. No.

Q. All right. The -- prior to the -- let me ask that a different way.

The credit cards that y'all utilize now -- Capital One, right? Is that correct?

A. I guess, yeah.
Q. When were those issued?
A. I -- I'm not certain.
Q. Was it in -- let's see. How long have you had one for?
A. I don't remember when I was issued the card.
Q. Is -- does -- all right. So Bank of America is where y'all bank at, right?
A. Yes.
Q. All right. Who all has debit cards for that account?
A. I'm not certain who have -- foremen have had cards that -- I don't know how many were out there at one point. Our -- I would bet there are quite a few. I know I --
Q. Do you know if Brandon --
A. Each --
Q. -- had a card?
A. Each of my foremen had one. I would think Brandon had one.
Q. Do you know who had which one if I were to give you the last four of the --
A. I do not.
Q. Okay. Have you ever reviewed the bank

statements --

A. I have not.

Q. -- for these cards? Who would do that?

A. I'm not sure.

MR. BEHR: George, did we use the minutes as an exhibit?

MR. OLIVER: Yes. It's the last minutes.

MR. BEHR: Oh, there we go.

BY MR. BEHR:

Q. All right. If you could turn your attention to Exhibit Number 31.

A. Yes.

Q. And you've never seen this document before either?

A. I don't recall.

Q. And -- and you sent it to yourself on February 15th, 2019?

A. Uh-huh.

Q. And as -- as far as you can recall, no yearly meeting occurred on December the 22nd, 2018, at 12 p.m.?

A. We did have -- 22nd was -- we had a get-together that day as well. We would have been together. Maybe I just don't remember this.

Q. What kind of a get-together?

A. We had a company Christmas party that afternoon and were all present and we may have had this that -- that morning and I don't recall.

Q. Where was the company Christmas party?

A. Where did we have the Christmas party? I'm not sure.

Q. Was it at --

A. This says it was --

Q. -- somebody's house?

A. -- at Wake -- this says it was at Wake Forest. I don't remember this. I don't know.

Q. So you don't recall that ever occurring then?

A. Uh-uh.

Q. And you don't recall how it came into your mailbox either then?

A. Do not.

Q. Or why you sent it to yourself on -- on that date?

A. I do not.

Q. Does anybody else have access to your iCloud account --

A. No.

Q. -- to where they could send you

stuff?

A. No.

Q. You mentioned in -- well, what is your -- your weekly salary? Is it 1400 a week, you said, or 13-?

A. 1325.

Q. 1325. And then did I hear -- do I recall you correctly saying that you may also receive bonuses?

A. Yes.

Q. When's the last time you received a bonus?

A. I'm not certain the dates, but I believe there was one in the spring. It's been -- after DOT's budget crunch it's been thin.

Q. Okay.

A. I didn't take a paycheck when --

Q. What was the amount of the bonus?

A. -- withholding a paycheck -- I don't recall.

Q. Who would have determined whether or not you were going to get a bonus in the spring?

A. Martha and Rudy.

Q. And are all employees W-2 employees?
A. I believe so.
Q. All right. Is anybody paid cash?
A. Not that I know of, no.
Q. There's no contract employees or day labor you may have where you pay cash?
A. No.
Q. Do you -- is there ever an instance where you or a foreman or somebody else would need to make large cash withdrawals from the bank account?
A. Yes.
Q. And what sort of instance would that be?
A. The cut and shove contracts, the storm contracts --
Q. Uh-huh.
A. -- that --
Q. Yeah.
A. -- we've discussed, we go into areas where there's no power, there's no credit cards, no internet, none of that, so --
Q. Yeah.
A. -- we have to have cash on hand for that and we bleed through it quickly.

Q. And how much cash would you need?

A. To operate, you know -- we -- we put three-man crews out on the road with that and -- and sometimes hire some subcontract crews as well. We can bleed through 50,000 in -- you know, in days.

Q. Uh-huh.

A. It's a lot of rooms, fuel, you know, equipment having to be picked up, things being trucked all over the state, you know.

Q. How often do you do that kind of work?

A. When we have those cut and shove contracts, we would -- you know, any -- any storms.

Q. So you wouldn't anticipate a lot of cash withdrawals outside of the storm season?

A. We have to have reserve on hand, you know, when that -- when that happens so...

Q. Reserve cash or reserve money --

A. We have to have --

Q. -- in the bank account?

A. You -- you don't know when there's a storm coming. I mean, we can't -- and you can't just at the last minute go and -- and take out

50,000 at the bank so...

Q. So there's a lot of walking-around money then or -- I don't understand.

A. So -- I -- can you rephrase the question for me, what you're asking?

Q. In reviewing the bank statements --

A. Uh-huh.

Q. -- there are a lot of cash withdrawals --

A. Uh-huh.

Q. -- tied to certain accounts and I was just wondering whether you knew why we might --

A. Without --

Q. -- see that.

A. -- seeing them specifically, I would think that would explain a majority of them.

MR. BEHR: Actually, we don't need to go into that. I'm good. I have no further questions.

MR. OLIVER: I just have one more.

EXAMINATION

BY MR. OLIVER:

Q. So go back to your last exhibit, Exhibit 31. Is this where -- the scan means it was scanned, what, on a phone maybe? Is that

what that -- what does that mean?
A. I -- I'm not sure what happened there, if -- you know, I -- probably something -- something to do with my phone.
Q. Okay.
A. Yeah.
Q. Do you see that you sent that one to yourself at the exact same time as Exhibit 3, February 15th, 2019, at 6:32 p.m.?
A. Yeah.
Q. So why -- what were you doing that day --
A. I'm not sure.
Q. -- that you were sending these documents to yourself?
A. I don't remember. I don't recall.
Q. And Exhibit 3, again, are the unsigned corporate resolutions.
A. Uh-huh.
Q. We've seen a lot of signatures with Brandon's signature. That doesn't look the same, does it? If you compare that to the bank -- the checks that he signed, does that look like the same signature to you?
MR. WALLER: What are you looking at

now?

MR. OLIVER: I'm looking at Exhibit 3.

BY MR. OLIVER:

Q. Doesn't he just do like a big B with swirls around it?

A. It doesn't look like his signature.

Q. And this third page --

A. It's not -- it's different.

Q. The third page of Exhibit 3 doesn't look like his signature either, does it?

A. Uh-uh.

Q. Is that a no?

A. I -- I'm used to seeing the B.

Q. Okay. You don't ever remember seeing Brandon sign pages like this Exhibit 3, do you?

A. I do not.

Q. And you don't know where you got this on February 15th of 2019 --

A. I do not.

Q. -- at 6:32 in the afternoon? Okay. And you don't know where you got Exhibit 31 on February 15th, 2019, at 6:32 p.m.? You don't know where that came from?

A. I don't.

MR. OLIVER: All right. Thank you.

IN THE MATTER OF: BRANDON SCOTT BAXLEY
30(b)(6) Jonathan Keith on 10/29/2019 Page 157

Those are all my questions.

THE WITNESS: Uh-huh.

(Whereupon, the deposition of JONATHAN KEITH concluded at 11:45 a.m., October 29, 2019.)

(Read and sign requested.)

www.huseby.com Huseby, Inc. Regional Centers 800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

DEPOSITION ERRATA SHEET

I, JONATHAN KEITH, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction |
|---|---|---|
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |

WITNESS my hand and seal on this, the ______ day of ___________, 20___.

______________________________

WITNESS SIGNATURE

This deposition was signed in my presence by _______________ on the ____ day of _________, 20___.

______________________________

NOTARY PUBLIC
NOTARY NO. ___________________
My commission expires:_______

CERTIFICATE OF COURT REPORTER

North Carolina

Wake County

I, Lisa A. Wheeler, RPR, CRR, Notary Public in and for the State of North Carolina, certify that on October 29, 2019, in Raleigh, North Carolina, JONATHAN KEITH, having produced satisfactory evidence of identification and having been first duly sworn by me to tell the truth, thereupon testified as set forth in the preceding 158 pages, exclusive of errata sheet and signature page, if required, the examination being reported by me verbatim and reduced to typewritten form by me personally.

I further certify that I am not of counsel or in the employ of the parties to this action; that I am not related by blood nor connected by marriage to the parties of this action; that I am not interested in the outcome thereof; that the foregoing is a true and accurate transcript of said proceeding to the best of my ability and understanding.

This the 12th day of November, 2019.

Lisa A. Wheeler, RPR, CRR
Notary Public, #19981350007

Exhibits

**KeithJ - 1** 4:10 17:6, 10,16

**KeithJ - 2** 4:12 24:19,21, 22

**KeithJ - 3** 4:13 25:7, 12 27:2 132:21,23 155:8,17 156:2,9,15

**KeithJ - 4** 4:16 38:15,16, 17 39:8

**KeithJ - 5** 4:20 24:7 46:8,12 54:10,11 146:17

**KeithJ - 6** 4:22 55:14,18

**KeithJ - 7** 4:23 57:10,13, 14

**KeithJ - 8** 5:1 58:22, 25

**KeithJ - 9** 5:2 61:2, 6,10

**KeithJ - 10** 5:4 63:3,7

**KeithJ - 11** 5:6 64:2, 7,8

**KeithJ - 12** 5:9 65:22 66:2

**KeithJ - 13** 5:11 66:17,21

**KeithJ - 14** 5:13 67:18,22

**KeithJ - 15** 5:15 83:25 84:4

**KeithJ - 16** 5:17 89:11,18

**KeithJ - 17** 5:19 91:12,17, 18

**KeithJ - 18** 5:21 100:8,13

**KeithJ - 19** 6:1 101:8, 13 102:4

**KeithJ - 20** 6:4 104:9

**KeithJ - 21** 6:5 104:20,25

**KeithJ - 22** 6:7 106:2, 6,7 108:13,14

**KeithJ - 23** 6:9 109:22 110:1 113:10

**KeithJ - 24** 6:11 113:11,16

**KeithJ - 25** 6:12 116:20,25

**KeithJ - 26** 6:15 119:21 120:2

**KeithJ - 27** 6:17 122:22 123:2,24

**KeithJ - 28** 6:20 124:8,13

**KeithJ - 29** 6:21 126:16,20

**KeithJ - 30** 6:23 129:10,14

**KeithJ - 31** 7:1 131:8, 14 149:12 154:24 156:21

**KeithJ - 32** 7:4 134:21

$

**$1** 122:13

**$10,000** 86:8

**$130** 94:22

**$147,000** 124:24

**$147,430.47** 126:8

**$185.75** 125:11,17, 23 126:3

**$189,000** 66:12

**$3,000** 114:24

**$3,135** 94:2

**$30,000** 117:12

**$348.98** 93:15

**$44,000** 89:25

**$460,000**

120:15

**$493,000** 120:14

**$50,000** 123:11

**$536.43** 97:19

**$67,040.92** 91:4

**$690.18** 98:16

**$7500** 115:3

**-**

**-2** 134:17, 18

**0**

**08** 127:17 136:22

**1**

**1** 17:6,10, 16 61:3 64:4 113:12 116:21 119:22

**1.6** 48:16

**10** 63:3,7

**10,885.55** 88:25

**1000** 97:18 98:16

**10:54** 113:7

**10:59** 113:7

**11** 63:4 64:2,8 129:11

**111,548.43** 91:5

**11:45** 157:4

**11th** 63:10

**12** 65:22 66:2 127:6 129:11 149:22

**12/31/17** 123:8,23

**12/31/18** 124:21

**12th** 92:22 93:7 95:17

**13** 66:17,21

**13-** 151:5

**1300** 27:10, 11,12

**1320** 113:25

**1325** 27:13 151:6,7

**13th** 117:23

**14** 21:6 67:18,22

**1400** 151:4

**147,000** 125:2

**15** 21:6,8 25:9 83:25 84:4 91:14 127:7 131:10

**15,000** 48:17 85:23 117:21

**150-** 82:9

**153.99** 93:22

**15th** 85:1 133:3,16 134:2,7 149:18 155:9 156:18,22

**16** 19:5 21:7,8 62:7,11 89:11,18 91:13 104:4 107:11 108:3,4,6 110:16 111:8

**16th** 92:23 135:20

**17** 91:12, 18,23,24 118:24

**18** 14:8 46:9 47:25 52:18,20 66:5 85:1, 2 88:25 92:1,23 100:8,13 101:22

**18,000** 117:15

**18th** 101:18

**19** 41:22 101:8,13 102:4 108:10 110:11 117:11 118:12 128:25

**1st** 61:9 62:7,11 64:8,11 93:23 102:25 114:18

**2**

**2** 24:19,21, 22

**2-** 29:19

**20** 29:18, 19,22 74:2 82:19 104:9 119:2

127:4

**20,000** 117:23

**2008** 13:13

**2011** 54:6

**2012** 54:6

**2015** 19:5 100:10

**2016** 22:10 61:3,10,24 62:14 67:16 71:21 72:2 101:19,22 102:17,18, 25 103:24 104:21,22 105:5 107:4 136:7

**2017** 50:11 122:24 123:4,12

**2018** 12:16 13:25 14:5,11,14 15:5 16:4, 6,11,16,19 17:8,23 18:7 25:5 26:4 28:13 29:3 33:17 37:23 38:18 39:11 42:16 46:9 51:1 54:23 55:10 57:3,7,23 62:17,21, 24 63:4, 10,13,17 64:4,8,11 65:15,23 69:11 71:16 91:13,14 95:17 96:24 101:10,16 102:8 124:9,12, 13,25 125:3,9 126:17,20 127:4,6 138:3 149:22

**2019** 25:9 40:6,13 67:9,19,25 68:12 69:20,25 70:19 77:10 106:4,20, 24 109:10 113:12 114:9,18 116:18,21 117:1 119:22 120:3 129:6,11 131:10 133:3,16 134:3,7 135:16,20 149:18 155:9 156:18,22 157:4

**2026** 116:4, 8

**20th** 39:11

**21** 104:20, 25

**216.84** 93:21

**22** 106:2,7 108:14

**22,5-** 85:23

**22nd** 40:13 149:21,23

**23** 101:9 109:22 110:1 113:10

**23rd** 101:15 102:8

**24** 65:23 113:11,16

**24,000** 69:19,25

**25** 17:7 29:19,22 36:22 82:19 116:20,25 127:4

**25,000** 119:9

**250-** 81:3, 10

**25th** 17:23 18:6

**26** 117:6 119:21 120:2

**26th** 67:8

**27** 122:22 123:2,24

**28** 67:19 113:12 118:24 119:2,5,6 124:8,13

**28th** 41:22 67:24 68:11 114:18

**29** 126:16, 20 157:4

**29,000** 85:23

**29th** 26:4 29:2 55:10 57:1,7 118:12

**2nd** 94:23

**3**

**3** 25:7,12

27:2 93:3 98:15 117:6 132:21,23 155:8,17 156:2,9,15

**3-** 134:16

**3/29/19** 120:20

**3/31/18** 58:23 59:9

**30** 129:10, 14

**30,000** 122:13

**31** 104:21, 22 116:21 119:22 122:24 124:9 131:8,14 149:12 154:24 156:21

**31-** 89:25

**31st** 93:18 107:3,11 108:6

**32** 134:19, 21

**3489** 119:8

**4**

**4** 38:16,17 39:8 48:15 93:4,5,9 95:25 97:18 106:4 107:2 120:19

**4/4/19** 109:23

**40** 35:6

**40,000** 118:22

**40-** 121:25 122:1,12

**400** 117:24

**43,219.36** 90:12

**45** 10:15 21:4

**47** 10:14

**4th** 40:5 106:19,20, 24 110:11 117:11

**5**

**5** 24:7 46:8,12 54:11 146:17

**5/17/16** 103:11

**5/17/2016** 104:10

**5/31/16** 110:17

**50,000** 117:17,19 153:5 154:1

**50-** 82:14 121:25 122:1,12

**52.86** 93:23

**5301** 92:24

**59798** 65:23

**5th** 92:23 93:22

**6**

**6** 55:14,18 120:19

**60** 34:25 49:21

**60ish** 34:23 35:10

**6:32** 155:9 156:20,22

**6th** 93:22

**7**

**7** 38:18 57:10,13, 14 100:10

**7/18/18** 55:15

**70** 34:25

**7th** 117:19

**8**

**8** 58:22,25 95:25

**88,801.52** 69:14

**8th** 51:1 117:21

**9**

**9** 61:2,6,10 98:15

**90** 77:6 81:6

**9348** 116:22 118:9

**9364** 118:14,17 119:23

**9690** 84:2 89:13

**992** 96:5

**9:46** 53:16

**9:54** 53:16

**A**

**a.m.** 40:10 53:16

113:7 157:4

**ABC** 93:23

**ability** 10:6

**abreast** 79:11

**access** 33:22 70:22 71:6,14 103:18 104:13 150:22

**account** 31:14,15, 18,21 39:18 40:21 84:1 89:13 104:21 105:2,6, 11,14 106:3,7 107:11 108:15 113:17 116:18,22 117:1 118:2,8,9, 10,13,17, 21 119:17, 23 120:3 123:11 124:24 133:19 148:12 150:23

152:11 153:22

**accounting** 123:5

**accounts** 31:19 78:2 80:11,16, 22 81:1,3 90:24 118:3 120:7 126:8 146:13 154:11

**accrual** 123:5

**accruing** 36:1

**accurate** 54:13 81:17 124:18,21 125:9,23 126:13 131:16

**accurately** 81:8

**add** 40:14 42:9 60:7

**added** 108:20

**adding** 108:14

**addition** 74:6

**additional** 13:23

**address** 25:23,25

**addresses** 25:20

**adjourn** 131:22

**Administrator's** 132:18

**advance** 144:3

**advice** 33:18,23

**affidavit** 55:15,20

**afternoon** 150:3 156:20

**agendas** 131:5

**agent** 128:24

**agree** 46:17 119:3

**agreement** 101:20,21

**ahead** 32:12 53:7 132:6

**Airington** 129:23

**allowed** 109:8

**America** 104:20 106:2,8 109:8 113:18 116:20 118:5 119:21 148:9

**amount** 37:4 69:14 90:12 119:8 122:6 151:19

**amounted** 23:19

**amounts** 85:25

**analyzing** 89:17

**annual** 77:18

**annually** 77:21 78:16 79:7

**answer's** 8:20 79:9

**answering** 8:21

**answers** 9:10

**anticipate** 153:16

**Antonelli** 22:7 23:1

24:10 115:2,19 145:21 146:3,8

**Antonio** 47:3

**appears** 102:9 118:1 133:6

**applied** 128:5,10, 16,17 129:16

**apply** 128:13,18

**approval** 51:20 52:2

**approved** 31:10 51:21

**April** 106:4, 19,20,24 108:10 109:10 110:11

**arborist** 52:25 147:8,12

**arborists** 46:22,25

**ard-** 147:8

**area** 48:10, 19 97:5

**areas** 152:20

**Aristeo** 47:3

**Arnold** 22:24

**arrangement** 136:19

**articles** 22:9 24:22 26:24

**ass** 139:11

**assets** 101:22

**assigning** 103:8

**assist** 104:16

**assume** 19:8, 13 26:18 30:5 58:6 72:18 73:3 87:4 106:1 109:21 110:10 128:12 129:3,7 131:21

**assuming** 22:15 41:17 102:25

**AT&T** 98:16, 18,23

**attached** 39:12 41:14 133:22

**attaches** 101:16

**attachment** 46:10 57:11 65:24 101:10 131:11 133:5,21

**Attachments** 25:10 38:20 129:12

**atten-** 87:9

**attention** 42:13 132:25 146:16 149:12

**attorney** 132:17

**Audi** 74:21, 25 75:2, 10,11

**August** 85:1 87:21 91:13,18 92:22 93:18 100:10 135:16

**authority** 42:24 127:19

**authorization** 72:21

**authorized** 73:4,22 87:3 88:7, 10,13 90:9 106:11 110:12 128:14

**Auto** 136:15,25 137:8 147:15

**average** 76:8,10 85:24

**aware** 9:18 37:6,9 50:23 51:17 52:13 54:19,24 60:25 69:5,12 88:9 97:16 99:21 100:2 108:19 109:15 110:25 111:10 114:8 115:6,9,12 116:16 118:10 141:18 147:20

**B**

**Ba-** 19:2

**back** 39:24 42:5 46:14 52:17 53:18 56:3 66:4 70:13,15 71:20 72:1 85:20 97:15 110:15 113:9 128:25 132:12 133:24 135:13 143:21 154:23

**backdated** 135:23

**background** 49:8

**balance** 78:10 105:3 122:24 123:8,23 124:9,13 125:3

**ballpark** 122:9

**BANA_BAXLEY-778** 120:20

**BANA_BAXLEY-930** 107:3

**BANA_BAXLEY0001** 105:1

**bank** 31:21 82:13 104:14,20 105:2,6,14 106:2,8 109:8 113:17 116:17,18, 20,25 117:5 118:3,5,8 119:16,21 120:2,6 124:24 126:8 148:8,9,25 152:10 153:22 154:1,6 155:22

**banking** 117:5 118:13 120:20

**bankruptcy** 49:19 50:7,15 51:1,16 68:5 132:17

**barrier** 45:24

**based** 123:6

**BASF** 64:4

**basis** 14:12, 16,17,18, 21,22 15:19 87:13 99:9,11 147:6,9

**Bates** 96:3 97:18 98:15

**Baxley** 8:15 10:9,22,24 11:3 12:3, 5,9 13:11, 12 14:9,10 15:16 16:24 17:3 18:4,18 19:2,18 26:14,16 27:4 29:2, 10,13,17 30:18 32:7 33:15 34:22 36:18,20 37:5 38:6 41:18 43:10 44:7 46:9,14,21 47:7,11,12 48:3,11,21 49:4,11,16 52:14,22 53:2 54:8, 25 55:11, 12,24 57:18 58:2,4,8 59:2,5,16 60:8,17, 19,24 62:8,12,16 63:1,13,17 64:3,9,10 65:24 66:8,18,25 67:1,23 68:14,19, 22 72:6,11 73:24 74:1,13 76:7 81:2, 19 82:13, 16 84:18 85:7 89:12,18, 25 92:10, 12,13,17, 24 99:1,23 100:10,17, 20,21 101:1,5,6, 9,19,25 102:11 103:5,6, 15,19,22 105:2 107:5,16 109:5 110:7,16

111:15,18, 24 112:2, 9,17,24,25 113:17 114:6,24 119:13,16 120:3 121:3,4,6, 8,14,16, 19,21,22 122:6,22 123:4 124:8 126:16 127:5,13, 14,15,18, 19,20,22, 24 128:1, 4,6,11 130:9 133:9 134:10,21 136:2,5 137:2,11 140:2 141:19,21, 22,25 142:3,7 143:8 144:15 145:3 147:17,19

**Baxley's** 34:8 133:8,9

**Baxleys** 11:8,18

**be-** 56:22

**bear** 134:5

**bearing** 133:7

**beginning** 105:3

**behalf** 8:15, 21 36:10, 13 37:4 41:18 55:24 57:18 59:2 62:15 66:7 99:17 103:19 106:24 109:9 128:6,10, 13 129:2

**Behr** 24:18 91:23 93:3,5,8, 11 96:3 116:4 132:4,8, 11,15,16 134:15,18, 20,24 149:5,9,10 154:17

**Ben** 96:4

**benefit** 37:8 72:7

**bet** 148:15

**Bicycle** 23:22,24 139:13,14, 17,20 147:14

**bid** 29:6 38:9,12,13 39:2,3,12, 14,17 40:2,13, 15,18 41:9 42:1,6,10, 12,14,22, 23 43:3,5 46:1,3,4,6 51:23 55:20 57:10 129:11,15

**bidder** 52:4, 5,7,9

**bids** 54:10, 16

**big** 75:1 98:13 156:4

**bigger** 86:16 91:2 122:5

**bill** 98:16, 18,20,21

**bills** 37:11, 15 126:4

**bio** 146:19

**bios** 146:18

**biscuit** 11:12

**Biscuits** 20:23 138:24

**bit** 22:5 31:14 50:6 74:19 80:18 81:24 83:22 114:13

**bleed** 152:25 153:5

**block** 61:14, 18

**BMW** 75:5,6 127:16 136:23,24 137:13

**Board** 17:24 66:18,23

**Bond** 129:11

**bonded** 40:14

**bonds** 128:5, 10,13,22 129:2,15

**bonus** 27:11 151:12,19, 23

**bonuses** 151:9

**books** 26:14, 16,20 70:6,12

77:2 97:12

**bottom** 47:11 96:4 104:25 107:2 113:22 119:7 129:22

**Bradford** 22:1,2 30:11 85:5 90:12 92:13

**Bradford's** 88:24

**Brandon** 10:9 12:3 14:9, 10,20 15:15,20 16:2,7,12, 13,16,20, 24 17:1,3 18:4,18 19:2 22:22 25:6 28:24 33:14 35:9,11 36:24 37:4,24 38:8,25 39:15 40:12 42:12 43:1,2,4 46:9,12 47:7 49:15,25 52:22 54:20 55:4,10,23 56:7 57:14 59:1,5 60:7,16,23 61:9 62:11,24 63:12,16, 23 64:3,9 65:11,15, 17 66:3 67:1 69:1 72:6,21 73:19 74:5,12 75:9 76:7, 21 89:12, 17,24 90:16 91:4 92:12,17, 24 94:22 96:14 97:1,14,19 99:1 101:9,15 102:7,11 103:6,14 106:14,23 107:4 110:7,12, 16 114:5, 24 115:3 119:11 121:11 127:19 128:8 129:17,24 130:3,6 137:21 138:2,15 139:24 141:1,2,3, 19 144:3, 12 147:7 148:17,21 156:15

**Brandon's** 27:2 35:13 73:24 74:3,4 75:14 83:11 90:21 94:6 99:10,12, 14 106:22 112:6 113:20 114:21 119:1 129:4 155:21

**Brandy** 76:6

**break** 9:22 53:3,10, 11,19 113:4 132:3

**Brian** 24:21 132:16

**brick** 22:3

**bridge** 30:14 44:15

**bridges** 43:15

**bringing** 42:12 132:24

**broken** 92:6

**budget** 31:6 32:8,17 77:2 151:15

**builders** 100:22

**bunch** 44:3

**Burger** 23:22,24 139:13,14, 17,20 140:6,8 147:14

**Burgers** 20:24 138:24

**business** 12:2 13:5 19:18,25 22:4 43:10 44:6 48:11,21 64:20 73:15 74:7 75:22 77:9 82:24 84:1 89:13 97:2,3 100:22,23

103:23 108:24 109:22 136:2,5,9, 19 139:3,8 142:8,11, 12 147:18

**business-type** 73:14

**buy** 127:20 141:11

**buying** 137:6 142:21,23, 25

**Byrne** 22:16, 22 24:6

**C**

**Caicos** 94:2

**call** 20:6, 10,20 74:10 131:19

**called** 19:22 21:9,12 23:22 109:5 140:6,8

**calling** 63:24

**calls** 39:19 40:21

**capacity** 8:14

**capital** 12:25 13:14 15:25 84:1 89:12 91:12 147:25

**caps** 42:9

**car** 74:15 75:7,10 136:13

**card** 72:11, 15,22,24 73:5,16 76:8 83:25 84:5,12, 15,18 85:19 86:1 87:1,7,16, 23 88:1,6, 13,17 89:11 90:1,8,11, 22,25 91:9,13 92:9 93:16 94:3,9,12 95:9,19 96:11,22 97:20 98:3,4 99:5 106:3,8 109:8,23 148:7,19

**cards** 84:10, 24 85:17 98:6 147:24 148:11,14 149:3 152:21

**careful** 57:6

**Carolina** 17:24 66:8,17,22

**cars** 136:13 137:6

**case** 21:15 41:11 68:6

**case-by-case** 99:9,11

**cash** 77:7 111:20 123:6 152:3,6, 10,24 153:1,17, 20 154:8

**cash-based** 123:5

**catch** 117:9

**ceased** 142:4

**cell** 73:25 74:1,6

**cer-** 125:13

**Certificate** 100:9

**certification** 47:3,6

59:8

**certified** 46:22,24 52:25

**change** 13:15 15:24 16:1 27:14 41:14 64:17

**changed** 13:24 27:16 61:20 64:13

**characterize** 142:7 144:4,7,23 145:22

**characterizing** 146:19

**charge** 75:25 88:7,17 89:25 94:1,9,19 95:8

**charged** 84:16 86:1 87:3 88:12,16 89:4 91:4, 5 94:22 95:1 96:14 97:19

**charges** 72:14

84:1,9 86:8 87:2 88:24 89:12,17 90:9 93:21 94:6,12 96:20 97:6,10,15 99:1,3,7

**chart** 83:25 89:11,16

**chased** 49:13

**chasing** 142:20

**check** 41:13, 23 113:11, 17,22 114:1,17 115:2,19, 20,23 116:2 118:25 119:8

**Checking** 104:21

**checks** 83:4, 7,9,16,18, 20,23,24 103:19 110:12 113:20 114:4,5, 14,23 115:9,12, 15,17 155:23

**childcare** 132:13

**children** 10:10

**Christmas** 150:2,5,6

**chunks** 120:16

**circled** 57:15

**City** 96:20

**cleanup** 44:10,11 136:4

**clear** 8:24 60:3 110:22

**clearing** 43:19 44:11

**clients** 98:11

**closures** 44:23

**Coast** 136:15,24 137:8 147:15

**collected** 125:13

**collection** 146:14

**com-** 94:11

**Combination** 70:20

**Commercial** 110:25 143:7

**common** 94:19

**companies** 112:7

**company** 8:21,23 21:12 23:11,13, 14,16 26:22 27:15 30:12 31:23 32:2,14, 17,22 34:1 35:9,12,14 36:4,10,13 37:5,8,11, 16,25 43:12 54:16 61:24 67:10,13, 16 69:4 70:2,6,12, 22 71:9, 14,25 72:7 75:7,10, 12,14 76:14,16 77:14 84:6 86:1 87:1, 16 88:2,8, 12,15,17 90:1 93:15 94:3,9,12, 14,15 95:9,18,19 96:10,21 97:2,3,12, 15,20 98:2,21, 22,25 99:13,18 100:5,9 103:1 104:14 105:13 106:16,24 109:2,4,9 110:12 111:1,18 116:17 117:1 118:3 120:7,13 122:20 123:4,10, 19 124:4, 14,23 125:2,11, 16,22,23 126:2,7,21 128:14,15 129:2 130:9,11 133:24 138:10 150:2,5

**company's** 75:16

76:24

**compare** 155:22

**comparison** 78:13

**compensated** 27:4

**compensation** 27:20 28:1 34:8 35:22,24 68:15,24 69:1,3,10, 13

**compiling** 104:17

**computer** 70:25

**Concern** 17:7

**concluded** 157:4

**concrete** 39:2

**confirm** 40:6,15 42:1

**confirmation** 39:13

**confirmed** 39:24

**confused** 112:13

**connection** 71:6

**consider-** 86:3

**considerably** 13:17 81:22 86:4 89:21

**construction** 11:4,23 34:16 43:12,13 45:25 49:6,8,13 100:18,22 101:5 121:7

**Construction/ baxley** 101:19

**contact** 15:22

**context** 39:19 65:6

**continue** 29:1 62:15,19 114:5

**continued** 64:9

**contract** 48:16 152:5

**contracting** 38:19 136:3

**contractor** 47:13,16, 19 51:19, 22 52:15

**contractor's** 53:21 54:4,6,12 55:1,8 66:25

**Contractors** 17:25 66:23

**contracts** 47:22 48:4,5,13 101:24 142:16 152:15,16 153:14

**control** 30:15 44:25

**convenient** 83:8

**conversation** 9:17 138:15 143:24

**conversations** 65:5 138:12,17

**cook** 94:18

**copied** 62:23 66:3

**copies** 24:7

**copy** 24:21 55:19 56:18 87:7,11 124:6

**Coquette** 94:20

**Corp** 10:22, 24 11:3 12:5,9 27:5 29:2 30:18 34:22 36:18 38:6 44:7 47:11 48:11,21 49:4,16 54:8 55:12 59:2,16 60:8,17, 20,24 62:8,12,16 63:1,13,17 64:11 67:1 72:11 73:24 74:1,13 76:7 81:2, 20 82:13 100:20 101:6 102:12 103:19 105:2 107:17 111:24

112:2,9, 24,25 113:17 114:6 120:3 121:22 123:4 127:5,13, 20,22,24 128:6,11 130:10 134:11 141:22 147:19

**Corp.'s** 127:18

**corporate** 26:6,14,21 37:14 58:15 129:25 130:12,16 133:7 134:22 155:18

**Corporation** 8:15 10:25 26:14,17 29:10,14, 17 32:7 41:18 43:11 46:14,21 54:25 55:24 57:19 58:2,5,9 65:24 66:8,19 67:23 99:23 100:10 101:19 102:1 103:5,16, 22 107:5 109:5 111:1,16, 18 112:17 119:14,16 121:6 122:22 124:8 126:16 134:21 136:2,5 137:2,11 140:3 141:19,21 142:1,4,8 143:7 147:17

**correct** 30:16 31:20 40:16 57:4 67:3 98:22 108:12 123:16 137:19 143:8 147:25

**correctly** 42:8 151:8

**counsel** 145:9

**counter** 90:19

**counties** 47:14,17, 20,22

**County** 93:24

**couple** 8:8 139:10

**court** 9:20

**covered** 75:18

**credentials** 147:13

**credit** 31:14 72:11,15, 22,24 73:16 76:7 83:25 84:5,9,12 86:1 87:1, 7,16,22 88:1,6,12, 17 89:11 90:1,8,11 91:8,12 93:15 95:19 96:10,21 147:24 152:21

**credits** 92:14

**crew** 34:13

**crews** 12:22 64:22 94:17 153:3,4

**crisis** 77:2

**crossed** 110:20

**crunch** 77:8 151:15

**Cue** 140:6,8

**culverts** 44:13

**curbs** 45:10

**current** 129:24

**cut** 44:7,9, 10 47:21 63:4 66:14 146:24 152:15 153:13

**D**

**daily** 14:12, 16,17,21 15:10,13, 18

**date** 12:13 39:14 61:17 67:10 93:7 95:16 110:13

124:15 125:12,24 135:6,9 150:20

**date's** 92:21

**dated** 17:23 18:6 38:18 67:24 101:18 103:11 106:19,20 108:5

**dates** 51:10 59:7 71:24 129:5 142:6 151:13

**day** 75:25 117:15,17 118:21 140:10,12, 13 141:25 149:24 152:5 155:12

**days** 15:17 21:5 51:3 64:25 77:6 81:6 153:6

**DE** 108:25

**deal** 12:21 14:21

**dealer** 136:14

**dealing** 15:14 22:3 31:5 121:17 144:19

**deals** 34:19, 20

**dealt** 14:12, 15,20

**debit** 148:11

**debtor** 59:22

**December** 39:11 92:2 111:7 122:23,24 124:9 126:17 149:21

**decided** 11:7

**deciding** 28:16

**decision** 28:4,11 31:1 36:17

**decisions** 12:24 14:23 15:4,16 30:20 33:10 38:6

**Delaware** 99:24 100:3,8 108:25 109:2,5

**delivered** 56:11

**Dencil** 84:20 92:15

**Department** 59:3 66:9

**depend** 88:21

**depending** 81:21,22 82:10 86:4 90:2 122:4

**depends** 15:13 86:10

**deposed** 8:14 9:1

**deposited** 120:13

**deposition** 24:6 157:3

**deposits** 117:25 118:2

**describe** 77:23

**description** 47:11

**descriptions** 44:5

**designation** 61:21

**detail** 63:20

**details** 66:18 111:3,11, 13 141:16

**determined** 151:22

**determines** 27:20

**didn't--** 23:17

**difficult** 55:18

**direct** 12:22 65:12

**directed** 22:11 42:16

**directing** 39:2,17 40:18 41:2,9 42:6,11

**direction** 16:7,12, 13,15,20, 21 33:19

**directions** 138:7

**directive** 42:14 65:1

**directives** 33:19,20 37:24

**directly** 137:7

**director** 58:2 59:5, 13,16 60:8,17, 19,23 61:15,19 62:12,20, 25 63:12, 16,24 64:10 66:4 110:21

**directors** 58:4,8

**disappeared** 142:17

**discuss** 33:1

**discussed** 31:8 32:10 38:10 49:2,6 147:20 152:20

**discussing** 65:3

**discussion** 32:4 138:9 143:11,25 145:16

**discussions** 33:13 40:22 144:2,10, 11,14 145:3,7,20 146:2

**dissolve** 77:1

**distributions** 68:15 69:10

**Division** 48:15

**docs** 58:15

**document** 17:15 84:4 133:13 134:25 135:3 149:14

**documented** 130:18

**documents** 24:13 26:21 59:11 101:16 106:3 133:20 134:2,6,13 155:15

**dollar** 95:8

**dollars** 68:17 120:21

**DOT** 31:5 32:8,17,20 51:22 52:2 77:4 81:6 143:3

**DOT's** 77:2 151:15

**doubled** 64:22

**draft** 26:9

**drafted** 146:18,20

**drainage** 45:12,16

**draw** 146:16

**drive** 74:23 75:3,9

**driving** 75:6

**due** 68:7 80:2 92:21 93:7 95:16

**duly** 8:4

**durham** 63:5

**Dustin** 85:9

**Dustin's** 86:6

**duties** 13:23 14:5,7,11, 14 29:5 34:10

**E**

**e-** 133:24

**e-mail** 25:7, 17,20,22, 25 38:17, 25 39:5, 10,12,20 40:5,12 41:12 43:7 61:2,8,9, 17 63:3,9 64:2,15 65:8,14, 16,17,22 101:8,15 102:3 129:10 131:8 133:2,19, 25

**e-mails** 38:23 60:22 62:12,14, 23 63:12, 16 66:2 129:15

**earlier** 68:16 76:20 82:22 114:3 137:18

**early** 62:8

**East** 136:15,24 137:8 147:15

**easy** 98:3

**Edge** 61:3

**effect** 113:1

**effective** 101:22

**elastometric** 39:2

**embezzlement** 89:8

**embezzling** 89:9

**Emergency** 38:19

**employee** 30:11 75:19 87:3 93:14 94:1,9,15 95:8,13 96:11 104:1 140:2

**employees** 29:16 47:2 91:4 99:4 152:1,5

**employer** 103:8 104:1,9

**end** 123:11 124:24 125:3,9 127:6 141:9 142:18 146:10

**ended** 133:18

**ending** 58:23 59:8 84:2 89:13 116:22 119:23

**endorsements** 52:23

**ends** 118:8

**engineers** 12:21 34:19

**entered** 18:2 64:18

**entering** 18:23

**enterprise** 32:13

**entertain** 98:11

**entity** 19:21 20:18 21:2 22:14 140:6

**equipment** 37:13 86:7 101:24 121:5,17 153:9

**error** 56:23 57:8

**essentially** 133:22

**established** 142:8

**estimate** 11:21 12:20

**estimating** 11:19

**estimation** 32:24

**estimator** 12:8,10 29:2 32:23 102:19 105:19 111:4

**estimator/ project** 13:19

**et al** 64:3

**event** 20:13, 21 44:12

**events** 139:11

**exact** 155:8

**EXAMINATION** 8:6 132:14 154:21

**examined** 8:4

**examples** 63:11

**Excavation** 45:18

**excavator** 127:17

**exception** 119:1 127:16 137:16

**excludes** 69:19

**excuse** 27:11 76:6 136:18

**Execution** 57:10

**exhibit** 17:6,10,16 24:7,19, 21,22 25:7,12 27:2 38:15,17 39:8 46:8, 12 54:10 55:14,18 57:10,13, 14,22 58:22,25 61:2,6,10 63:3,7 64:2,7 65:22 66:2,17,21 67:18,22 83:25 84:4 89:11,18 91:12,17 100:8,13 101:8,13

102:4 104:9,20, 25 106:2,6 107:2 108:13 109:22 110:1 113:10,11, 16 114:17 116:20,25 119:21 120:2 122:22 123:2,24 124:8,13 126:16,20 129:10,14, 20 131:8, 14 132:21, 23,25 134:16,21 146:17 149:6,12 154:23,24 155:8,17 156:2,9, 15,21

**existed** 124:6

**expect** 39:14 82:2,8 93:14 94:1,4,8, 11,14 95:17 96:9 127:8

**expense** 82:15 97:23 98:2

**expensed** 97:11

**expenses** 73:4,14, 15,17,20 78:1 79:12,13, 19,22 81:19 86:14 95:18

**experience** 49:11

**expire** 54:5

**expired** 48:8 53:25 54:7

**expires** 48:7

**explain** 154:16

**explaining** 23:8

**explanation** 93:19,24 112:5

**extent** 79:19

**F**

**failing** 22:4

**fair** 70:16

**fairly** 65:12 121:6 122:8 136:3

**fall** 62:5

**false** 19:1 20:12 23:18 139:3

**familiar** 55:21 140:5 141:24

**familiarity** 100:24 136:17,18

**family** 89:4

**fast** 98:9, 10

**father** 11:6, 11

**Fayetteville** 11:11 18:21 20:25 138:21

**February** 17:7,23 18:6 25:9 42:2,4 52:17 113:12 114:9,17, 18 131:10 133:3,16 134:2,7 135:17,19, 20 149:18 155:9 156:18,22

**feel** 34:3

**fencing** 44:17,19

**field** 12:22 34:12,17 40:22 94:17,18

**file** 22:8 32:12 51:16 128:24

**filed** 19:21 20:18 22:14 23:21 50:7,10 51:1

**filing** 24:9

**fill** 130:4

**financed** 127:18

**finances** 82:24

**financial** 122:21 128:19,21 129:1

**financially** 76:14,16

**financials** 129:25

130:7

**find** 31:10 32:7,24 70:7 95:12 132:22 134:14

**fine** 51:15

**finger** 79:18,22 80:15

**finish** 53:5 64:23 101:3

**fire** 30:7

**fired** 30:9

**firm** 145:14,18

**five-month** 69:16

**flagpoles** 44:21

**floating** 75:7

**Florence** 38:20 66:15 97:1

**Florida** 96:20,25 97:7

**flow** 77:7

**focused** 49:12

**folks** 82:19

**follow-up** 132:19

**food** 18:20 19:19,24 20:2 73:10 95:1 98:9,10 138:19,20 140:8

**Foods** 21:9,13 22:9 24:14,23

**footer** 64:15

**foreman** 90:17,18 152:9

**foremen** 72:12 98:12 148:13,20

**Forest** 150:12

**form** 55:21 58:22 59:19,23 60:1 109:23 130:4

**formal** 77:22,23 78:7,15,19

**formation** 26:24 100:10

**formed** 58:16 99:24 102:12

**forming** 21:2

**forwarded** 129:17

**found** 32:21 89:3

**fourth** 129:20

**frame** 92:3

**frequently** 56:21

**fresh** 138:2

**front** 17:21

**fruition** 18:25

**fuel** 153:8

**full** 8:11 10:25

**full-time** 29:20

**funded** 31:22 32:2

**funds** 143:5,6

**G**

**gave** 13:18 50:3 72:21 114:4

**general** 17:25 53:21 54:12,25 55:5,7 66:23 81:13

**generate** 80:18 125:5

**generating** 123:20,21

**George** 8:9 92:25 115:25 149:5

**Georgia** 32:19,22

**get-together** 149:24 150:1

**Ginger** 13:9,11 72:18 74:21 75:2 83:2,10 88:5 105:15,21,24 106:1 145:3

**Ginger's** 83:13

**give** 8:11 28:16 30:25 33:20 44:4

46:6 54:16 81:17 88:23 114:5 128:18,22 134:10 148:23

**giving** 42:13 54:9

**GMC** 74:16

**good** 27:23 54:7 80:18 81:24 83:21 114:13 154:18

**gooutdoorsflorida.com** 96:17

**great** 9:22 34:17

**greater** 32:19

**grew** 10:17

**groceries** 73:10 94:15,16, 19

**gross** 142:13

**grow-** 35:21

**growing** 35:21

**guarantor** 31:16

**guess** 19:1 25:19,22 51:24 81:9,11,16 106:18 112:7 122:17 131:16 146:9 147:12 148:1

**guys** 10:17 96:3

**H**

**habit** 29:7 56:7,23

**half** 12:15 81:15 82:10

**halfway** 129:21

**hand** 56:11 152:24 153:18

**handle** 99:8, 10,13

**handled** 33:22 99:12 129:16

**handles** 15:21 30:19 31:13,18

**happen** 98:7

**happened** 16:4 21:3 23:19 27:19 56:24 111:10 138:25 139:4 155:2

**hard** 9:17

**Harden** 8:10

**Harrell** 17:21

**Harrison** 84:20 92:15

**hats** 34:11

**head** 12:13 33:12 47:23 131:23

**health** 35:23 37:3 72:4

**hear** 14:18 76:24 151:7

**heard** 24:2,3 100:25 111:12 143:11,20

**hearing** 143:24

**hearsay** 111:21

**heavy** 75:1 82:5,8

**held** 29:12 69:6

**helping** 23:9

**helps** 30:19 31:3 34:13

**Hendren** 145:12,18

**hey** 63:23

**high** 39:3

**higher** 50:6 52:3,7,8 85:24 89:21

**highway** 55:6 67:2

**highway/bridge** 43:14

**hire** 30:6 153:4

**hired** 30:9

**hiring** 22:7

**hold** 47:2, 21 52:22 53:21 54:12,25 64:10 134:14

**holding** 66:3

**Holdings** 110:25 143:7

**holds** 47:5

**Holmes** 8:10

**home** 37:13, 15 50:1 83:11,13 100:22

**honestly** 18:16 140:16

**hotel** 73:11

**hours** 34:21 35:4,8 49:21,25 50:4

**house** 150:10

**household** 37:15

**hu-** 98:13

**Huddleston** 22:16

**Huddleston's** 24:6

**Hulu** 97:22 98:2

**hundred** 82:17 95:8 118:14 120:21

**hundreds** 56:4

**Hurricane** 38:19 66:15

**I**

**icloud** 150:23

**idea** 77:25 135:14

**identi-** 104:1

**identification** 17:8 24:24 25:10 38:21 46:10 55:16 57:11 58:23 61:4 63:5 64:5 65:25 66:19 67:20 84:2 89:14 91:15 100:11 101:11 103:9 104:1,10, 11,22 106:4 109:24 113:13 116:23 119:24 122:25 124:10 126:18 129:12 131:11 134:23

**images** 113:11,17 114:17 118:25

**immediately** 39:12 101:25

**impair** 10:4

**improvements** 45:12

**in-** 79:24

**inaccurate** 126:6,14

**Inbox2019-661** 129:21

**include** 65:5

**including** 63:9 74:3, 4 101:23

**increase** 28:3 64:22

**individual** 8:14

**individually** 8:20 141:20

**informal** 78:23

**information** 34:4 54:9, 15 59:15 60:6 66:24 68:7,10,11 69:24 70:16,17 71:8,11 79:16 104:17 121:20 122:18,19, 21 124:12, 18 128:19, 21 129:1, 18

**initial** 21:12 26:24 147:3

**initially** 31:22 32:3

**inpoint** 28:9

**input** 28:7, 10 38:11 71:8

**inspections** 34:20

**install** 44:13

**Installation** 44:17,21 45:6,20

**instance** 88:11

152:8,13

**insurance** 35:23 37:3 72:4 75:15 129:23

**intend** 98:1

**interaction** 15:3

**interest** 141:12

**interested** 33:1 48:11,22

**internet** 71:5 152:22

**invest-** 136:12

**invested** 136:13 141:4

**investor** 137:3,7

**invite** 40:16

**invoice** 65:23 66:7,11 71:12 146:13

**invoices** 77:6 79:24 80:1,9,19

**invoicing** 71:12,23

**involved** 21:17,23 22:16,21 32:11 33:10 106:16 136:3,10 138:16 139:19,24 140:21,22, 25 141:1, 2,6,19

**involvement** 141:9 142:4

**irrigation** 45:6

**IRS** 102:17 104:9

**ISA** 52:25

**ISA-CERTIFIED** 147:7,12

**issued** 148:2,6

**issues** 12:21 16:9 34:20

**items** 45:9 73:11 95:1 97:11

**J**

**Jackson** 85:11

**January** 40:5,13 41:22 46:9,15 47:25 52:20 54:1,3 57:23 101:9,15, 18,22 102:8 122:23 126:17

**JANVIER** 17:12 59:18,22 60:9 92:25 115:25 116:7,9, 11,13

**Jeff** 85:11

**JKEITHNC@ ICLOUD.COM** 25:21

**job** 34:14 65:3 73:8 98:9

**jobs** 12:21 32:20,21 38:9,10,12 40:23 42:22 49:14 51:22,23 71:12,13 75:23 81:23 128:17 142:20,21, 23,25

**Johnson** 85:9

**joint** 16:23, 25 18:3,9, 18

**Jonathan** 8:3,12 17:7 25:8 39:11 64:3 67:18 85:13 101:9 110:2 131:9 157:3

**jonathan@ baxleycorp.com** 25:8,24 131:9

**July** 51:1

**June** 26:1,4 28:13 29:2 33:17 37:23 42:16 54:23 55:10 57:1,7 62:17,21, 24 63:13, 17 65:15 69:11 71:15

102:25 138:3

**K**

**keith** 8:3,8, 12 17:6,7 24:22 25:2,7,8 38:17 46:8 55:14 57:10 58:22 61:2 63:3 64:2, 3 65:22 66:17 67:18,19 83:25 85:13 89:11 91:12 100:8 101:8,9 104:9,20 106:2 109:22 110:2 113:11 116:20 119:21 122:22 124:8 126:16 129:10 131:8,9 132:16 134:21 157:4

**key** 12:24 14:23 15:16 30:20,25 33:9 47:3

**kind** 18:24 19:1 20:12,21 23:18 74:15 75:24 139:3 150:1 153:11

**kinds** 73:7,8 80:22

**Kitchen** 11:12 140:13 142:5 147:15

**knew** 154:12

**knowledge** 35:15 100:21 102:13 108:1 109:3 119:18 121:13 124:19

**L**

**label** 134:15

**labor** 59:3

152:6

**landscaping** 45:2,7

**language** 147:4

**large** 116:17 120:16 152:10

**largely** 43:12

**Late** 62:6

**latest** 64:21

**lawsuit** 111:1,15 112:19,23

**leads** 76:23

**leanest** 82:1,4

**learn** 143:10,14, 18

**lease** 121:21

**leases** 121:5

**Leasing** 121:3,4,8, 14,16,19, 22 122:6 127:14,15 128:2,4

**leave** 73:9

**leaving** 73:12

**led** 32:16, 18

**left** 103:5 116:5

**lengthy** 136:3

**letter** 17:6 18:12 19:7,9 46:8,18 67:18,22 68:2,11 69:23 70:3,17 104:10

**letters** 54:20

**level** 50:5 136:17,18

**levels** 51:20,23

**liabilities** 125:10,19

**liability** 100:9 138:10

**license** 52:23 53:22 54:4,7,12 55:1,6,8 66:18,25 67:2,14,15

**licenses**

101:24

**Licensing** 66:18,22

**life** 34:17

**limit** 75:24 76:3

**limited** 67:3 100:9 101:23

**lines** 135:24 147:18

**list** 40:15 42:2,10

**listed** 13:24 58:14 126:25 127:2

**lists** 24:10 47:14 106:10

**LLC** 10:25 13:2,8 21:9,13 22:9 24:14,23 26:14,17 27:5 29:14,17 30:18 36:19 38:6 46:21 47:11 55:12 57:19 60:8 67:1 81:20 99:23 101:6 102:12 103:19 105:2 107:5 109:5 111:24 121:3,9, 15,22 127:14 128:6,11 130:12 134:22 136:6 137:11 142:8 147:17,19

**loan** 69:19, 25 70:7 141:24 143:7

**loaned** 111:20 112:6,8, 10,16,18

**loaning** 112:25

**loans** 69:21 70:12,13, 14 111:17

**long** 10:8, 20 55:5,7 67:12 138:13 148:4

**longer** 16:6 84:23 137:22 140:14

**looked** 18:23,25 20:13 33:23 84:8 87:15,18 89:3 91:8

**lose** 9:25 24:17 48:3

**loss** 78:8 122:23 123:3,7,23 126:17,20 127:9 139:1

**lost** 136:20 139:11 141:10 142:15

**lot** 11:4,22 22:6 34:11 86:6 97:6 153:8,16 154:2,8 155:20

**low** 82:9 143:1

**lower** 52:10, 12

**lunch** 73:9

**M**

**made** 40:21 46:18 69:20 70:12,14 89:17 124:6 137:10 141:25

**mailbox** 150:17

**main** 118:9

**maintenance** 43:14,16 47:13 86:7

**majority** 29:6 86:14 154:16

**make** 12:24 28:4 31:9 36:17 49:4 55:19 57:5 80:21 81:5 91:2 97:7 100:14 101:3 110:22 152:10

**makes** 54:10 90:23 123:24

**making** 38:5

**Malone** 145:18

**man-** 62:19

**manage** 36:16

**management** 12:12,18

**manager** 11:20 12:10,24, 25 13:2,4, 14,19 15:5,21,25 25:6 26:4 27:15,25 28:8,13,17 29:9,13 30:17 34:3 49:15 50:14 51:4,16 55:12 56:9,16,19 57:23 62:16,21 63:25 67:23 71:15 72:25 77:12 88:19 90:4 104:13,16 105:19 114:11 123:15 124:15 125:16 127:21 128:11

**managers** 13:7 88:6 121:14 130:18

**managing** 60:17,19, 23 61:15, 19 62:12, 20,25 63:12,16, 24 64:10 66:4

**March** 67:8 116:18,21 117:1,11 118:12 119:22 120:2 128:25 129:6,10, 11

**margin** 143:1

**mark** 17:10 24:18,21 38:15 123:2 124:13

**marked** 17:8, 16 24:23 25:10 38:20 46:10 55:15 57:11 58:23,25 61:4 63:5 64:5 65:24 66:19 67:19 84:2 89:13 91:14 100:11,13 101:11 104:11,22, 24 106:4,6 109:23 113:13,16 116:22 119:23 120:1 122:25 124:9 126:18 129:12 131:11,13 134:22

**markets** 31:11 32:10,16

**marking** 64:7 91:17

**Martha** 13:12 14:9,13, 21,23,24 15:8,12 16:17,21 26:18 28:5,20 30:4,19 31:1,8 33:25 35:5 36:8,12, 20,23 58:12 68:14,24 70:1,21 84:18 87:4 92:9,13 105:15 119:2 121:10 131:15 145:2 151:25

**Martha's** 30:17 31:13,15 36:15 129:3,7

**material** 91:2

**materials** 73:7 81:24 86:7,9,16 89:1 90:19 101:23

**matter** 8:10 145:18

**Maxwell** 8:12

**meal** 86:14

**meals** 73:10 75:20,23, 25 76:4 98:8

**means** 60:2 142:25 154:24

**meant** 60:4

**median** 45:10
**medical** 95:18
**medicine** 10:3
**meeting** 130:16,17 131:14,19 149:21
**meetings** 98:12 130:9,11, 12,15,21, 24 131:2,5
**Melanie** 129:22
**member** 55:11 56:16,19 102:11 103:6,15 105:12,16, 22 111:24 121:12,19
**member/manager** 57:15 58:19,20 59:12 105:9,12 107:4,16, 19,24 108:2,7 110:17,22 137:22 138:3
**members** 21:12 24:11 145:13
**memory** 63:11,15, 19
**men** 29:18, 19 47:4
**mentioned** 37:3 112:20 137:18 138:20 143:2,5 151:3
**merge** 100:20
**merger** 100:25 101:10,16, 20,21
**Message** 25:7 64:2 101:8 131:8
**met** 8:8
**mid-level** 51:25
**middle** 51:24 103:4
**mil** 48:16 82:10
**million** 77:1 142:16
**minute** 93:8 153:25
**minutes** 8:8 130:19 131:1,16 149:6,8
**mischaracterizing** 137:20
**misleading** 48:14
**mistake** 133:19,23
**moment** 134:10
**Monday** 64:21
**monetary** 72:7
**money** 31:23 35:18 36:1,5 76:20 82:12 112:1,6, 17,18,24, 25 119:19 136:12,20 141:4,10 153:20 154:3
**month** 27:10 62:3 76:4, 8 82:2,4, 8,10,16,18 85:23 86:2,11 89:24 93:17 96:23 120:14 121:22,25 122:2,10, 13
**monthly** 81:19
**months** 70:10 85:18 87:17 88:1 91:9
**morning** 40:1 150:4
**mortar** 22:3
**move** 74:19
**Moving** 44:19
**mulch** 45:20
**multiple** 24:7 52:23
**municipal** 32:20 43:21

**N**

**names** 46:24 58:18 114:4
**NCDOT** 47:13, 19 51:19 52:14
**necessarily** 42:13
**needed**

111:20

**negative** 123:10 124:23 125:2 126:8

**neglected** 64:17

**Nello's** 111:2

**Netflix** 94:12 97:10

**non-collusion** 55:14,20

**Nordstrom** 97:20

**North** 17:24 66:8,17,22

**notary** 17:21

**note** 64:24

**notebook** 80:8

**notice** 101:10 103:11 114:23

**November** 38:18 39:1 61:3,9 62:7,11 64:4,8,11 85:1 91:14 92:2 95:17

**number** 38:23 47:14 74:9 91:22 103:9 104:2,10 118:9 119:8 132:21,23 134:16 146:17 149:12

**numbered** 96:3

**numbers** 86:23 89:18 116:7 127:8

**numerous** 130:15

**O**

**object** 59:18,23

**objecting** 60:12

**objection** 60:9

**objects** 60:1

**occurred** 149:21

**occurring** 150:13

**October** 87:21 88:24 91:19 92:1,18,22 93:7 157:4

**office** 24:10 37:14 68:8 72:6 83:10 104:17 132:18 134:11

**officers** 58:10,11 126:24

**oftentimes** 94:18

**Oliver** 8:7,9 17:9,13,14 20:8,9 24:20,25 25:11 38:15,22 41:5,7 46:11 53:17 55:17 57:12 58:24 59:21,24, 25 60:10, 11 61:5 63:6 64:6 66:1,20 67:21 84:3 89:15 91:16,22, 24,25 93:2,4,6, 10,12,13 95:22,24 96:6,8 100:12 101:12 104:12,23 106:5 109:25 113:8,14 116:2,5,8, 10,12,14, 15,24 119:25 123:1 124:11 126:19 129:13 131:12 132:2,6,9, 12,24 135:17 136:1 147:16 149:7 154:20,22 156:2,3,25

**Oliver's** 132:20

**on-call** 44:10

**one's** 42:9 92:9

**online** 117:5 118:13 120:20

**open** 11:15 105:11

**opened** 105:7,10, 14

**opening** 102:10 106:3,7

**operate** 153:2

**operations** 36:16

**opportunity** 38:19 39:13

**order** 41:15 64:4,21 131:20

**organ-** 23:10

**organization** 22:9 24:23

**organize** 23:10

**organized** 109:2

**organized/ registered/ principal** 108:24

**Outpatient** 96:9

**outstanding** 146:12

**oversight** 97:24,25

**owed** 36:1 125:10,16, 18,23 126:3

**owes** 36:4 125:22

**owned** 74:13 111:2 127:14 128:4 140:13,14

**owner** 36:15, 24 37:1 56:9 121:11 140:15

**owners** 28:11,21 36:18 121:8

**owns** 121:5 127:15 140:18

**P**

**p.m.** 149:22 155:9 156:22

**package** 35:24

**pages** 47:9 156:15

**paid** 27:6 33:25 35:11,13, 14,16 37:4,11, 15,16 69:24 70:13,15, 19 97:14 111:15 112:1 121:21 126:2,4 152:3

**Panama** 96:20

**paraphrase** 137:19

**part** 18:20 20:24 21:19,20, 24 23:3,6 50:16,17 109:18,19 111:22 121:16 122:19 123:19,21 136:24 143:25

**participated** 130:10

**partnership** 18:17 20:14

**partnerships** 17:2 18:3, 13

**party** 138:14 139:25 141:15 145:17 150:2,5,6

**password** 61:3 71:2

**past** 18:4 34:12 143:19

**pasted** 146:24

**pay** 35:18 37:12 73:24 75:14,20 76:21 87:9 90:24,25 93:14 94:12,14, 16 95:18 98:1,8,16, 18 152:6

**paycheck** 151:18,20

**paychecks** 115:14

**paying** 97:22

**payment** 72:5 92:21 93:7 95:16

**payments** 126:24

**payroll** 36:2 58:22 59:8 82:15 114:14 115:15,17, 20,23 127:2,8

**pays** 74:1 75:16 77:5

**people** 21:16 29:13 30:7,9 63:9 73:8 84:24 85:4 92:6 125:22,24 127:4 131:5 142:22

**percent** 36:22

**percentage** 32:19 81:10

**percentages** 36:21

**Perez** 46:8, 13,18

**performed** 45:8 46:1

**period** 21:4 69:16,17 89:16 91:1,3

**person** 33:22 82:23 99:5

**personal** 25:22 73:17,19 74:6,24 98:6 128:19,21, 25 129:25 133:18

**persons** 106:11

**pertaining** 68:5

**pesticide** 52:22

**phone** 39:19 40:21 73:25 74:6 98:20,21 143:24 154:25 155:4

**phones** 74:2

**pick** 75:23 98:3

**picked** 153:9

**picking** 90:18

**piece** 23:9

**pile** 132:22

**Pines** 136:14

**pipes** 45:16

**place** 9:25 11:12 39:17 56:23 108:24

**plate** 22:5

**Plates** 140:13 141:4 142:4 147:15

**PO** 64:4

**point** 13:15 19:21 27:17 28:1,3,6 29:8,19,24 33:16 51:11 54:11 60:20 71:22 75:8 77:6 82:17 85:21 128:23 142:20 143:15 146:21 148:15

**policy** 75:16 88:15

**Polypropylene** 45:24

**portion** 39:3

**position** 33:21 64:14

**positions** 58:13

**Possibly** 95:10

**potential** 98:11 138:10

**potentially** 37:19

**power** 30:6 152:21

**prebid** 40:14

**Predominantly** 11:19

**prefer** 42:23

**present** 150:3

**preservation** 44:15

**previous** 50:8

**price** 48:16

**primary** 74:20

**prime** 51:19, 24 52:3, 10,14

**printed** 66:22

**prior** 14:5, 7,11 51:9

55:10 62:10 67:10,11 71:18 134:6,11 147:22
**privy** 36:17 102:21 105:20 111:3 121:18
**prob-** 34:14
**problem** 34:14 99:6
**proceedings** 53:16 113:7
**proceeds** 111:15 112:8,10, 19
**produced** 123:18,19 124:14 126:21 134:14
**product** 64:24
**production** 64:23 134:10,13
**profit** 78:8 122:23 123:3,7,22 126:17,20 127:9
**profitability** 77:13
**profitable** 76:24 77:10 78:5
**project** 11:20 12:10 15:21 39:3 40:13,19 41:9 43:3 45:7 105:19 122:4
**projects** 11:21,23 29:6 32:25 33:5 43:17 44:3 47:17 71:23 81:23 82:11 86:4 90:3 111:19 143:1
**pronouns** 112:13
**property** 101:24,25
**pulse** 79:19
**purchase** 101:20,21
**purchased** 139:4,5,8
**purchases** 91:2
**purportedly** 133:8
**purports** 135:6
**Pursuant** 101:20
**pursuing** 48:12,22
**put** 29:8 43:15 70:17 139:2 153:2
**putting** 143:3

**Q**

**qualifications** 46:14 47:10 54:9
**qualified** 46:6
**qualifier** 55:3,4 67:2,6,9, 13
**question** 9:24 36:13 53:5 60:3, 5 140:24 145:2 154:5
**questions** 8:19,22 9:8 36:9 132:4,20 136:1 138:5 154:19 157:1
**Quickbooks** 70:6,21,23 71:9,15 72:1 80:3, 21,23
**quickly** 77:5 152:25
**quote** 71:12
**quotes** 71:13

**R**

**R.J.** 22:7, 24,25 115:2,19 116:2 146:9
**raise** 28:15, 17
**raises** 27:18 28:12
**Raleigh** 21:9,12 22:9 24:14,23 56:12 94:20

**ran** 138:20

**range** 82:1 98:14 122:9,15

**rapidly** 35:20

**read** 40:1 55:18 109:16,18, 19 157:5

**reading** 40:24 41:8 42:7,8

**ready** 40:2

**real** 49:13 141:16

**reason** 9:23 50:13,23 116:16 135:8 137:22

**rec-** 102:5

**recall** 12:12 16:25 18:15 19:14 20:17 21:14,18 22:13,14 24:15 27:16 28:3,16 43:9 50:9, 12 51:13 61:1 62:18,22 64:1 67:14 68:18 69:22 70:1,9,10, 11 87:17 97:13 102:2,10 112:9 124:7 126:9 130:13,14, 16,20,23 131:17,18 132:24 133:14 134:2,6,8 135:2 149:16,20 150:4,13, 16 151:8, 21 155:16

**receipt** 39:24

**receivable** 78:3 80:12,16, 23 81:1,4 146:13

**receive** 37:7,10 60:22 79:4 102:3,5 120:6 151:9

**received** 39:13 40:7,15 59:15 60:6 61:9 65:9, 15,17 68:14 69:3,7 70:18 72:7 84:5 122:20 143:6 151:11

**receives** 68:24 69:1

**receiving** 68:16

**Recently** 9:5

**recess** 53:15 113:6

**recognize** 17:15 56:18

**recollection** 61:7 63:8 101:14

**reconstruction** 45:14

**record** 8:11 53:18 60:12 113:9

**records** 70:2,5 103:1 104:14 124:4

**Redwine** 145:18

**refer** 29:1,9

**reference** 18:12

**references** 47:10

**referring** 18:10,11, 13 19:6 108:9 117:3,8

**refresh** 63:11,15, 19

**refreshes** 61:7 63:8 101:14

**regular** 77:13,21 87:5,13

**regularly** 79:6 87:22 120:6

**relate** 8:23

**related** 66:15

**relationship** 16:2

**relationships** 12:3

**relative** 84:8

**remember** 19:22 22:7,20 62:4,10, 13,23 63:21 88:11 101:17 109:7,12 112:1 120:9 125:15 126:7,10, 11 130:17 131:4 133:17 135:7 137:23 138:12 148:6 149:25 150:12 155:16 156:14

**remind** 9:18

**removal** 43:22 47:13

**Remove** 45:16

**renewal** 67:11

**renewals** 48:6

**renewed** 67:8

**Rentals** 121:24 122:1

**repair** 43:16 45:10

**repairs** 43:15

**repayments** 69:20,25 70:8

**rephrase** 63:14 154:4

**replace** 45:10,16

**reply** 43:4

**report** 77:22,23, 24 79:10 80:23 125:5 126:14

**reporter** 9:20 20:7 41:4,6 134:17

**reporting** 79:6

**reports** 77:13,20 78:7,15, 20,23 80:22 123:22

**represent** 23:12,14 55:11 59:19,22 62:19

**represented** 23:15 58:1 102:17

**representing** 8:9 23:11 62:25

**represents** 145:17

**request** 68:7 104:18 122:20

**requested** 157:5

**require** 81:24

**reserve** 153:18,20

**residence** 72:5

**resign** 49:15 51:15

**resigned** 51:4 59:12,13, 16 60:8 72:25 108:2 127:21 128:11

**Resolution** 134:22

**resolutions** 26:7 133:7 155:18

**resort** 94:2

**respect** 137:17 145:21

**response** 104:18

**rest** 36:23

**restaurant** 11:6,9 18:20 20:24

**restoration** 45:22

**return** 41:13,23

**revenue** 142:14

**review** 17:11 25:13 70:2 72:14 134:9,12

**reviewed** 148:25

**reviewing** 99:1 132:25 154:6

**reword** 60:14

**riding** 143:23

**road** 44:23 45:14 143:24 153:3

**roads** 43:15 44:11

**role** 11:18 12:12,18, 19 13:14 15:23 16:1 30:17 31:25 56:14,22 69:6 90:21 105:18 124:1 130:25 137:5

**roles** 12:8

**rooms** 73:11 153:8

**roughly** 69:16

**rude** 9:19

**Rudolph** 143:8 144:15

**Rudy** 13:9, 11 14:9 15:1,8,10 16:17,21 28:5,20 30:5 33:2 34:8,11 35:1,10 36:20,22 58:12 68:18,20 69:20 70:1,8,12, 14,18,20 72:18 83:2,20,21 85:7 87:4 106:14 109:13 111:18 112:5,16, 24 114:14, 23 115:9 131:15 151:25

**Rudy's** 69:13 100:22

**run** 32:25 34:13 80:22,24

**running** 79:25

**runs** 121:24

**Ruth** 17:21

**S**

**safe** 83:13 98:25

**safety** 34:20

**salary** 27:14 151:4

**sales** 90:19 136:15,25 137:8 147:16

**Sam** 22:1,2, 22 30:11 85:4 86:9 88:24 90:12,17, 18 92:12 139:21 140:2 141:3

**Sam's** 86:7

**scan** 133:5 154:24

**Scan.pdf** 25:9 131:10

**scanned** 133:21 135:13 154:25

**scanning** 134:2

**scans** 133:6

**scheduling** 15:21

**Seaboard** 93:15,21 97:10

**searched** 124:4

**season** 153:17

**Secretary** 22:8 24:9

**Selective** 129:24

**sell** 12:20 127:20

**send** 54:17, 20 104:17 133:15 150:25

**sending** 66:7 135:16 155:14

**sense** 97:8

**September** 22:10 63:4,10 65:23 66:5 87:21 91:19 92:23 93:22,23 94:23 96:24

**Sequoia** 136:21 137:13

**series** 66:2 95:15 129:15

**services** 49:6

**set** 122:6,8

**settled**

111:7 112:23

**settlement** 111:14

**shakes** 131:23

**Shane** 61:3

**sheet** 122:24 123:8,23 124:9,14

**sheets** 78:10

**shift** 49:5

**Shoreline** 45:4

**short** 132:10

**shortfall** 31:6 32:8, 17

**shortly** 23:20

**Shots** 95:3,5

**shove** 44:7, 9,10 47:21 63:4 66:14 152:15 153:13

**show** 25:12 58:25 61:6 63:7 64:7 65:7 84:15 91:17 95:23 100:13 104:24 106:6 113:15 120:1 131:13

**showed** 25:2 45:9

**shows** 67:1 110:16

**sic** 46:13 92:23

**side** 103:5

**sign** 41:13, 23 56:19 58:17 61:13 62:11,15 83:6,8,16, 18,20,23, 24 103:19 109:9 110:12 114:5 133:10,12 156:15 157:5

**signature** 17:18 61:14,18 106:3,7,22 107:8,12 109:7,22 113:20,25 114:20 118:25 133:8,9 134:5 155:21,24 156:6,10

**signatures** 27:2 113:19 155:20

**signed** 17:20 26:7 41:17 55:23 56:4,8,12, 23,25 57:6,14,22 59:1,5 60:23 62:13 106:21 107:4,24 108:6,11 109:12,16 110:2 114:14,15, 24 115:3 119:11 134:6 135:2,5,6, 8,11,13 155:23

**signer** 106:11 108:15,20

**signing** 63:12,16 106:23 107:18 109:7 110:16 135:7

**signs** 83:4, 9,21 114:3

**similar** 9:7

**situation** 88:21 99:8

**small** 23:9 128:15 142:12

**smaller** 11:23

**snapshot** 65:4 78:6

**Soccer** 95:3, 5

**sold** 136:21 137:15 139:1,6

**sole** 102:11 103:6,15

**solely** 121:10

**solve** 34:14

**somebody's** 150:10

**someone's** 75:7

**sooner** 77:20

**sort** 10:3 11:21 12:2 37:7,10 43:13 55:20

58:18 71:11 77:24 79:6 99:3 136:5 152:13

**sound** 126:1

**source** 60:7

**Southern** 136:14

**Spark** 84:1 89:12

**speak** 14:24 49:24 99:16,17

**speaking** 145:10

**specific** 76:17 81:12 95:21 144:16 146:25

**specifically** 154:15

**specifics** 143:12

**spend** 76:3

**spends** 76:7

**spent** 48:17 85:16

**spoke** 146:7, 9

**spring** 12:15,16 13:13,24 14:5,8,11, 14 15:5 16:4,6,11, 16,19 25:5 26:2 62:5, 6 151:14, 24

**stabilization** 45:4

**staff** 46:22 132:17

**stage** 43:1

**Stamp** 98:15

**stamped** 97:18

**stand** 63:20 126:5

**start** 19:1 20:12 23:18 92:13,24 138:1 139:3

**started** 11:3,24 12:7 19:18 27:18 31:23 61:23 67:16 71:20,22 72:1 103:23 104:6 105:13 106:17 136:6,8

**starting** 97:17 109:9 118:24 132:21

**startup** 142:9

**state** 22:8 56:8 79:20 100:8 108:23 153:10

**State's** 24:10

**state-** 95:15

**statement** 48:1 87:16 88:6 90:11,13 95:16 104:21 105:2 116:21 119:22 122:23

**statements** 46:17 77:18 78:8 84:5,13 87:1,8,23 88:1 90:8 91:9,13,18 116:25 120:2,7 149:1 154:6

**states** 31:11

**step** 12:11 137:21 138:8,11

**stepped** 50:13 62:16,20 138:3

**stepping** 50:8 56:22 57:2

**Steve** 140:10,12, 13 141:25

**stone** 86:19

**stop** 63:23

**stopped** 25:6 103:15 107:16,18

**store** 37:12 93:23

**storm** 44:10, 11 152:15 153:17,24

**storms** 153:15

**strange** 91:6

**stress** 50:5,

14 138:6

**strike** 65:19 144:10

**String** 38:18 61:2 63:3 65:22 129:10

**Strings** 38:17

**strong** 51:10 64:24

**stuff** 32:24 49:11 111:6 136:20 151:1

**subcontract** 153:4

**Subcontractor** 52:11

**Subject** 25:9 38:18 61:3 63:4 64:4 65:23 101:10 129:11 131:10

**submitted** 39:14 130:6 134:11

**substance** 10:3

**Substitute** 109:23

**summer** 50:8, 10 62:4,6

**suppose** 108:14

**surprise** 50:25 51:6 56:20 57:24 89:18 90:4 94:5

**surprising** 86:20

**swirls** 156:5

**sworn** 8:4

**systems** 45:6

**T**

**takes** 64:8

**taking** 49:18 142:25

**talk** 9:9 15:11,15, 18,20

**talked** 82:22 131:5

**talking** 15:7

**team** 142:22

**telling** 38:2 41:23 63:21 64:19

**tells** 43:3

**ten** 64:24

**tend** 98:9

**terms** 101:21

**testified** 8:5 67:5 68:16 72:6 79:12

**testify** 10:6 79:17

**testify-** 68:18

**testifying** 145:25 147:7

**testimony** 144:3,12, 15 145:24

**thin** 151:16

**thing** 25:1 27:23 90:20 115:18 120:16 136:12

**things** 13:21 33:18 49:2 73:7,12 77:3 86:15 136:4 144:23 146:24 147:16 153:9

**thinking** 19:12,14 51:8

**thinks** 33:2 38:11

**thought** 25:5 93:9

**thousand** 34:9 68:16,21 82:17 118:14 120:21

**three-** 69:17

**three-man** 153:3

**three-month** 91:1,3

**tied** 154:11

**tight** 77:4

**time** 9:19, 23 11:5,22 18:12 20:7 22:4 31:25 35:13 41:6 42:5 49:17 62:1,8,10 64:18 87:15 89:17 92:3 94:16 103:25 105:17,18, 22 111:22 112:25

115:7,10, 13 118:4 120:9 125:15 126:2,7 132:10 137:5 138:13 146:7 151:11 155:8

**times** 9:3 15:12 77:4,7

**title** 12:23 16:1 58:18

**today** 8:13 10:6 40:3 81:2 132:19 144:3,12, 15,19 145:24 147:1,20

**told** 33:4 37:24 38:12 51:11 63:23 147:11

**top** 12:13 33:11 38:17 47:23 96:1 108:22 116:5

**total** 79:25

**town** 10:18

**Toyota** 127:17

**tracking** 142:13

**traffic** 30:15 44:25

**tran-** 117:5 141:16

**transactions** 92:14,15 141:17 144:5,8

**transfer** 117:12 118:13,20 119:13 120:21

**transfers** 116:17 117:6 119:6 120:25

**Transportation** 66:9

**tree** 11:22 43:21,22, 24 47:12 49:5,11

**trimming** 43:24

**trips** 74:22

**Trisure** 129:23

**truck** 18:20 19:19,24 20:2,23 74:16,17 75:12 138:19,20, 25 140:8

**trucked** 153:10

**trucks** 74:23 127:25

**true** 47:25 68:11

**trustee** 8:9

**Turks** 94:2

**turn** 20:15 92:5 146:17 149:11

**two-and-a-half-year** 69:17

**type** 32:6 73:4 81:22 99:8

**types** 43:16 49:2,6 83:6

**typical** 23:3,6 65:8,14, 16,18 73:11 85:24 89:24 121:6

**typically** 39:23 73:9 77:5 80:9, 24 86:17 87:6,10 126:4

**U**

**U.S.** 59:3

**Uh-huh** 8:16 9:11 13:20 14:1 17:13 24:8,12 25:3,18 26:5 34:15 39:16 40:4,11 41:16,19 43:25 44:8 46:16 47:15 49:9 52:6 55:25 69:15,18 77:19 84:7,11,19 85:3 89:2 92:4,16,19 98:19 103:10 106:9 108:4

110:8 111:25 114:10,19 116:14 119:10 120:18 123:9 124:17 141:23 149:19 152:17 153:7 154:7,10 155:19 157:2

**Uh-uh** 146:4 150:15 156:11

**ultimately** 28:10

**unauthorized** 88:17

**understand** 60:4,13 79:1 89:10 105:6 111:17 121:10 135:15 154:3

**understanding** 113:3 137:15 143:6

**United** 121:24 122:1

**unsigned** 155:17

**unusual** 65:19

**utilize** 147:24

**V**

**vacation** 89:4

**valid** 87:2

**variables** 88:23

**varies** 81:22 86:3

**vary** 86:3

**vehicle** 74:12,20, 24 75:12, 14 136:11 139:5,6

**vehicles** 75:4 127:13,15, 20,24 137:10

**venture** 18:18

**ventures** 16:23 17:1 18:3,9

**verbal** 9:10

**verify** 87:1 90:8

**version** 135:10,12

**versus** 82:2, 7

**view** 76:25

**Virginia** 32:19,21

**W**

**W-2** 152:1

**W-9** 109:23

**wait** 93:8

**Wake** 93:23 150:11

**Wakemed** 96:9

**walking-around** 154:2

**wall** 45:24

**Waller** 95:20,23 134:19 145:11 155:25

**wanted** 33:7

**water** 53:12

**WBE** 32:13

**wears** 34:11

**weather** 44:12

**web-based** 71:1

**week** 14:25 15:8,9,12 27:11,12 34:9,21 35:1,4,8 49:22 58:22 59:8 68:17,21 76:4,10 115:16 146:10 151:4

**weekend** 34:12

**weekends** 74:22

**weekly** 14:18,24 15:8 27:10 151:4

**weeks** 15:13 143:19

**Wetlands** 45:22

**whatnot** 98:13

**whatsoever** 100:24

**When's** 146:7 151:11

**whichever** 75:13

**Whoever's** 83:8

**Wine** 93:15, 21 97:10

**winter** 62:5

**withdrawals** 152:10 153:17 154:9

**withdrew/ transferred/ debited** 120:15

**withholding** 151:20

**women-owned** 32:13

**wondering** 154:12

**word** 56:18 110:21

**worded** 60:3

**words** 19:12 80:15

**work** 11:7, 9,17,22 31:10 32:6,25 34:22 35:16 43:21 49:5 51:22 66:14 73:8 74:16 77:1 97:4 121:18 133:24 146:14 153:12

**worked** 10:20 20:13 44:4 137:9 139:10

**working** 11:3 18:25 49:21,25 50:5 67:16 127:5 136:6,8

**workload** 15:14

**works** 30:14 35:2,5,9 50:1

**worth** 86:8 142:16

**write** 19:9 39:22 68:2,4

**written** 115:6,7, 10,13,15

**wrong** 40:24 41:8 60:2 98:3

**wrote** 17:24 19:11,12 69:23 70:3 110:21

**X**

**X5** 75:6

**Y**

**y'all** 147:24 148:9

**year** 12:15 39:1 42:2, 4 45:8 46:15 48:8,9 51:8 54:2, 3,21 62:1 64:23 66:25 77:3 78:20 87:19,22 123:11 124:25 136:23 142:14,18

**year-over-year** 78:13

**yearly** 48:6 76:12 77:17 130:21,23 149:21

**years** 10:15, 21 11:5,24 12:7 48:17 61:23 63:22

**yesterday** 64:22

**young** 142:11,12